# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| **EDWARD G. BERNARD, JR.,** | **Case No. 1:03-cv-0531-AMD** |
| **Plaintiff,** |  |
| **v.** |  |
| **CALHOON MEBA ENGINEERING SCHOOL,** |  |
| **Defendant.** |  |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant Calhoon MEBA Engineering School ("CMES"), and moves the Court pursuant to FRCP 56(e) for summary judgment on both counts set forth in the Complaint of Plaintiff Edward G. Bernard, Jr. ("Mr. Bernard"), a copy of which together with Defendant's Answer is attached hereto, on the following grounds:

1. Plaintiff cannot establish two of the critical elements of a prima facie case that CMES violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq., ("Title VII") because of a racially hostile environment, as alleged in Count I, because the scattered incidents of racial remarks by a co-worker were not sufficiently severe or pervasive to create an objectively hostile environment, and Mr. Bernard's resentment of management's efforts to investigate his complaints cannot form the basis for a hostile environment claim. Even if a prima facie case could be established, however, there is no basis for imposing liability on CMES because it took prompt and effective remedial action.

2.Plaintiff cannot establish two of the critical elements of a prima facie case of retaliation in violation of Title VII, as alleged in Count II, because CMES took no adverse action against him and he cannot establish a causal connection between his complaints and any of the events that he argues constitute adverse action.  Even if a prima facie case could be established, however, CMES has articulated sound business reasons for its actions and there is no evidence that could establish that those reasons are a pretext for discrimination.

WHEREFORE, Defendant CMES respectfully prays that the Court grant it

summary judgment dismissing both Counts of the Complaint herein.

Dated:    Washington, D.C.                    Respectfully submitted,
          October 10, 2003

                                              BEINS, AXELROD, KRAFT, GLEASON & GIBSON,
                                              P.C.


                              By:_____
                                     Barbara Kraft, Esq.
                                     1717 Massachusetts Avenue, N.W., Suite 704
                                     Washington, D.C. 20036-2001
                                     Attorneys for Defendant
                                     CALHOON MEBA ENGINEERING
                                     SCHOOL


                              VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.


                              By:_____
                                     Neal I. Korval, Esq.
                                     Jonathan A. Wexler, Esq.
                                     805 Third Avenue
                                     New York, New York  10022
                                     Telephone:  (212) 407-7700
                                     Facsimile:  (212) 407-7799
                                     Attorneys for Defendant
                                     CALHOON MEBA ENGINEERING
                                     SCHOOL

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **EDWARD G. BERNARD, JR.,** | **Case No. 1:03-cv-0531-AMD** |
| **Plaintiff,** | |
| **v.** | |
| **CALHOON MEBA ENGINEERING SCHOOL,** | |
| **Defendant.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

SUMMARY OF ARGUMENT1

PROCEDURAL HISTORY2

STATEMENT OF FACTS2

ARGUMENT16

I.SUMMARY JUDGMENT STANDARD16

II.PLAINTIFF HAS FAILED TO ESTABLISH A CASE OF HOSTILE WORK ENVIRONMENT17

A.Plaintiff Cannot Establish a Prima Facie Case of Racial Harassment17

1.Mr. Helms' Scattered Remarks Are Insufficient To Constitute A Racially Hostile Environment18

2.Mr. Bernard's Resentment Of Management's Efforts To Assure That There Was No Recurrence Cannot Form The Basis For A Hostile Environment Claim20

3.There Is No Basis For Employer Liability21

B.Management's Prompt and Effective Remedial Action Precludes Liability21

III.PLAINTIFF CANNOT ESTABLISH A CLAIM FOR RETALIATION24

A.Plaintiff Cannot Establish A Prima Facie Case Of Retaliation24

1.There Was No Tangible Job Detriment Involved In Any Of The Incidents That Mr. Bernard Claims Are Retaliatory24

a.There were no adverse consequences to the discipline, meetings, or criticism24

b.The assignment to the grounds crew was within the scope of Mr. Bernard's ordinary duties26

2.There Is No Nexus Between Mr. Bernard's "Protected Activity" And Any Of His Issues With Mr. Shafer Or Mr. McNally28

B.Even If Plaintiff Could Establish A Prima Facie Case, Defendant CMES Has Articulated Sound Business Reasons For Each Of The Actions Complained Of, And Mr. Bernard Cannot Create A Triable Issue That Any Of Them Is A Pretext For Retaliation31

CONCLUSION34

TABLE OF AUTHORITIES

**Cases**          **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986) .......... 16

Carter v. Ball, 33 F.3d 450 (4th Cir., 1994) ............................................................. 18, 32

Carter v. Morgan, 34 Fed.Appx. 427,(4th Cir., 2002) ................................................. 17

Causey v. Balog, 162 F.3d 795 (4th Cir., 1998) ...................................................... 17

Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) .................... 16

EEOC v. R&R Ventures, 244 F.3d 334 (4th Cir., 2001) ............................................. 19

Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed2d 662 (1998) .......... 18

Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L,Ed,2d 295 (1993) ............. 17, 18

Hartsell v. Duplex Prods., Inc., 123 F.3d 766 (4th Cir., 1997) ................................... 19

Larkin v. Perkins, 22 Fed.Appx. 114 (4th Cir., 2001) ............................................. 28

Leeper v. Duke Energy Corp., 54 Fed.Appx. 180 (4th Cir., 2003) ........................................ 22, 23

Lissau v. Southern Food Service, Inc., 159 F.3d 177 (4th Cir., 1998) ......................................... 18

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 89 L.Ed.2d 538,
    106 S.Ct. 1348 (1986) .............................................................................. 16

Matvia v. Bald Head Island Management, Inc., 259 F.3d 261 (4th Cir., 2001) .......................... 24

Mezu v. Dolan, 2003 U.S. App. LEXIS 19528, *5-*6 (4th Cir., 2003) ....................................... 20

Mezu v. Morgan State Univ., 264 F.Supp.2d 292 (D.Md., 2003) .............................................. 20

Mikels v. City of Durham, N.C., 183 F.3d 323 (4th Cir., 1999) ................................................. 21

Munday v. Waste Mgmt. Of North America, Inc., 126 F.3d 239 (4th Cir., 1997) .................... 25

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998,
    140 L.Ed.2d 201 (1998) ........................................................................... 18

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097,
    147 L. Ed. 2d 105 (2000) ......................................................................... 32

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

Reinhold v. Com. Of Virginia, 151 F.3d 172 (4th Cir., 1998) ...................................... 28

Spears v. Missouri Dep't of Correction & Human Res., 210 F.3d 850 (8th Cir., 200) .............. 25

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089,
    67 L.Ed.2d 207 (1981) ............................................................... 31

Thompson v. Potomac Electric Power Co., 312 F.3d 645 (4th Cir., 2002) ................................ 25

Trusty v. State of Maryland, 28 Fed.Appx 327 (4th Cir., 2002) ........................................... 16, 19

Von Gunten v. Maryland, 243 F.3d 858, 870 (4th Cir., 2001) ......................................... 17, 18, 24

Defendant Calhoon MEBA Engineering School, hereinafter ("CEMS") hereby submits in Memorandum of Points and Authorities In Support of Its Motion For Summary Judgment on both counts of the complaint of Plaintiff Edward G. Bernard, Jr., hereinafter ("Plaintiff" or "Mr. Bernard").

## SUMMARY OF ARGUMENT

Plaintiff cannot establish a prima facie case of hostile work environment against CMES, so Count I must be dismissed. The scattered remarks of a single coworker are not sufficient to constitute a work environment that a reasonable person would find to be hostile or abusive. Likewise, Mr. Bernard's resentment of the efforts by the School's management to assure that there was no recurrence of the remarks cannot form the basis for a hostile environment claim. Even if the remarks of Mr. Bernard's coworker could suffice to create a legally cognizable hostile environment, however, the School's management took prompt remedial action and the alleged harassment never recurred.

Count II should be dismissed because Mr. Bernard suffered no retaliation as a result of his complaints. The alleged retaliatory incidents did not result in any tangible change in the terms, conditions or benefits of his employment. Neither the warnings that Mr. Bernard was given for attendance, conduct or job performance, nor any of the meetings that he was required to attend, resulted in any tangible employment consequences, and the assignment to the grounds crew was within the scope of Mr. Bernard's ordinary job duties. Because of this fact, and because there was no causal relationship between Mr. Bernard's complaints and his issues with the School's supervisory personnel, Mr. Bernard cannot establish a prima facie case of

1

retaliation against CMES. Finally, even if one or more of the alleged retaliatory actions could

form the basis for a prima facie case, CMES has articulated sound business reasons for each of

the actions complained of, and Mr. Bernard cannot create a triable issue that any of them was a

pretext for retaliation.

## PROCEDURAL HISTORY

The Complaint in this matter was filed and served on or about February 27, 2003. It

contains two counts. Count I alleges that CMES created a hostile working environment for Mr.

Bernard based on his race, because of certain statements by a co-worker, William Helms, in

violation of Title VII. Count II alleges that CMES retaliated against Mr. Bernard because he

complained about the hostile work environment by deducting money from his pay, demoting

him, giving him warnings and "other acts."

The parties exchanged documents. Plaintiff took the deposition of Dawn Trumps, the

Human Resources Manager for CMES, and CMES took the deposition of Mr. Bernard.

## STATEMENT OF FACTS

### The Hiring Of Mr. Bernard By CMES

Plaintiff was hired by CMES on November 13, 2000, in the Maintenance Department, for

building and general services. The Maintenance Department is responsible for landscaping,

snow removal (on a seasonal basis), maintenance and repair of boats, and maintenance of

vehicles. In about July, 2001, Mr. Bernard was assigned to the maintenance of the School's fleet

of boats. Mr. Bernard did not regard this assignment as being motivated by his race.

(Defendant's Statement of Uncontested Facts, hereinafter "Facts," ¶¶ 1, 3, 5.)

Mr. Bernard's resume bears the notation "Re: Caretaker," and discloses that Mr.

Bernard's varied previous experience included time spent working as an apartment caretaker,

groundskeeper, foreman and landscape and lawn care technician. In a job description prepared

by his supervisor, in May, 2002, Mr. Bernard's position was described as consisting of mechanical work on the School's fleet of trucks and grounds equipment, being responsible for the maintenance and cleaning of the boats on a daily basis, helping with safe boating classes and signing of boat float plans, trimming and fertilizing of trees, flowers and bushes on campus grounds, and performing bike repair when necessary.  (Facts, ¶¶ 4, 6.)

### CMES' Policy Against Discrimination and Harassment

CMES has an employee handbook which includes a policy entitled "Equal Employment Opportunity and Anti-Harassment Policy," which Mr. Bernard acknowledged by signature and subsequent testimony that he understood.  He also attended a training class on its contents.  The Human Resources Manager, Dawn Trumps, meets with all newly hired employees to do an orientation with the employee handbook, and conducts training for supervisors on such topics as harassment, ADA and FMLA.  Prior to Mr. Bernard's complaint of September 3, 2002, she had most recently conducted training about harassment in the workplace in February of 2002. (Facts, ¶¶ 8, 10, 11.)

The Policy provides that anyone who believes he or she has been subjected to conduct that may violate the Policy should report that conduct to the Human Resources Manager or the Director of the School.  When Ms. Trumps, visits the School, her availability is publicized via the School's internal television monitors, which are found throughout the School buildings.  Her job includes the investigation of complaints of racial discrimination as they are brought to her attention, whether from the employee, a supervisor or the Director of the School.  (Facts, ¶¶ 9-11.)

In addition, John McNally, the Facilities Manager, distributed a document that listed the use of cultural slurs, disrespectful comments, putdowns, harassing language/actions and other conduct, such as using racial slurs and sexual inferences, as behavior not meeting CMES'

expectations.  Mr. Bernard acknowledged that Mr. McNally discussed the contents of this document with him.  (Facts, ¶12.)

### The EEOC Charge and Alleged Racial Remarks by William Helms

On about October 23, 2002, Mr. Bernard filed a charge with the EEOC alleging that, shortly after he began working for CMES in November, 2000, he had been subjected to verbal harassment from a co-worker, William Helms, in the form of racially derogatory comments and jokes.  His charge also alleged that, despite complaining to management and Human Resources, the harassment continued and created a hostile environment.  On November 27, 2002, the EEOC determined that it could not conclude that the information obtained in its investigation established violations of Title VII.  (Facts, ¶13.)

Helms' "jokes" allegedly consisted of the following:  (1) how do you get a black man out of a tree - - you cut the rope;  (2) how do you know how well a black man is hung - - by how tight the rope is around his neck; and (3) "Ed [Mr. Bernard], I'm going to tell you right now, I think they're [i.e., the School's management] trying to make us their niggers."  On September 3, 2002, Bernard complained about the "jokes" to his supervisor, Mr. Shafer.  (Facts, ¶14)

In July 2003, according to Mr. Bernard, Helms repeated the third of these "jokes," – phrased by Mr. Bernard as, "Ed, excuse my French, but they're trying to make us all their niggers" – within the context of an offer to testify on Mr. Bernard's behalf against CMES. According to Mr. Bernard's own testimony, he actually found the remark somewhat amusing on this occasion; "I'll admit on that I kind of chuckled when I walked away."  (Facts, ¶15.)

Mr. Bernard also claims that, when he was hired in November 2000, Helms told him "You know what Ed, you're all right for a black boy," although he made no reference to this incident in his complaint of September 3, 2002.  Finally, according to Mr. Bernard, Helms at one point prior to September 3, 2002, said to him, "Bend over, I need me a black boy today,"

although he did not reference this remark in his September 3 complaint, either. These six remarks by Mr. Helms were the only racial remarks Mr. Bernard claims to have heard during his entire employment at the School. (Facts, ¶¶16-18.)

### Mr. Bernard's Complaint to Mr. Shafer and Helms' Apology

On September 3, 2002, Mr. Bernard complained to Mr. Shafer that he and another African-American employee were "tired" of Mr. Helms' making racial remarks toward them, despite the fact that Mr. Shafer was clearly not one of the individuals designated by the Policy as the appropriate recipient of discrimination complaints. Although Mr. Bernard had complained to Mr. Shafer prior to this meeting about how Mr. Helms was talking about him behind his back and criticizing his work, and also about his jokes, this was the first occasion on which he brought any allegations of racial harassment to the attention of Mr. Shafer or any other managerial personnel. (Facts, ¶¶ 9, 19, 20.)

Mr. Bernard had previously complained about the racial remarks of Mr. Helms to two African-American employees, Vernon Freeman and Kevin Young. Their response was, "That's how Will is. We all joke around like that." Indeed, according to Mr. Bernard, Mr. Helms and Vernon Freeman socialize together, and would describe themselves as friends. (Facts, ¶21.)

After hearing Bernard's complaint on September 3, 2002, Mr. Shafer immediately called Mr. Helms in, and confronted him. Mr. Helms apologized to Mr. Bernard, although Mr. Bernard later said he was dissatisfied with the quality of Helms' apology. (Facts, ¶22.)

### Ms. Trumps' Investigation and Follow-up by Ms. Matthews and Ms. Trumps

After learning via voice mail from Mr. Shafer on September 3, 2002 that Mr. Bernard had complained of race discrimination, Ms. Trumps arranged to be at the School the next day to address Mr. Bernard's complaint. In recounting Mr. Helms' behavior to her, Mr. Bernard related only the August 30 comment. He acknowledged that Mr. Shafer had had Helms apologize to him and shake his hand, but told Ms. Trumps that he was not satisfied with that alone. (Facts, ¶23.)

Ms. Trumps told Mr. Bernard that Mr. Helms' August 30 remark was inappropriate, that the School did not tolerate racial remarks, and that his fears that Mr. Helms could get him fired were unfounded. She informed Mr. Bernard that she was going to speak to Helms and take further action if anything else occurred. Ms. Trumps also emphasized to Mr. Bernard that he should let her know if anything else actually did occur. Mr. Bernard appeared satisfied with their conversation, and told Ms. Trumps that he was glad he had spoken with her, and that he did not feel that the matter needed to be pursued further. (Facts, ¶23.)

Mr. Bernard also told Ms. Trumps that he had contacted an attorney who had advised him to file a complaint with the Maryland Human Relations Commission, and that they had discussed what constituted a hostile environment. Ms. Trumps told Mr. Bernard that she did not feel that Mr. Helms' remark employing a racial epithet, followed by his apology, rose to the level of a hostile work environment. Mr. Bernard testified that he then concluded that Ms. Trumps was a racist, on the basis of the informal interpretation of the law she offered to him on this occasion. (Facts, ¶24.)

Ms. Trumps also met with Mr. Helms on September 4 and obtained his assurance that the racial joking about which Mr. Bernard had complained would never happen again. She nonetheless told him that the incident would be documented and become a permanent part of his file, and warned him that further incidents would lead to further discipline. (Facts, ¶25.)

On the afternoon of September 6, the School's Director, Ms. Matthews met with the rest of the Maintenance Department, and reminded them about respecting one another and not participating in rumors, abusive language, name-calling, racial or sexual harassment or any type of discrimination.  Mr. Bernard asked to be excused from this meeting, but Ms. Matthews met with him personally and assured him that racially offensive language would not be tolerated and that he should report any such behavior directly to her or Ms. Trumps.  (Facts, ¶26.)

Ms. Trumps and Ms. Matthews had another meeting with Mr. Helms, as well as Mr. Bernard, on October 10 because of a remark that Helms had supposedly made to another African-American employee and that Mr. Bernard had heard about second-hand and reported. The meeting with Mr. Bernard was also intended to address certain threatening statements he had made regarding Mr. Helms in an October 4 meeting with Ms. Trumps and Ms. Matthews. (Facts, ¶28.)

After their first conversation on September 4, 2003, Ms. Trumps held several follow-up meetings with Mr. Bernard in October, and subsequently, in an effort to ensure that there was no recurrence of the offensive remarks.  Ms. Matthews, the Director of CMES, also held follow-up meetings with Mr. Bernard.  No further racial comments were ever made to Mr. Bernard, except for Mr. Helms' repetition of the "Ed, excuse my French" remark in July, 2003.  Mr. Bernard does not claim that he reported this comment to anyone at the School[1],  and he agreed that he neither heard nor reported any additional remarks.  (Facts, ¶¶ 27, 29, 30.)

Mr. Bernard regarded these efforts by Ms. Trumps and Ms. Matthews to assure that there was no recurrence of the racial remarks in a negative light:  "[t]hey were always calling me in the office every now and then asking me if there was any more jokes or anything like that. . . . It

---

[1] Mr. Bernard also said that a co-worker had commented on Mr. Bernard's having a white girlfriend by saying in passing "Ed, you like those white women."  (Bernard, p. 152.)

made me paranoid." Indeed, the basis for Mr. Bernard's assertion in his October 22, 2002 EEOC charge that the hostile environment continued to that date was nothing more than "[t]he constant drilling and asking me questions", and after he filed that charge, he refused to cooperate further in Ms. Trumps' investigation. (Facts, ¶¶31, 32.)

## Alleged Retaliation

Mr. Bernard filed a second discrimination charge with the EEOC on April 10, 2003. In it, he asserted that he had been retaliated against by being demoted and by being given two written warnings.

### Assignment to Grounds Crew ("Demotion")

In November, 2002, Mr. Bernard was assigned to work on the grounds crew, a part of the Maintenance Department in which he was employed. The assignment was not a demotion, but had been necessitated by a vacancy caused by a co-worker's illness, as was stated in the memo that recorded the assignment. It was a temporary assignment, lasting for only three weeks, and did not involve changing Bernard's job title. Nevertheless, Mr. Bernard regarded it as a demotion, even though there was no cut in pay or benefits and he continued to have some responsibility for the vehicles and motors. (Facts, ¶¶ 34, 35, 38.)

The boats for which Mr. Bernard had primary responsibility are taken out of the water at the end of October. Maintenance work on the boats continues in a seasonally reduced form after that point. Mr. Bernard performed maintenance work on the boats in November, 2002, continuing with his regular, though reduced, responsibilities. (Facts, ¶36.)

The grounds crew work, which Mr. Bernard had performed in the past, involved additional responsibilities, namely the servicing and winterizing of tractors, necessitated by the change in season. Mr. Bernard has acknowledged that he did not take issue with the additional duties themselves, but with the fact that they were not accompanied by a pay raise. He also

believed that the grounds crew assignment interfered with his ability to get his work as a mechanic done. His resume and job description notwithstanding, he felt that working on the boats and grounds crew was not what he was hired to do and that the School was guilty of "false advertising." (Facts, ¶¶ 37, 39.)

**Warnings About Attendance**

Under the CMES Attendance and Leave Policy in effect in 2002, employees were required to exhaust all forms of paid time off and vacation time before any unpaid absences were allowed. After an employee exhausted all of his paid time off, all incidents of unpaid absences, lateness or early leave were to be documented, and the School would impose progressive discipline. Unscheduled absences were required to be reported to the Office Manager within one hour of the start of the employee's shift. (Facts, ¶40.)

Mr. Bernard received a warning dated September 25, 2002 for accumulating six incidents of unpaid and unscheduled absence under the School's attendance policy, which he signed because he regarded the warning as neither inaccurate nor racially motivated. On December 9, 2002 Mr. Bernard received another warning, this time for having accumulated seven incidents. Ms. Trumps later rescinded this warning because Mr. Matthews had decided to credit certain of these absences as vacation days, as discussed in the section titled "'Deduction' From Pay," below. (Facts, ¶¶41, 42.)

Mr. Bernard received a warning on November 26, 2002, not for an absence, but for failing to call in on November 15, 2002, to tell his manager he would be absent. Mr. Bernard felt that the warning was unfair, and refused to sign it, claiming that his manager had driven him to the hospital the day before and knew that he wouldn't be in on November 15. He also claimed that the fact of his absence was posted on a magic marker board in the office of his immediate supervisor. (Facts, ¶43.)

In February, 2003, the School instituted a revised attendance policy, based upon a rolling point system. On May 15, 2003, Mr. Bernard received a "first" warning for having accumulated four points under the new system. He claims to have signed it only because he didn't understand the new policy, although it had been explained to him by Ms. Trumps. On July 21, Mr. Bernard received another "first" warning for having accumulated four points under the new absenteeism policy. He agreed that he was deserving of this warning, since he had been taking off time to look for another job. At no time, did any of these warnings serve as the basis for any tangible employment action being taken against Mr. Bernard. (Facts, ¶¶44, 45.)

**Concerns About Mr. Bernard's Threatening Language Regarding Helms**

At the follow-up meeting on October 4, 2002 among Mr. Bernard and Ms. Trumps and Ms. Matthews, Mr. Bernard made the following two statements as recounted by Ms. Trumps: (1) "I'm very stressed. This is what spawns people to go postal." (2) "I'm not a violent person. If I would have done something, I would have done something before now. One day I may come in here and climb Will Helms like a tree and snap his neck like a branch." Mr. Bernard elaborated at deposition that "I said I understand how a postal workers are like they are," and "I said if I was a violent person I would have already climbed Will Helms like a tree." (Facts, ¶¶46, 47.)

Because Ms. Trumps and Ms. Matthews reasonably believed that Mr. Bernard had threatened Mr. Helms with violence, they held a follow up meeting with him on October 10. After discussion, Mr. Bernard told Ms. Trumps and Ms. Matthews to write up "whatever and I'll sign it." Ms. Trumps composed a memo for Mr. Bernard's signature, reflecting their belief that his statement constituted an assurance not to act upon the threats that he had made. Despite Mr. Bernard's refusal to sign this memo when it was presented to him, CMES did not discipline him because Ms. Trumps and Ms. Matthews accepted his assurances that he was not going to act violently. (Facts, ¶¶48, 49.)

**"Deduction" from Pay**

In early December, 2002, a week's pay was "deducted" from Mr. Bernard's paycheck. As explained by Ms. Trumps, an adjustment had been made to Mr. Bernard's check, to compensate for mistakenly paid holiday and vacation pay. This adjustment caused him to complain to Ms. Matthews because he had not understood the technicalities of CMES' attendance policy and had already spent the money on Christmas presents. Ms. Matthews promptly reversed the decision on humanitarian grounds, and Mr. Bernard was paid the vacation pay that he hadn't actually accrued, as well as the holiday pay that been deducted for his failure to timely present a doctor's note. Thus, Mr. Bernard received back all of the money that had been deducted within about a week, despite the fact that only a portion of it was actually due him. (Facts, ¶50.) (As noted above, because the absences were now credited as vacation, Ms. Trumps also rescinded an attendance warning notice.)

**Job Performance Issues and Conflicts with McNally and Shafer**

John McNally was hired as Facilities Manager in February, 2003. As a new manager, he was enthusiastic about streamlining operations at CMES, and his enthusiasm resulted in friction with employees other than Mr. Bernard. Ms. Trumps and Ms. Matthews both advised him to "slow down a little bit, not specifically with Ed [Bernard] but with everybody in general." (Facts, ¶51.)

On February 19, 2003, Mr. McNally gave Mr. Bernard a verbal warning because of a confrontation Mr. Bernard had had with his supervisor, Bob Shafer, about shoveling snow. Mr. Bernard did not believe the warning to have been racially motivated or retaliatory, but instead attributed it to Mr. McNally's not fully understanding the situation. Mr. McNally counseled both Mr. Shafer and Mr. Bernard about their behavior. His notes also reflect concern that Mr. Bernard was not readying the boats for the return to water on May 1. (Facts, ¶¶ 52, 53.)

Mr. Bernard testified that he regarded Mr. McNally as a racist because of an incident on March 13, 2003, in which Mr. McNally asked him to pick up a cardboard box and, as Mr. Bernard admitted, he failed to do so. That incident led to a series of discussions between Mr. McNally and Mr. Bernard on the same day, in which Mr. McNally attempted to communicate his concerns about Mr. Bernard's performance, and Mr. Bernard expressed dissatisfaction with the way he had been treated. These conversations ended with the two shaking hands and agreeing to be more open in communications with each other. (Facts, ¶¶ 54,55.)

Mr. Bernard failed a safe boating course, but denied that he failed it on purpose, though he "didn't give it 100 percent." Although everyone in the Maintenance Department took the safe boating course together, Mr. Bernard felt that his being forced to take the test was racially motivated because he did not want to work on the boats and did not want to operate the boats in any capacity. (Facts, ¶56.)

On April 9, 2003, Mr. McNally met with Mr. Bernard and Mr. Shafer, in order to inform Mr. Bernard that he was aware of his complaint in the fall of 2002 and to ask if he had experienced any discriminatory, retaliatory, offensive, vulgar or other inappropriate behaviors since Mr. McNally's arrival. Mr. Bernard said he had wondered whether Mr. McNally's asking him to keep a log of his boat activities, meet with him weekly and prepare weekly boat reports was retaliatory, and Mr. McNally assured him that he had been asked to do these things because of Mr. McNally's own inexperience in working with boats, and that Mr. Bernard was not the only mechanic whom he had questioned. (Facts, ¶57.)

At the same meeting, Mr. Bernard said he had not been subjected to any subsequent inappropriate behavior, and that he had not reported any inappropriate behavior to anyone at the School. He did say there had been additional incidents, but that he had reported them only to his lawyer and he refused to discuss the incidents further or to meet with Mr. McNally and Ms.

Matthews to discuss them.  Mr. McNally informed Mr. Bernard he planned to ask periodically about whether there had been additional incidents, and assured him that he would do everything in his power to make his work environment easy and comfortable for Mr. Bernard.  He also reiterated to Mr. Bernard and Mr. Shafer that inappropriate behaviors would not be tolerated, and reminded Mr. Bernard of the Staff Performance Indicators/Customer Service Behavioral Indicators.  (Facts, ¶57.)  On April 14, 2003, Mr. Bernard met with Mr. McNally and Ms. Matthews to discuss his claim in the April 9, 2003 meeting that incidents had occurred after his September 2002 complaint.  Both again reassured him that the School would not tolerate inappropriate racial behaviors, but Mr. Bernard again refused to discuss any incidents.  (Facts, ¶58.)

On June 10, 2003, an incident occurred between Mr. Bernard and Mr. McNally, regarding measuring the fuel level of the Ketch, one of the Schools' boats.  Mr. McNally had asked Mr. Bernard to check the fuel level on the Ketch, and Mr. Bernard replied that he didn't know how it could be checked because he thought the tube leading to the tank was twisted.  Mr. McNally was able to use a dowel rod to measure the fuel level.  According to Mr. Bernard, Mr. McNally then asked him "what was so hard about this, why couldn't you have done this?"  Mr. Bernard regarded this as racist because Mr. McNally was looking at him "as if I'm ignorant," when Mr. Bernard had explained that he hadn't looked at the tank yet, and Mr. McNally was acting "[l]ike he's discovered the wheel."  Mr. Bernard walked away while Mr. McNally was still speaking with him, which ultimately led to the issuance of a warning for both unsatisfactory work and insubordination on June 24, 2003, although Mr. Bernard experienced no adverse employment consequences as a result of the warning.  (Facts, ¶59.)

On June 11, 2003, Mr. Shafer issued a written warning to Mr. Bernard for not cleaning up a lifeboat.  In an attached memorandum Mr. Shafer explained that Mr. Bernard needed to

keep the boats, trucks and his workshop cleaner, as they had discussed on May 28.  Mr. Bernard regarded this warning as discriminatory.  On the same day, Mr. McNally wrote a memo to Mr. Bernard in support of Mr. Shafer's warning.  In that memo Mr. McNally recounted a number of incidents that led him to conclude that Mr. Bernard's performance was substandard and lacking in the proper thoroughness and level of expertise expected by Mr. McNally.  The crux of the issue, as recounted by Mr. McNally, was that Mr. Bernard would not accept the wider range of his responsibilities, and continued to view his "role as limited to simply engine repair or mechanical problems."  Once again, Mr. Bernard characterized this criticism of his job performance by Mr. McNally as racially motivated and "a lie," disputing or attempting to justify all but two of the specific complaints set forth in the memo.  (Facts, ¶¶60, 61.)

On the same day, Mr. Bernard handed Mr. McNally a handwritten note, characterizing the fuel tank incident of the preceding day as a clear demonstration of racial prejudice and retaliation.  He also demanded to meet with Ms. Matthews.  The  next day a letter was sent by Mr. Bernard to each of the MEBA Trustees, announcing that he had filed suit on February 27, 2003 against the School and claiming that several more suits were about to be filed by other employees because of Mr. McNally.  Mr. Bernard testified that he was referring to white employees in the Maintenance Department  (Facts, ¶62.)

On June 17,2003, Ms. Trumps and Ms. Matthews met with Mr. Bernard to discuss his note of June 11.  Prior to his note and subsequent demand to meet with Ms. Matthews, Ms. Trumps had been given no reason to suspect that Mr. Bernard had had any problems since November.  Mr. Bernard recounted the incident with the boat fuel tank, and acknowledged that he had walked away, and that he had continued to do so even after Mr. McNally called him back.  (Facts, ¶63.)

Ms. Trumps and Ms. Matthews then met with Mr. McNally, who disclosed that he had discussed the fuel tank issue with Mr. Bernard because of a complaint from a MEBA member. Mr. McNally denied using a humiliating tone or language, and stated that he regarded Mr. Bernard's walking away during the conversation as insubordinate. Mr. McNally also told Ms. Trumps and Ms. Matthews that Mr. Bernard had lost his work log, and that he had made errors on the boat inspection reports, and Mr. Bernard confirmed both of these allegations in his testimony. (Facts, ¶¶ 64, 65.)

A warning notice was ultimately issued to Mr. Bernard on June 24 for unsatisfactory work quality and insubordination, as a result of the June 10 incident on board the Ketch, along with a brief explanatory memo from Mr. McNally. Mr. Bernard regarded this warning, too, as racially motivated and retaliatory, because it was not issued until two weeks after the incident, and the issues had not been discussed in Mr. McNally's lengthy memo regarding his performance deficiencies dated June 11. Ms. Trumps and Ms. Matthews discussed the warning notice with Mr. Bernard on June 26, and concluded that he had been insubordinate on June 10, despite his insistence that virtually everything was false and that all of his problems with Mr. McNally were attributable to racism or retaliation. (Facts, ¶66.)

In July there were problems regarding the maintenance and mechanical condition of one of the School's boats, as explained in memos written by Mr. McNally, but Mr. Bernard did not receive any warnings and was not subject to any other disciplinary action. Nonetheless, Mr. Bernard concluded that these criticisms, too, were racially motivated and retaliatory and dismissed them as lies in his testimony. (Facts, ¶67.) On August 15, 2003 Mr. Bernard departed the employ of CMES to take a higher paying position as a mechanic at Tidewater Yacht Maintenance in St. Michaels. (Facts, ¶68,69.)

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Trusty v. State of Maryland, 28 Fed.Appx 327, 329 (4th Cir., 2002). The evidence is viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  In order to avoid summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986), and summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).  In this case, even construing the facts in the light most favorable to plaintiff Mr. Bernard, no genuine issue for trial exists, and summary judgment should be granted to defendant Calhoon MEBA Engineering School ("CMES") on both Count I (namely harassing environment) and Count II (retaliation).

### II.    PLAINTIFF HAS FAILED TO ESTABLISH A CASE OF HOSTILE WORK ENVIRONMENT

#### A.    Plaintiff Cannot Establish a Prima Facie Case of Racial Harassment

To establish a claim for a racially hostile work environment, Mr. Bernard must show that: (1) the harassment was unwelcome; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on his employer. Causey v. Balog, 162 F.3d 795, 801 (4th Cir 1998) (holding that plaintiff employee failed to establish the elements of a prima facie case of racially hostile work environment); Carter v. Morgan, 34 Fed.Appx. 427, 429 (4th Cir., 2002)

While the first and second elements may be assumed, Mr. Bernard cannot satisfy either the third or the fourth element necessary to establish a prima facie case. The third – that of demonstrating that the harassment was sufficiently severe or pervasive to constitute a hostile work environment – is manifestly not met here, even if everything that Mr. Bernard testified to occurred in the manner that he described. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L,Ed,2d 295 (1993); Von Gunten v. Maryland, 243 F.3d 858, 870 (4th Cir., 2001). The six isolated "jokes" and comments made by his coworker Mr. Helms, having occurred over the space of two and a half years, were not sufficiently pervasive to constitute a hostile environment, nor did they rise to the level of severity necessary to ground such a claim. The questioning conducted by Ms. Trumps and Ms. Matthews, which Mr. Bernard also believes contributed to a hostile work environment, was not discriminatory conduct at all, and so cannot be used to support his claim. Having failed to demonstrate that the "harassment" he underwent was objectively severe enough to alter the conditions of his employment and to create an abusive atmosphere, Mr. Bernard cannot establish a prima facie case of hostile environment.

**1.    Mr. Helms' Scattered Remarks Are Insufficient To Constitute A Racially Hostile Environment**

Title VII does not supply a remedy for every instance of verbal or physical harassment in the workplace.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); Lissau v. Southern Food Service, Inc., 159 F.3d 177, 183 (4th Cir., 1998) (holding that if supervisor's conduct was not severe or pervasive enough to create a hostile work environment, then summary judgment in favor of defendant employer would be appropriate). Relief is unavailable where the alleged conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment" or where the victim "does not subjectively perceive the environment to be abusive."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Lissau, 159 F.3d at 177.

The Supreme Court has explicitly held that "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed2d 662 (1998); Lissau, 159 F.3d at 177.  The 4th Circuit concurs that "The existence of a hostile environment cannot be predicated upon acts that are isolated or genuinely trivial."  Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994) (holding that public criticism by a supervisor and the presence of a potentially offensive poster were not themselves sufficient to constitute a racially hostile work environment).

In establishing that the harassment was sufficiently severe or pervasive to constitute a hostile work environment, the plaintiff's burden of proof is twofold: Mr. Bernard must show that his workplace was both subjectively and objectively hostile.  Harris v. Forklift Sys., Inc., 510 U.S. at 21; Von Gunten v. Maryland, 243 F.3d 858, 870 (4th Cir., 2001) (holding that plaintiff presented insufficient evidence that the acts she complained of would create an environment that a reasonable person would find hostile or abusive).  Even if the incidents Mr. Bernard alleges actually did upset him to the degree that he subjectively perceived his work environment at the

School to be somewhat hostile, there is no evidence that they created "an environment that a reasonable person would find hostile or abusive." Harris, 510 U.S. at 21.

In weighing whether or not a work environment is objectively hostile, the court should consider the totality of the circumstances, particularly: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it resulted in psychological harm. Harris, 510 U.S. at 23; Trusty v. State of Maryland, 28 Fed.Appx. 327, 329 n. 1 (4th Cir, 2002) (holding that plaintiff's factual allegations concerning an alleged racially hostile work environment were neither severe nor pervasive enough to support such a claim). No single factor is determinative, but in making the assessment, a reviewing court must keep in mind that Title VII is not "a federal guarantee of refinement or sophistication in the workplace," Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir., 1997), nor does it "guarantee freedom from boorish remarks that do not create an objectively abusive environment." EEOC v. R&R Ventures, 244 F.3d 334 (4th Cir, 2001).

The primary basis for Mr. Bernard's hostile environment claim involves a series of no more than six discrete comments, all of which involved a single coworker, and which were spread out over a space of approximately two and three quarter years. These incidents are laid out in detail in the deposition of Mr. Bernard and consist principally of the three "jokes" complained of by Mr. Bernard on September 3, 2002, as well as two prior comments, and the subsequent repetition of one of the three "jokes" in the context of an offer to testify on Mr. Bernard's behalf. All of the objectionable comments were voiced by a single individual: William Helms, a fellow employee of Mr. Bernard's, specializing in plumbing and air conditioning. (Facts, ¶¶14-18)

The incidents that Mr. Bernard alleges, were, by virtue of their small number and the

infrequency with which they occurred, far from pervasive.  Mezu v. Dolan, 2003 U.S. App.

LEXIS 19528, *5-*6 (4th Cir., 2003), aff'g Mezu v. Morgan State Univ., 264 F.Supp.2d 292, 296

(D.Md., 2003) (holding that allegations of four discrete instances of harassment based on

national origin were not sufficiently severe or pervasive to alter the conditions of employment;

see lower court decision for full summary of allegations).  Moreover, if these incidents occurred

as described, while they were certainly tasteless and offensive, they were not so severe that a

reasonable person would find that Mr. Bernard's environment was hostile or abusive as a result.[2]

They were, in fact, mere isolated utterances of the sort that the courts have held insufficient to

ground a hostile environment claim.  Faragher, 524 U.S. at 788; Harris, 510 U.S. at 23.

### 2.   Mr. Bernard's Resentment Of Management's Efforts To Assure That There Was No Recurrence Cannot Form The Basis For A Hostile Environment Claim.

Mr. Bernard testified that the follow-up questioning by Ms. Trumps and Ms. Matthews

itself constituted a hostile environment.  Indeed, after he filed his EEOC charge, he refused to

cooperate in Ms. Trumps' investigation.  (Facts, ¶¶ 31, 32.)  Even if Mr. Bernard perceived the

investigation that Ms. Trumps and Ms. Matthews conducted as unpleasant or stressful,[3] his

perception of it as such is wholly subjective and does little to support his contention that his

work environment was objectively hostile.

Indeed, this very questioning by Ms. Matthews and Ms. Trumps constituted a good-faith

effort on the part of CMES to comply with the requirements of Title VII, and cannot reasonably

be said to have turned Mr. Bernard's work environment into one that "a reasonable person would

---

[2] In fact, Mr. Bernard testified that other African-American employees were not offended by Mr. Helms behavior, and at least one African-American employee, Vernon Freeman, socialized with Mr. Helms and regarded him as a friend. (Facts, ¶21.)

[3] He testified that "they were always calling me in the office every now and then asking me if there were any more jokes or anything like that... it made me feel paranoid."  (Bernard, pp. 91-92.)

find hostile or abusive." <u>Harris</u>, 510 U.S. at 21. The five-part test supplied by the Court in <u>Harris</u> for determining whether or not particular discriminatory conduct is sufficiently severe or pervasive to ground a hostile environment claim is simply not met here because the challenged action was in no way discriminatory.

### 3.    There Is No Basis For Employer Liability

In addition, as discussed below, CMES' response to Mr. Bernard's complaint, which is not contested by Mr. Bernard, precludes employer liability and therefore prevents Mr. Bernard from establishing the fourth element of a prima facie case.

### B.    Management's Prompt and Effective Remedial Action Precludes Liability

Even if it were possible for Mr. Bernard to marshal sufficient triable facts to establish a colorable prima facie case of harassment, CMES must be awarded summary judgment because it incontrovertibly took prompt remedial action when alerted to Helms' offensive conduct, and he did not report any recurrence of the conduct. For harassment perpetrated by fellow employees, employers are "liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it." <u>Mikels v. City of Durham, N.C.</u>, 183 F.3d 323, 331-32 (4th Cir, 1999); <u>Leeper v. Duke Energy Corp.</u>, 54 Fed.Appx. 180, 181 (4th Cir., 2003) (citing <u>Mikels</u> and holding that plaintiff failed to present evidence sufficient to impute liability to his employer). Therefore, in order to hold defendant CMES liable for the harassing behavior of Mr. Bernard's fellow employee Will Helms, Mr. Bernard cannot prevail unless CMES failed to take prompt and adequate remedial action, after it had acquired actual or constructive knowledge of Mr. Helms' behavior.

Mr. Bernard initially brought Mr. Helms' harassing behavior to the attention of his supervisor, Robert Shafer, on September 3, 2002. This was the first point at which CMES possessed knowledge, actual or constructive, of Mr. Helms' comments to Mr. Bernard. Upon

receiving this notice, Mr. Shafer promptly initiated remedial action, by immediately summoning

Mr. Helms, who apologized to Mr. Bernard, and by notifying the Human Resources Manager,

Dawn Trumps of Mr. Bernard's racial discrimination complaint[4].  Facts ¶¶19, 20, 22.)

Ms. Trumps arranged to be at the School the next day, where Mr. Bernard told her that he

was not satisfied with Mr. Helms' apology.  Ms. Trumps assured Mr. Bernard that the School

viewed Mr. Helms' behavior as inappropriate and intolerable, that his own job had not been

jeopardized by the complaint, and that she was going to speak to Mr. Helms and to take further

action if anything else occurred.  She also told Mr. Bernard that he should inform her if anything

else did occur.  Ms. Trumps testified that Mr. Bernard appeared satisfied and stated that he did

not feel he needed to pursue the matter further.  (Facts, ¶23.)

Ms. Trumps subsequently met with Mr. Helms and obtained his assurance that the racial

joking about which Mr. Bernard complained would never happen again.  She informed him that

the incident would be documented and become a permanent part of his file, and that further

incidents would lead to further discipline.  (Facts, ¶25.)  Two days later, the School's Director,

Ms. Matthews, met with the entire Maintenance Department to remind them of the School's

policy on mutual respect and non-discrimination.  (Facts, ¶26.)

Both Ms. Trumps and Ms. Matthews also held several follow-up meetings with Mr.

Bernard (Facts, ¶¶27-29), in order to be sure that there was no recurrence of the incidents.

(Facts, ¶¶27-30.)  At no time did Mr. Bernard report any recurrence of racial comments.[5]  Both

---

[4] It is worth noting, that Mr. Shafer was not the proper person with whom a complaint of discrimination or harassment was to be lodged pursuant to School policy.  The Equal Opportunity and Anti-Harassment Policy instructs employees to bring their complaints to the Director of the School (Ms. Matthews), or to the Human Resources Manager (Ms. Trumps).  Mr. Shafer properly notified both women as soon as Mr. Bernard complained. (Facts ¶¶9, 23.)

[5] In fact no further comments were made, except for Mr. Helms' repetition of the "Ed, excuse my French" remark in July, 2003 in the context of an offer to testify against CMES on Mr. Bernard's behalf.  (Facts, ¶29.)  Mr. Bernard did not report this comment to anyone at the

women also met subsequently with Mr. Helms, again to ensure that there was no recurrence. (Facts, ¶28.)

The uncontested record thus reflects the fact that defendant CMES immediately initiated remedial action upon acquiring notice of the remarks that Mr. Bernard had been subjected to by Mr. HelMs.  Mr. Bernard has failed to present any evidence that the action taken by CMES, including the documentation of the incident added to Mr. Helms' personnel file, and the series of follow-up meetings that occurred between CMES management and both Mr. Bernard and Mr. Helms, was in any way inadequate.

In the context of harassment by fellow employees, such as that alleged by Mr. Bernard, employers may be held liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it.  <u>Mikels</u>, 183 F.3d at 332; <u>Leeper v. Duke Energy Corp.</u>, 54 Fed.Appx. at 181.  As there is no evidence to suggest that defendant CMES failed to take either prompt or adequate remedial action after it learned of Mr. Helms' remarks, no liability for the remarks of Mr. Helms may be imposed upon CMES and summary judgment dismissing Count I should be granted.

**III.    P<span>LAINTIFF</span> CANNOT <span>ESTABLISH A CLAIM FOR RETALIATION.</span>**

   **A.    Plaintiff Cannot Establish A Prima Facie Case Of Retaliation**

---

School, and may indeed have found it amusing.  (Facts, ¶15.)

In order to establish a prima facie case of retaliation under Title VII, Mr. Bernard must show that (1) he engaged in protected activity, (2) defendant CMES took an adverse employment action against him, and (3) a causal connection existed between the protected activity and the asserted adverse action.  Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir., 2001); Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir, 2001).   While the first prong of this test has rather clearly been met, there is no evidence to support either of the other two requirements, namely that CMES subsequently took some form of adverse employment action against him and that there was a causal connection between his earlier complaint and that adverse action.

**1.    There Was No Tangible Job Detriment Involved In Any Of The Incidents That Mr. Bernard Claims Are Retaliatory.**

**a.    There were no adverse consequences to the discipline, meetings, or criticism.**

Mr. Bernard alleges that a series of warnings which he received with respect to both his attendance and his conduct constituted retaliatory adverse action towards him on the part of CMES.  More specifically, he received a number of warnings regarding his attendance in the fall, and again in May, 2003 and July, 2003.  (Facts, ¶¶40-45)  Likewise, Mr. Bernard contends that the various warnings placed in his file regarding his conduct, particularly the warning dated June 24, 2003, for insubordination and poor performance arising from the fuel measuring incident on the Ketch on June 10, 2003, (Facts, ¶¶59-61, 66, 67), constituted adverse employment action.

It is certainly true that conduct short of "ultimate employment decisions" can constitute adverse employment action, so long as that conduct adversely affects the "terms, conditions or benefits" of the plaintiff's employment.  Munday v. Waste Mgmt. Of North America, Inc., 126 F.3d 239, 243 (4th Cir., 1997); Von Gunten, 243 F.3d at 867-68.  However, a poor performance

rating, a warning, or a "write-up," does not in itself constitute an adverse employment action, because it has no tangible effect on the recipient's employment. <u>Von Gunten</u>, 243 F.3d at 868 (quoting <u>Spears v. Missouri Dep't of Correction & Human Res.</u>, 210 F.3d 850, 854 (8th Cir., 200)). "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." <u>Spears</u>, 210 F.3d at 854; <u>Thompson v. Potomac Electric Power Co.</u>, 312 F.3d 645, 652 (4th Cir, 2002) (holding that plaintiff's failure to introduce evidence that a lower performance evaluation "affected the terms, conditions or benefits of his employment" was sufficient to support a grant of summary judgment for the defendant, quoting <u>Spears</u>).

In this case, the terms, conditions and benefits of Bernard's employment were in no way affected by the warnings that he received. While they may have rankled him, they did not result in any adverse employment consequences for him. Therefore, neither the warnings regarding attendance, nor those regarding conduct that Mr. Bernard received can serve as the basis for a claim of retaliation. (Facts, ¶¶40-45, 51-67).

Mr. Bernard has also suggested that both the manner in which Ms. Trumps and Ms. Matthews addressed his threatening comments, and Mr. McNally's criticism of his job performance, were retaliatory. The meeting with Mr. Bernard regarding his threatening statements was a reasonable exercise of managerial caution, and the request that he sign a written assurance that he would not act on his threats, resulted in no adverse effects upon the terms, conditions or benefits of his employment. (Facts, ¶¶46-48.) Indeed, Ms. Matthews and Ms. Trumps believed Mr. Bernard's assurance that he did not intend to act violently toward Mr. Helms, and did not penalize him in any way for failing to sign a statement to that effect. (Facts, ¶49.) Similarly, the two or three admonitions from Mr. McNally did not result in any tangible employment action taken against Mr. Bernard. Even the write-ups for insubordination had no

negative consequences.  While these events may have been unpleasant or annoying to Mr.
Bernard, none of them affected the terms, conditions or benefits of his employment in any way.
Munday, 126 F.3d at 243; Von Gunten, 243 F.3d at 867-68.

Finally, Mr. Bernard also claims that the "deduction" of pay that he allegedly suffered
constituted retaliation.  The "deduction" in question was in fact an adjustment to Mr. Bernard's
check, made as a consequence of the discovery that he had been mistakenly paid for time off on
November 11, 12, 14 and 17.  (Facts, ¶50.)  Following Mr. Bernard's complaint to the Director
of the School, Ms. Matthews, the decision was reversed on humanitarian grounds, and Mr.
Bernard was paid all of the money he sought within about a week, some of which he actually had
not accrued.  The adjustment made to Mr. Bernard's check was entirely justifiable under CMES
rules, and, in any event, he suffered no permanent deduction.  (Facts, ¶50.)  Once again, the
terms, conditions, and benefits of his employment were wholly unaffected by this incident, and it
therefore cannot be used to support a claim of retaliation.

### b.    The assignment to the grounds crew was within the scope of Mr. Bernard's ordinary duties.

In November of 2002, Mr. Bernard was assigned to work temporarily on the grounds
crew, a part of the Maintenance Department in which he was employed, in order to fill in for a
sick employee.  (Facts, ¶¶34, 35.)  The responsibilities of the Maintenance Department include
landscaping, snow removal (on a seasonal basis), maintenance and repair of boats, and
maintenance of vehicles.  (Facts, ¶3.)  Mr. Bernard was explicitly informed at the time that the
assignment was not a reflection on his work and was not a demotion.  He experienced no cut in
pay or reduction in benefits and he continued to have some responsibility for the vehicles and
motors.  (Facts, ¶¶34, 35.)  This was a temporary seasonal assignment, lasting approximately
three weeks, and did not involve reclassifying his job title.  (Facts, ¶38.)

The boats, for which Mr. Bernard had had primary responsibility, are taken out of the water at the end of October, although maintenance work on them continues, and Mr. Bernard performed that work in November, 2002.  In fact, Mr. Bernard continued with his regular responsibilities in connection with maintaining the boats.  The grounds crew work, which Mr. Bernard had performed in the past, involved servicing and winterizing tractors.  (Facts, ¶¶36, 37.)

These additional duties temporarily assigned to Mr. Bernard did not constitute a change in the "terms, conditions or benefits" of his employment because they were within the scope of his official job description, and were among the functions contemplated at the time he was hired.  On the resume submitted by Mr. Bernard when he was hired is the notation "Re: Caretaker."  That resume discloses that Mr. Bernard had previously spent time employed as an apartment caretaker and groundskeeper, as well as a foreman and landscape and lawn care technician.  (Facts, ¶4.)

The former Director of CMES, Henry Phillips, sent a memo to the Administrator of the MEBA Plans at the time of Mr. Bernard's hiring, in November of 2000, stating that Mr. Bernard had been "hired in the maintenance department, for building and general services."  (Facts, ¶3.)  Subsequently, in a job description prepared by his supervisor, Robert Shafer, in May, 2002[6], Mr. Bernard's position had been described as consisting of performing mechanical work on the School's fleet of trucks and grounds equipment, being responsible for the maintenance and cleaning of the boats on a daily basis, helping with safe boating classes and signing of boat float plans, trimming and fertilizing of trees, flowers and bushes on campus grounds, and maintaining bike repair when necessary.  (Facts, ¶6.)

---

[6] It bears noting that this job description was written and submitted approximately four months before Mr. Bernard made his initial complaint to Mr. Shafer.

By Mr. Bernard's own admission, he would not have taken issue with the additional job duties that the grounds crew work involved, if a pay raise had accompanied them.  (Facts, ¶37.) Even if the additional duties temporarily assigned to Mr. Bernard out of necessity were outside of the ambit of his job description, the imposition of additional job duties does not necessarily qualify as adverse employment action.  <u>Reinhold v. Com. Of Virginia</u>, 151 F.3d 172, 175 (4th Cir., 1998) (holding, in the context of a supervisory sexual harassment claim, that the assignment of additional work did not constitute "tangible employment action" sufficient to give rise to automatic imputation of liability against employer for supervisor's sexual harassment).

**2.    There Is No Nexus Between Mr. Bernard's "Protected Activity" And Any Of His Issues With Mr. Shafer Or Mr. McNally.**

There is no nexus between Mr. Bernard's protected activity (the complaint to Mr. Shafer, the two EEOC charges and the instant lawsuit) and any subsequent issues that developed between either him and Mr. Shafer or him and Mr. McNally.  Mr. Bernard has failed to show that the protected activity he engaged in actually caused him to be subjected to retaliatory treatment. <u>Van Gunten</u>, 243 F.3d at 863; <u>Larkin v. Perkins</u>, 22 Fed.Appx. 114, 115 (4th Cir., 2001) (holding that plaintiff's claim of retaliation failed because he presented no evidence establishing a causal connection between his filing an EEOC charge and defendant's decision relative to his job application).

First, the record is barren of any suggestion that anyone at CMES – whether in management or otherwise – regarded Mr. Bernard's complaint to Mr. Shafer as anything other than wholly appropriate.  On the contrary, Ms. Matthews, Ms. Trumps, Mr. Shafer, and, later, Mr. McNally, gave Mr. Bernard every assurance that they and CMES viewed the language employed by Mr. Helms as improper and not to be tolerated.  (Facts, ¶¶22, 23, 26-29, 57, 58.) There is no record, for that matter, that Helms himself did anything other than apologize when

called to account by Mr. Shafer (Facts, ¶22), and no suggestion that he or anyone else wanted to retaliate against Mr. Bernard in any way. The incidents cited in the Complaint, and in Mr. Bernard's testimony had no connection to Mr. Bernard's complaint of September 3, 2002, and Mr. Bernard has not produced even a hint of evidence that they did. The record is similarly devoid of any evidence that CMES management resented Mr. Bernard's EEOC filings or the filing of this action. Indeed, the only evidence in the record relating to those protected activities is Mr. Bernard's admission that he refused to cooperate in Ms. Trumps' investigation of his EEOC charge. (Facts, ¶¶31, 32.)

John McNally was hired as Facilities Manager in February, 2003. (Facts, ¶51.) While he was aware of Mr. Bernard's earlier complaint, there is no evidence that his motive in criticizing Mr. Bernard's job performance was in any way retaliatory. In fact, he made an effort to communicate with Mr. Bernard his concern that the events that had precipitated the complaint in the fall not be repeated, meeting with Mr. Bernard and Mr. Shafer on April 9, 2003 to ask if Mr. Bernard had experienced any discriminatory, retaliatory, offensive, vulgar or otherwise inappropriate behaviors since his (Mr. McNally's) arrival. (Facts, ¶57.)

At that meeting, Mr. Bernard said that he had wondered whether Mr. McNally's asking him to keep a log of his boat activities, meet with him weekly and prepare weekly boat reports was retaliatory, but was reserving judgment. Mr. McNally assured him that these requirements were a function of his own inexperience in dealing with boats and that Mr. Bernard was not the only mechanic who had been questioned and "scrutinized" in this manner. Mr. Bernard then declined to discuss additional incidents which he alleged had occurred, despite Mr. McNally's assurances that he would do everything within his power to make the work environment at CMES as comfortable for Mr. Bernard as possible and that inappropriate behavior would not be tolerated. (Facts, ¶57.) On April 14, 2003, in a follow up meeting with Mr. McNally and Ms.

Matthews, Mr. Bernard again refused to discuss the subsequent incidents that he had alleged. (Facts, ¶58.)

The sources of some of the incidents between Mr. McNally and Mr. Shafer and Mr. Bernard were documented in a memo written by Mr. McNally and presented to Mr. Bernard on June 11, accompanying a warning issued to him by Mr. Shafer because of the messy condition of one of the School's life boats. In the memo Mr. McNally recounts a number of incidents (the failure to repair pulleys and lines at the docks, the cardboard container incident, the failure of the safe boating course, and several other mistakes or omissions) that led him to conclude that Mr. Bernard's performance was substandard and lacking in the proper thoroughness and level of expertise expected by Mr. McNally. The memo provides clear evidence that Mr. McNally and Mr. Shafer were not motivated by a desire to retaliate for his complaint in their criticism of Mr. Bernard, but rather that they held the perception that Mr. Bernard would not accept the wider range of his responsibilities, and continued to view his "role as limited to simply engine repair or mechanical problems." (Facts, ¶¶59, 60.) Mr. Bernard's own testimony was to the same effect; he did not like working on the boats, although he acknowledged that his assignment to the boats was not discriminatory. (Facts, ¶5, 56.)

Finally, Mr. Bernard has presented no evidence that the confrontation that occurred between Mr. McNally and himself on June 10, 2003 was in any way related to his earlier complaint. On that occasion, Mr. McNally discovered a way in which the fuel level on one of the school's boats could be checked, following Mr. Bernard's denial that checking the fuel level was possible. Mr. McNally's alleged transgressions against Mr. Bernard on that occasion were apparently limited to asking him "what was so hard about this, why couldn't you have done this?" looking at Mr. Bernard "as if [he was] ignorant," and acting "[l]ike he's discovered the wheel," as well as writing Mr. Bernard up for insubordination because Mr. Bernard walked away

while McNally was speaking to him.  (Facts, ¶¶ 61, 63, 64.)  None of these allegations even rise

to the level of discriminatory activity or suggest a retaliatory motive, and there is no plausible

relation between them and the earlier complaint.  Mr. Bernard has thus failed to show any nexus

between the protected activity in which he had engaged and any of the criticism of his work or

conduct by his supervisors.

> **B.**    **Even If Plaintiff Could Establish A Prima Facie Case, Defendant CMES Has Articulated Sound Business Reasons For Each Of The Actions Complained Of, And Mr. Bernard Cannot Create A Triable Issue That Any Of Them Is A Pretext For Retaliation.**

Even if one or more of these actions could allow Mr. Bernard to succeed in establishing a

prima facie case of retaliation, CMES has articulated legitimate, non-discriminatory reasons for

the various incidents about which Mr. Bernard complains.  Any presumption raised by Mr.

Bernard's prima facie case therefore "drops from the case," Texas Dep't of Community Affairs

v. Burdine, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981), and the

ultimate burden of establishing that the reasons provided were merely pretextual rests on Mr.

Bernard.  Carter v. Ball, 33 F.3d 450, 460 (4th Cir, 1994); Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 146-47, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (holding that a successful

plaintiff must not only establish that defendant's proffered explanation is not credible, but that

its own alternative explanation *is* credible).

The undisputed record contains substantial evidence of the legitimate, non-retaliatory

reasons for which Mr. Bernard was issued the warnings relating to his attendance and conduct.

For the former, CMES followed its established policy regarding attendance and punctuality.

(Facts, ¶¶40-45.)  With respect to the conduct, it is clear that Mr. Bernard made mistakes in his

work, and that his behavior towards Mr. McNally on the occasion of the fuel-measuring incident

was insubordinate (Facts, ¶¶54-56, 59-61, 64-67.)  Likewise, CMES possessed

nondiscriminatory reasons for investigating the threatening language that Mr. Bernard had used in relation to Mr. Helms, and would in fact have been remiss in the duty of care that it owed to its employees had it not done so. (Facts, ¶¶46-49.) Mr. Bernard was not singled out for criticism by Mr. McNally, a new arrival at CMES whom the Human Resources Manager described as simply "very enthusiastic about making changes and getting things done." In fact, Mr. McNally's enthusiasm for change apparently rankled several employees besides Mr. Bernard. (Facts, ¶51.) Mr. Bernard testified that a group of white employees in the Maintenance Department were talking of filing suit because of Mr. McNally's management style. (Facts, ¶62.) Ms Trumps stated that "People weren't ready for him [McNally]" because "he was doing too much too soon." She and the School's Director ultimately advised McNally to "slow down a little bit, not specifically with Ed [Bernard], but with everybody in general." (Facts, ¶51.) While these events suggest that Mr. McNally management style was initially quite robust, they provide substantial evidence that his occasionally tense interactions with Mr. Bernard were not discriminatory or retaliatory.

Mr. Bernard's temporary assignment to the grounds crew was also supported by legitimate nondiscriminatory reasons. The note from the supervisor responsible for assigning Mr. Bernard to the grounds crew states that the assignment was to help fill a current vacancy on the grounds crew due to an employee absence. William Freeman, one of the grounds crew members, was out on disability at that time, necessitating that his job duties be dispersed amongst the other employees in the Maintenance Department. (Facts, ¶¶34, 35, 38.)

Additionally, the boats, for which Mr. Bernard had had primary responsibility, are taken out of the water at the end of October. Mr. Bernard's temporary reassignment was thus the result of a combination of a seasonal change in the maintenance needs of CMES, and a temporary labor shortage, caused by the absence of Mr. Freeman, that necessitated the shifting of

some duties.  Furthermore, the grounds crew work, involving servicing and winterizing tractors, had been competently performed by Mr. Bernard in the past, and was consistent with his job description and the job skills that he had chosen to list on his resume.  (Facts, ¶¶3, 4, 6, 36, 37.) Mr. Bernard has presented no evidence to suggest that his temporary assignment to the grounds crew was in any way related to his earlier complaints about Mr. Helms' comments, or retaliation, or that it was for anything other than legitimate nondiscriminatory purposes.

As for pretext, the record is devoid of any evidence that race or retaliation was a factor for any of CMES' actions.  Invariably, Mr. Bernards' reason for believing that the actions of management were racially motivated or retaliatory was that it was all "lies" and invariably he admitted to facts that showed that at most he simply disagreed with the way management wanted things done, or forgot to do what he was asked to do, or felt he was too busy to do what was requested.  (Facts, ¶¶24, 40-45, 51-67.)  Probably the key event is the confrontation with Mr. McNally on the Ketch on June 10, 2003, and regardless of Mr. Bernard's dislike of the way McNally was acting ("as though had he's just invented the wheel"), Mr. Bernard did admit to walking off while his manager was speaking to him and that does amount to insubordination. (Facts, ¶63.)

<u>**CONCLUSION**</u>

For all of the above reasons, defendant CMES should be granted summary judgment on the Complaint in its entirety.

Dated: Washington, D.C.
       October 10, 2003

Respectfully submitted,

BEINS, AXELROD, KRAFT, GLEASON & GIBSON, P.C.


By:_____
      Barbara Kraft, Esq.
      1717 Massachusetts Avenue, N.W., Suite 704
      Washington, D.C. 20036-2001
      Attorneys for Defendant
      CALHOON MEBA ENGINEERING
      SCHOOL


VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.


By:_____

      Neal I. Korval, Esq.
      Jonathan A. Wexler, Esq.
      805 Third Avenue
      New York, New York  10022
      Telephone:  (212) 407-7700
      Facsimile:   (212) 407-7799
      Attorneys for Defendant
      CALHOON MEBA ENGINEERING
      SCHOOL

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| **EDWARD G. BERNARD, JR.,** | **Case No. 1:03-cv-0531-AMD** |
| **Plaintiff,** | |
| **v.** | |
| **CALHOON MEBA ENGINEERING SCHOOL,** | **ORDER** |
| **Defendant.** | |

**This matter having been brought before the Court on October 10, 2003, by motion of Beins, Axelrod, Kraft, Gleason & Gibson, P.C., 1717 Massachusetts Avenue, N.W., Suite 704, Washington, D.C. 20036-2001, and Vedder, Price, Kaufman & Kammholz, P.C., 805 Third Avenue, New York, New York 10022, attorneys for defendant Calhoon MEBA Engineering School ("CMES") in the above-captioned matter, for an Order for summary judgment in favor of CMES, and the Court having reviewed the papers filed and submitted by the parties; having heard the arguments of counsel; and for good cause shown,**

**It is therefore, on this _____ day of _____, 2003:**

**ORDERED** that CMES' motion for summary judgment is hereby granted; and it is

**FURTHER ORDERED** that plaintiff's Complaint is hereby dismissed with prejudice.

_____
Hon. Andre M. Davis, U.S.D.J.

(   ) opposed

(   ) unopposed