UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **EDWARD G. BERNARD, JR.,**<br><br>Plaintiff,<br><br>v.<br><br>**CALHOON MEBA ENGINEERING SCHOOL,**<br><br>Defendant. | Case No. 1:03-cv-00531-AMD |

**DEFENDANT'S STATEMENT OF UNCONTESTED FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Calhoon MEBA Engineering School ("CMES" or "the School"), in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(e), hereby submits its Statement of Uncontested Facts ("Facts"), containing citations to the record in which support for such facts is found, together with a separately bound volume of excerpts from the record which are referenced herein as exhibits.

**The Hiring of Mr. Bernard by CMES**

1. Plaintiff, Edward Bernard ("Plaintiff" or "Mr. Bernard"), was hired by CMES on November 13, 2000, as a maintenance mechanic. (Complaint, hereinafter "Cplt.," attached to the Notice of the instant Motion, ¶ 8).  He claims that he was told that the job would involve taking care of the trucks, tractors and mowers at CMES, as well as the engines on two boats, and that he would "rarely" be asked to do other tasks.  (Deposition of Edward Bernard, hereinafter "Bernard," pp. 17-18.)  (All pages of this Deposition that are referenced herein are collected at Exhibit 1.)

2. Training at CMES is one of the benefits provided by the MEBA (Marine Engineers Beneficial Association) Benefit Plans.  CMES is managed by the MEBA Plans.  The MEBA Plans are governed by a board of trustees consisting of union officials and shipping company representatives.  (Deposition of Dawn Trumps, hereinafter "Trumps," pp. 5-6.)  (All pages of this Deposition that are referenced herein are collected at Exhibit 2.)

3. The Director of CMES in November 2000 when Mr. Bernard was hired, Henry Phillips, sent a memo to the Administrator of the MEBA Plans stating that Mr. Bernard had been "hired in the maintenance department, for building and general services." (Exhibit 3.)  The Maintenance Department is responsible for landscaping, snow removal (on a seasonal basis) maintenance and repair of boats, and maintenance of vehicles. (Trumps, pp. 19-20.)

4. On the handwritten resume submitted by Mr. Bernard when he was hired is the notation "Re: Caretaker."  The resume discloses that Mr. Bernard was a mechanic maintaining fleet trucks and forklifts for 6 months in 2000, was a diesel engine technician for a year and three months before that, had been a roll technician/press helper at

Tidewater Publishing Co. for about 6 1/2 years, and had worked as an apartment caretaker, groundskeeper, foreman and landscape and lawn care technician. (Exhibit 4.)

5. In about July, 2001, Mr. Bernard was assigned to the maintenance of the School's fleet of boats. His supervisor, Bob Shafer (Maintenance Supervisor), asked him to perform this work after the employee previously in charge of the boats left. Mr. Bernard agreed to do the work as a favor to Mr. Shafer, but only on a temporary basis. Mr. Bernard did not regard this assignment as being motivated by his race. (Bernard, pp. 22-24.)

6. In a job description prepared by Mr. Shafer, in May, 2002, Mr. Bernard's position was described as consisting of mechanical work on the School's fleet of trucks and grounds equipment, being responsible for the maintenance and cleaning of the boats on a daily basis, helping with safe boating classes and signing of boat float plans, trimming and fertilizing of trees, flowers and bushes on campus grounds, and performing bike repair when necessary. (Exhibit 5.)

7. CMES initially paid Bernard $10.50 per hour, more than the $9.50 he asked for when he applied for the job. In the course of his employment his hourly rate was increased to $11.81 an hour. (Bernard, pp. 15-16.)

### CMES Policy Against Discrimination and Harassment

8. CMES has an employee handbook, a copy of which was received by Mr. Bernard, who attended a training class on the contents of the handbook in April, 2002. (Bernard p. 53 and Exhibit 6, sign-in sheet for training, with Mr. Bernard's signature.) The handbook includes a policy entitled "Equal Employment Opportunity and Anti-Harassment Policy" (the "Policy", Exhibit 7), which Mr. Bernard acknowledged he understood. (Bernard, p. 55.)  Indeed, when the Policy was first distributed to CMES employees, Mr. Bernard signed a form (Exhibit 8, Bernard p. 59) containing the following statement: "I understand that it is my responsibility to read and comply with the Equal Employment Opportunity and Anti-Harassment Policy and if I have any questions they will be answered upon my request by the Human Resources Manager or the School Director." The Human Resources Manager, Dawn Trumps, also meets with all newly hired employees to do an orientation with the employee handbook.  (Trumps, p. 20.)

9. The Policy provides that anyone who believes he or she has been subjected to conduct that may violate the Policy should report the conduct to the Human Resources Manager or the Director of the School. (Exhibit 7, par. 4.)

10. When Ms. Trumps, the Human Resources Manager, visits the School, the visit is announced on the School's internal television monitors, which are found throughout the School buildings. (Trumps, p. 23.)  Ms. Trumps also conducts training for supervisors on such topics as harassment, ADA or FMLA. (Trumps, p. 37.)

11. Ms. Trumps also investigates complaints of racial discrimination as they come to her attention, whether from the employee, a supervisor or the Director of the School. (Trumps, pp. 39-40.)  She conducted training about harassment in the workplace in February, 2002. (Trumps, p. 23.)

12. In February, 2002, CMES appointed John McNally as Facilities Manager.  McNally distributed to the Maintenance Department employees a document entitled "Customer Service Behavioral Indicators" (Exhibit 9), which, among other things, lists as behavior that does not meet the employer's expectations the use of cultural slurs, disrespectful comments, putdowns, harassing language/actions and other conduct, such as using racial slurs and sexual inferences.  Mr. Bernard claimed to have been sick on the two days that this document was distributed and discussed, but acknowledged that Mr. McNally discussed the contents with him. (Bernard, pp. 179-180.)

**The EEOC Charge and Alleged Racial Remarks by Will Helms**

13. On about October 23, 2002, Mr. Bernard filed a charge with EEOC (Exhibit 10) alleging that, shortly after he began working for CMES in November, 2000, he had been subjected to harassment from a co-worker Will Helms in the form of racially derogatory comments and jokes.  His charge also alleged that, despite complaining to management and Human Resources, the harassment continued and created a hostile environment.  On November 27, 2002, the EEOC determined that it was unable to conclude that the information obtained in its investigation establishes violations of Title VII. (Exhibit 11.)

In July 2003, according to Mr. Bernard, Helms repeated the third of these "jokes," — phrased by Mr. Bernard as, "Ed, excuse my French, but they're trying to make us all their niggers." (Bernard, pp. 62, 137.)  In the same conversation, Helms told Bernard "I will

4

testify on your behalf before I testify for them," apparently referring to Mr. Bernard's EEOC charge or the instant litigation. (Bernard, p. 62.)[1]

14. Mr. Bernard also claims that, when he was hired in November 2000, Helms told him "You know what Ed, you're all right for a black boy." (Bernard, p. 79.)

15. Finally, according to Mr. Bernard, Helms at one point prior to September 3, 2002, said to him, "Bend over, I need me a black boy today." (Bernard, p. 137.)

16. These remarks by Mr. Helms were the only racial remarks Mr. Bernard heard during his employment at the School. (Bernard, pp. 68-69.)

### Mr. Bernard's Complaint to Mr. Shafer and Helms' Apology

17. On September 3, 2002, Mr. Bernard had complained to Mr. Shafer that he and another black employee, Barry Lofland, were "tired" of Mr. Helms' making racial remarks toward them and possibly others. (Exhibit 12, file memo by Mr. Shafer dated September 3, 2002.) Mr. Lofland was supposed to attend the meeting of Bernard and Shafer, but did not. (Bernard, p. 72-73.) Mr. Bernard testified that it was Mr. Helms' comment on August 30, 2002 about "trying to make us their niggers," that "sparked it [the complaint] off." (Bernard, p. 62.)

18. Prior to this September 3, 2002 conversation, Mr. Bernard had complained to Mr. Shafer about how Mr. Helms was talking about him behind his back and criticizing his work, and also about his jokes (Bernard, p. 64).

19. Bernard had previously complained about the racial remarks of Mr. Helms to two African-American grounds crew employees, Vernon Freeman and Kevin Young. Their response was, "That's how Will is. We all joke around like that." (Bernard, pp. 65, 188-189.) Indeed, Mr. Bernard admitted that Mr. Helms and Vernon Freeman socialize together, and would describe themselves as friends. (Bernard, p. 188.)

20. After hearing Bernard's complaint on September 3, 2002, Mr. Shafer immediately called Mr. Helms in, and confronted him. Mr. Helms apologized to Mr. Bernard. (Exhibit 12, Mr. Shafer's file memo regarding the complaint, the meeting and the apology.) Mr. Bernard considered Helms' apology to be "snotty," because all Helms said was, "Man, look, I apologize. I apologize." Mr. Bernard was dissatisfied with Helms' apology because he felt Helms "didn't have any sincerity in his heart or eyes, [and] . . . I can look a man deep in his eyes and see what he's thinking . . . and I didn't see any compassion, no remorse there at all." (Bernard, pp. 78, 80.)

### Ms. Trumps' Investigation and Follow-up by Ms. Matthews and Ms. Trumps

After learning via voice mail from Mr. Shafer on September 3, 2002 that Mr. Bernard had complained of race discrimination, Ms. Trumps arranged to be at the School the next day. Before she spoke to Mr. Shafer, Mr. Bernard sought her out, and told her about the August 30 comment by Will Helms. Mr. Bernard told Trumps that Mr. Shafer had had

---

[1] This remark, or one like it, evidently did not disturb Mr. Bernard. "I'll admit on that I kind of chuckled when I walked away" after Helms, who was digging a hole or something like that, said he was doing "nigger work." (Bernard, p. 116.)

NEWYORK/#124491.2

Helms apologize and shake his hand, but he was not satisfied with that. Ms. Trumps told Mr. Bernard that Mr. Helms' remark[2] was inappropriate, that the School did not tolerate racial remarks, that his fears that Mr. Helms could get him fired were unfounded, and that she was going to speak to Helms and take further action if anything else occurred. Ms. Trumps also told Mr. Bernard that he should let her know if anything else occurred. Ms. Trumps testified that Mr. Bernard appeared satisfied with their conversation, told her he was glad he spoke with her, and felt he didn't need to pursue the matter further. (Trumps, pp. 41-44.)

---

[2] Ms. Trumps testified that Mr. Bernard told her only about the August 30 remark, "they just want to make us all their niggers." (Trumps, p. 41.)

6

21.

Mr. Bernard told Ms. Trumps that he had contacted an attorney who had advised him to file a complaint with the Maryland Human Relations Commission, and that they had discussed what constituted a hostile environment. Ms. Trumps told Mr. Bernard that she did not feel that Mr. Helms remark that used a racial epithet, followed by his apology, constituted a hostile work environment. (Trumps, p. 44; see also her notes on this meeting, Exhibit 13) Based on Ms. Trumps' statement, Mr. Bernard concluded that she was a racist. (Bernard, pp. 76-77.) What Mr. Bernard says he understood from his conversation with Ms. Trumps was that "I didn't have grounds to stand on" in his discrimination complaint. (Bernard, pp. 79-80.)

22. Ms. Trumps also met with Mr. Helms on September 4 and he assured her that the racial joking about which Mr. Bernard complained would never happen again. She told him that the incident would be documented and become a permanent part of his file, and further incidents would lead to further discipline. (Trumps, p. 90-91; Exhibit 13.)

23. Ms. Matthews had been told by Mr. Shafer about Mr. Bernard's complaint and had instructed Shafer to speak with Helms, which he reported that he had done. Shafer also told her about the meeting at which Mr. Helms apologized. (Ms. Matthews' file memo, Exhibit 14, with entries for 9/3/02, 9/4/02, 9/5/02 and 9/6/02.) Ms. Matthews decided to hold a meeting herself with the maintenance staff, from which Mr. Bernard asked to be excused. Ms. Mathews assured him that racially offensive language would not be tolerated and that he should report any such behavior directly to her or Ms. Trumps. On the afternoon of September 6 Ms. Matthews met with the rest of the Maintenance Department, and reminded them about respecting one another and not participating in rumors, abusive language, name-calling, racial or sexual harassment or any type of discrimination. (*Id.*)

24. Ms. Trumps visited the School on October 4 and met with Mr. Bernard, among others, to clarify whether there had been any recurrence of offensive language and to deal with Mr. Bernard's complaint that one of the women in the Department had told him that the Maintenance staff felt he was "prejudiced against white boys because he was isolating himself." (Trumps, pp. 49-55; Exhibit 15.)

25. On October 10, 2002, Ms. Trumps and Ms. Matthews had another meeting with Mr. Helms as well as Mr. Bernard because of a remark that Helms had supposedly made to another African-American employee Mr. Bernard had heard about and reported. (Trumps, pp. 55-60, 71) The meeting with Mr. Bernard was also intended to address certain threatening statements he had made regarding Mr. Helms. (Trumps, pp. 66-68; see discussion starting at paragraph 48, below, on Mr. Bernard's threatening language.)

26. After their first conversation on September 4, 2002, Ms. Trumps had several follow-up meetings with Mr. Bernard. (Trumps, pp 49, 51.) No further racial comments were made, except for Mr. Helms' repetition of the remark about the School's treatment of all of its employees "like niggers" in July, 2003 (Bernard, pp. 62, 137.) Mr. Bernard does not claim that he reported this comment to anyone at the School. Mr. Bernard agreed that he did not report any other remarks and that he heard none. (Bernard, pp. 103-105, 113, 136, 140, 190.)

7

27. Ms. Matthews, the Director of CMES, also had meetings with Mr. Bernard to be sure that there was no recurrence of the incidents. (Bernard, pp. 94, 103-104.)

28. Mr. Bernard regarded the efforts of Ms. Trumps and Ms. Matthews to assure that there was no recurrence of the racial remarks in a negative light: "[t]hey were always calling me in the office every now and then asking me if there was any more jokes or anything like that. . . . It made me paranoid." Indeed, the basis for Mr. Bernard's assertion in his October 22, 2002 EEOC charge that the hostile environment continued to that date was, according to Mr. Bernard "[t]he constant drilling and asking me questions." (Bernard, p. 138.)

29. After he filed his EEOC charge on October 22, 2002, Mr. Bernard refused to cooperate further in Ms. Trumps' investigation. (Bernard, p. 174.)

**Alleged Retaliation**

30. Mr. Bernard filed a second discrimination charge with EEOC (Exhibit 16) on April 10, 2003. In it, he asserted that after EEOC "closed" his first charge (a reference to Exhibit 11), and that he was retaliated against by being demoted and given two written warnings.

**Assignment to Grounds Crew ("Demotion")**

31. In November, 2002, Mark D'Arcy, an instructor at the School, assigned Mr. Bernard to work on the grounds crew, which is part of the Maintenance Department. (Exhibit 17, memo from Mark D'Arcy to Ed Bernard, November 6, 2002.) Mr. D'Arcy told Mr. Bernard that the assignment was to fill a vacancy caused by a co-worker's illness and was not a demotion. Nevertheless, Mr. Bernard regarded it as a demotion, even though there was no cut in pay or benefits and he continued to have some responsibility for the vehicles and motors. (Bernard, pp. 19-21.) The grounds crew was a temporary assignment, and did not involve changing Bernard's job title. (Trumps, p. 82-83.)

32. The memo from Mr. D'Arcy assigning Mr. Bernard to the grounds crew states that the assignment was to help fill a current vacancy on the grounds crew due to an employee absence. (Exhibit 17.) William Freeman, one of the grounds crew members, was out on disability at that time. (Bernard, p. 144.)

33. The boats, for which Mr. Bernard had primary responsibility, are taken out of the water at the end of October. Maintenance work on the boats continues after October. Mr. Bernard performed maintenance work on the boats in November 2002. (Bernard, p. 25.) In fact, Mr. Bernard continued with his regular responsibilities in connection with maintaining the boats. (Bernard, p. 33.)

34. The grounds crew work, which Mr. Bernard had performed in the past, involved additional responsibilities and Mr. Bernard "wouldn't have had a problem with it" if they had given him a pay raise. (Bernard, pp. 26-27.) The grounds crew work involved servicing and winterizing tractors. (Bernard, p. 29.)

35. The assignment to work with the grounds crew lasted approximately three weeks. (Trumps, p. 83.)

36. Mr. Bernard felt that the grounds crew assignment interfered with his ability to get his work as a mechanic done, since he believed that he was the only person

8

with the skills of a maintenance mechanic, which he described as being a jack of all trades. (Bernard, pp. 46, 50-52.) He felt that working on the boats and grounds crew was not what he was hired to do and that the School was guilty of "false advertising." (Bernard, p. 196.) He also felt that doing this work was a demotion because he was a skilled worker and was not hired to cut grass or trim bushes or scrub boats. (Bernard, p. 194, 198.)

### Warnings About Attendance

37. Under the CMES Attendance and Leave Policy in effect in 2002 (Exhibit 18), employees must exhaust all forms of paid time off and vacation time before any unpaid absences are allowed. After an employee exhausts all of his paid time off, all incidents of unpaid absence, lateness or early leave are documented, and the School will impose progressive discipline. Unscheduled absences are required to be reported to the Office Manager within one hour of the start of the employee's shift.

38. Mr. Bernard received a warning dated September 25, 2002 for accumulating 6 incidents of unpaid, unscheduled absence under the School's attendance policy. (Trumps, pp. 99-100; Exhibit 19.) He signed this warning because he agreed with it, and did not consider it to be racially motivated. (Bernard, p. 210.)

39. On December 9, 2002, Mr. Bernard received another warning, this time for having 7 unpaid, unscheduled absences. (Trumps, pp. 99-100; Exhibit 20.) Ms. Trumps later rescinded this warning because Ms. Matthews had decided to credit certain of these absences as vacation days, as discussed in the section "Deduction" From Pay, starting at paragraph 50, below. (Trumps, pp. 98-100.)

40. Mr. Bernard received a warning on November 26, 2002 (Exhibit 21), from his acting manager, Mark D'Arcy, for failing to call in on November 15, 2002, to tell D'Arcy he would be absent. This warning was not for being absent but for failing to call in. (Trumps, p. 101.) Mr. Bernard felt the November 26, 2002 warning was unfair, and refused to sign it, claiming that Mr. D'Arcy had himself driven Mr. Bernard to the hospital the day before and knew that Mr. Bernard wouldn't be in on November 15. (Bernard, pp. 200-201.) Bernard also claimed that the fact of his absence was posted on a magic marker board in the office of his immediate supervisor, Mr. Shafer. (Bernard, p. 202.)

41. In February, 2003, the School instituted a revised attendance policy, based upon a point system, and Ms. Trumps explained the new system to Mr. Bernard and the other employees. Under the new system, employees receive the first warning after they accumulate four points. (Trumps, p. 93.) On May 15, 2003, Mr. Bernard received a first warning for accumulating four points under the new system. (Exhibit 22.) He signed the warning. (Bernard, pp. 213-214.)

42. On July 21 Mr. Bernard received another "first" warning for having accumulated four points under the new absenteeism policy. (Exhibit 23.) He agreed with this warning, since he had been taking off time to look for another job. (Bernard, p. 296.)

### Concerns About Mr. Bernard's Threatening Language Regarding Helms

43. At a follow-up meeting on October 4, 2002 among Mr. Bernard and Ms. Trumps and Ms. Matthews, Mr. Bernard made two statements that caused the

women to be very concerned.  As recounted by Ms. Trumps, the statements were:  (1) "I'm very stressed.  This is what spawns people to go postal."  (2) "I'm not a violent person.  If I would have done something, I would have done something before now.  One day I may come in here and climb Will Helms like a tree and snap his neck like a branch."  (Trumps, p. 54.)

44. Mr. Bernard explained at deposition that he made these remarks because he was "really tired of coming up and explaining things" to Ms. Trumps and Ms. Matthews, because "they kept asking me to come in and meet with them and meet with them."  (Bernard, p. 117.)  His testimony was that "I said I understand how a postal workers are like they are," (id.) and "I said if I was a violent person I would have already climbed Will Helms like a tree."  (Bernard, p. 118.)

45. Because Ms. Trumps and Ms. Matthews believed that Mr. Bernard had threatened violence by suggesting that he might "go postal" and saying that some day he might snap Mr. Helms' neck like a tree branch, they called Mr. Bernard in to follow up on what they regarded as inappropriate remarks.  Although Mr. Bernard was agitated and confrontational, he eventually told Ms. Trumps and Ms. Matthews to write up "whatever and I'll sign it," which is what they did, because they understood him to be assuring them that he was not a violent person and they felt it would be best to get that in writing.  (Trumps, pp. 66-69.  See also, Exhibit 24, an unsigned memo dated October 11 regarding this incident and stating that Mr. Bernard had no intention of acting on those threats, with a notation by Ms. Matthews.)

46. Mr. Bernard refused to sign the memo (Exhibit 24) because he did not agree that it represented his meaning.  (Bernard, pp. 120, 125.)  CMES did not discipline Mr. Bernard for not signing the memo:  "We believed him, that he was not going to act.  Would we have liked to have gotten it in writing: yes.  Did we get it: no."  (Trumps, pp. 69. 103.)

* **"Deduction" from Pay**

In early December, 2002, a week's pay was deducted from Mr. Bernard's paycheck.  He appealed to CMES Director, Ms. Matthews, who promptly arranged to have the money restored.  (Bernard, pp. 155-157.)  As explained by Ms. Trumps (Trumps, pp. 108-119), the following had occurred:  CMES has a policy whereby employees who are absent are "forced" to use their paid time off, including vacation days, for these absences (Exhibit 25) and as explained above in paragraph 40, the progressive warning system for absences does not begin until all paid absences have been used.  (Exhibit 18.)  There is also a requirement that employees report to work on the day after a holiday in order to receive holiday pay, unless they present a doctor's note.  (Exhibit 26.)  Vacation days are awarded on an employee's anniversary date.  November 11, 2002 was a holiday, and Mr. Bernard did not report to work on November 12, 13 or 15; these days were initially recorded as vacation days and paid to Mr. Bernard, but on reviewing the payroll Ms. Matthews and then Ms. Trumps realized, first, that there was no doctor's note for the 12th, so the holiday on the 11th should not have been paid, and second that although Mr. Bernard's hire date was November 13 and he would ordinarily have received his two weeks vacation accrual on that anniversary date, he had been off the payroll for a period

of time and under the CMES policy[3] his anniversary date was adjusted accordingly, so he should not have been paid for the 12th, 13th and 15th.  The mistakenly paid holiday and vacation pay was deducted from Mr. Bernard's next check (see Ms. Trumps' memo to payroll, November 25, 2002, Exhibit 27), which caused him to complain to Ms. Matthews because he had not understood the adjustment of his anniversary date and had already spent the money on Christmas presents, so Ms. Matthews reversed the decision in order to be fair, and Mr. Bernard was paid the vacation pay that he hadn't actually yet accrued.  Also, since by then Mr. Bernard had presented a doctor's note, he was given the holiday pay.  (See Ms. Matthews' memo to Ms. Trumps and payroll, December 9, 2002, Exhibit 28.)  Mr. Bernard received back the money that had been deducted within about a week.  (Bernard, p. 160.)

---

[3] The Attendance Policy (Exhibit 19) provides that "If an employee has five or more consecutive unpaid days absent, his/her paid leave accruals (vacation and variable paid time) will be adjusted accordingly."  Mr. Bernard did not understand that this could mean that the anniversary date of his hiring could change.  (Bernard, p. 159.)

11

### Job Performance Issues and Conflicts with McNally and Shafer

47.	John McNally was hired as Facilities Manager in February, 2003. (Bernard, p. 175.) As a new manager, he was "very enthusiastic about making changes and getting things done." Ms. Trumps and Ms. Matthews advised him to "slow down a little bit, not specifically with Ed [Bernard] but with everybody in general." (Trumps, p. 80.)

48.	On February 19, 2003, Mr. McNally gave Mr. Bernard a verbal warning because of a confrontation Mr. Bernard had with his supervisor, Bob Shafer, about shoveling snow. Bernard felt the warning was not racially motivated or retaliatory, however, but just the result of Mr. McNally's not understanding the situation. (Bernard, pp. 217-219.)

49.	According to Mr. McNally's file notes, on February 19, 2003 he counseled both Mr. Shafer and Mr. Bernard about their behavior. (File notes dating from 2/19/03 to 4/3/03, Exhibit 29, p. 3, entries for 2/19/03 and 2/20/03.) His notes reflected the fact that Mr. Bernard was not readying the boats for the return to water on May 1. (Exhibit 29, pp. 2-3, entries for 3/11/03, 3/5/03 and 3/4/03.)

50.	Mr. Bernard regarded Mr. McNally as a racist because of an incident on March 13, 2003, in which Mr. McNally asked him to pick up a cardboard box and, as Mr. Bernard admitted, he failed to do so. When Mr. McNally saw that the box had not been removed, he told Mr. Bernard that he (McNally) had had to physically place it in the receptacle himself. Mr. Bernard "apologized to the utmost" about it: "I said, man, I said I'm sorry. I apologize. . . . I didn't see it; but I figured the grounds crew picked it up." Mr. Bernard felt that Mr. McNally "was torturing" him about the box (Bernard, pp. 178-179; 238-240.) and that he was being "drilled and insulted" because Mr. McNally questioned him as to why he didn't inform Mr. McNally that he had not disposed of the box. (Bernard, p. 240.)

51.	The cardboard box incident led to a series of discussions between Mr. McNally and Mr. Bernard on March 13, 2003 in which Mr. McNally attempted to communicate his concerns about Mr. Bernard's performance, and Mr. Bernard expressed dissatisfaction with the way he had been treated. (Exhibit 29, pp. 1-2, entries for 3/13/03, 11:00 a.m. and 10:00 a.m.). The conversations ended with the two shaking hands and agreeing to try to be more open in communications with each other. (*Id.*, 11:00 a.m. entry.)

52.	Mr. Bernard failed a safe boating course, but denied that he failed it on purpose, though he "didn't give it 100 percent." He "might have mentioned to John [McNally] that I failed it because I didn't want to be a part of the boats." (Bernard, pp. 220-221.) Mr. Bernard eventually passed the test, but felt that his being forced to take the test was racially motivated because he did not want to work on the boats and did not want to operate the boats in any capacity. (Bernard, pp. 224-225.) Everyone in the Maintenance Department took the safe boating course together. (Bernard, p. 226.)

53.	On April 9, 2003, Mr. McNally met with Mr. Bernard and Mr. Shafer. As recounted in a memo prepared by Mr. McNally (Exhibit 30), Mr. McNally told Mr. Bernard that he was aware of Bernard's complaint in the fall 2002 and asked if he had experienced any discriminatory, retaliatory, offensive, vulgar or other inappropriate

12

behaviors since Mr. McNally's arrival. Mr. Bernard said he had wondered whether Mr. McNally's asking him to keep a log of his boat activities, meet with him weekly and prepare weekly boats reports was retaliatory (see Mr. McNally's memo to Mr. Bernard, February 27, 2003, Exhibit 31), but was reserving judgment. Mr. Bernard said he had not been subjected to any inappropriate behavior, and that he had not reported any inappropriate behavior to anyone at the School since September 3, 2002. Mr. Bernard did say there had been additional incidents, but that he had reported them only to his lawyer and refused to discuss the incidents further or to meet with Mr. McNally and Ms. Matthews to discuss them. At the April 9, 2003 meeting, Mr. McNally explained to Mr. Bernard that he was having him keep the log book and make weekly reports because of Mr. McNally's own inexperience with boats, and that Mr. Bernard was not the only mechanic he had questioned. Mr. McNally also told Mr. Bernard he planned to ask periodically about whether there had been additional incidents and that he would do everything in his power to make it easy and comfortable for Bernard. Mr. McNally also told Mr. Bernard and Mr. Shafer that inappropriate behaviors would not be tolerated. Mr. McNally also reminded Mr. Bernard of the Customer Service Behavioral Indicators and the Staff Performance Indicators, as discussed at paragraph 12, above. (Exhibit 9).

54. On April 14, 2003, Mr. Bernard met with Mr. McNally and Ms. Matthews to discuss Mr. Bernard's claim in the April 9, 2003 meeting that incidents of inappropriate behavior had occurred after his September 2002 complaint. Both told him the School would not tolerate inappropriate racial behaviors. (Bernard, p. 193.) The meeting was recorded in a memo from Mr. McNally to Ms. Matthews (Exhibit 3). Mr. Bernard refused to discuss any such incidents.

55. On June 10, 2003, an incident occurred between Mr. Bernard and Mr. McNally that led to the subsequent issuance of a warning to Mr. Bernard. Mr. McNally had asked Mr. Bernard to check the fuel tank on the Ketch, one of the School's boats, and Mr. Bernard replied that he didn't know how this could be done because he thought the tube leading to the tank was twisted; Mr. McNally then took a dowel rod and dropped it directly into the tank to measure the fuel level. Mr. Bernard said he hadn't been down to look at the tank but that he was glad Mr. McNally had figured out how to measure it, to which Mr. McNally responded "what was so hard about this, why couldn't you have done this?" (Bernard, pp. 262-263.) Mr. Bernard regarded this as racist because Mr. McNally was looking at him "as if I'm ignorant," when Mr. Bernard had explained that he hadn't looked at the tank yet, and Mr. McNally was acting "[l]ike he's discovered the wheel." (Bernard, p. 264.) Mr. Bernard then walked away while Mr. McNally was still speaking with him, which ultimately led to the issuance of a warning for both unsatisfactory work and insubordination on June 24, 2003. (Exhibit 35.)

56. On June 11, 2003, Mr. Shafer issued a written warning to Mr. Bernard for not cleaning up the lifeboat; in an attached memorandum Mr. Shafer explained that Mr. Bernard did not clean the boat and that altogether Mr. Bernard needed to keep the boats, trucks and his workshop cleaner, as they had discussed on May 28. (Exhibit 33.) Mr. Bernard testified that he believed that Mr. McNally was really behind this warning, and that he regarded it as racially motivated and retaliatory because the incident hadn't occurred the way it was described by Mr. Shafer, and because Mr. Bernard's his work area was not nearly as dirty as everybody else's. (Bernard, p. 330-331.)

13

57.     On June 11 Mr. McNally wrote a memo to Mr. Bernard in support of Mr. Shafer's warning. (Exhibit 34.) In the memo Mr. McNally recounts a number of incidents (the failure to repair pulleys and lines at the docks, the cardboard container incident, the failure of the safe boating course, and several other mistakes or omissions) that led him to conclude that Mr. Bernard's performance was substandard and lacking in the level of thoroughness and expertise expected of him. The crux of the issue, as recounted by Mr. McNally, was that Mr. Bernard would not accept the wider range of his responsibilities, and continued to view his "role as limited to simply engine repair or mechanical problems." Mr. Bernard acknowledged receiving the memo but characterized it as "a lie" and therefore racially motivated and retaliatory. (Bernard, pp. 231-233.) Mr. Bernard disputed or attempted to justify each criticism set forth in Mr. McNally's memo (Bernard, pp. 232-255), except that he agreed that he had forgotten to put away an ice eater that he had pulled out of the water (Bernard, p. 246), and that he had also forgotten to fuel one of the boats. (Bernard, p. 251.)

58.     Also, on June 11 Mr. Bernard handed Mr. McNally a handwritten note (Exhibit 36), stating that the discussion on June 10 "was a clear demonstration of prejudice by insulting my intelligence as a black man," and also "a clear case of harassment because of my race, and for retaliation." Accordingly, Mr. Bernard stated that he was going to complain to the MEBA Trustees, and copy both EEOC and the NAACP. The next day a typed letter was sent by Mr. Bernard to each of the Trustees (Exhibit 37), announcing that he had filed suit on February 27, 2003 against the School and stating that "[d]ue to extremely poor management practices, several more suits are about to be filed by other employees." The purpose of this communication to the Trustees, which was also copied to NBC, CBS, Fox News, CNN, a local television station and to the NAACP, was "to get some sleep, stop having headaches, and stop having to take Viagra." (Bernard, p. 264.) The employees who were going to complain were the white employees in the Maintenance Department, and they were going to complain about Mr. McNally. (Bernard, p. 266.) He also demanded to meet with Ms. Matthews at this time. (Trumps, p. 75.)

59.     On June 17, 2003, Ms. Trumps and Ms. Matthews met with Mr. Bernard to investigate his note of June 11. Prior to Mr. Bernard's demand to meet with Ms. Matthews the previous week, they had been given no reason to suspect that the issue remained unresolved; as Ms. Trumps testified, "I had not been getting any telephone calls [for several months] from employees relating to discrimination, alleged discrimination situations, or Ed [Bernard] or anybody." (Trumps, p. 74.) As recounted in Ms. Trumps' memo dated June 19, 2003 (Exhibit 38), Mr. Bernard recounted the incident with the Ketch's fuel tank on June 10. He acknowledged that he had started to walk away and was called back by Mr. McNally who had said he was not done speaking with Mr. Bernard, and that Mr. Bernard continued to walk away, stating "I don't feel like being harassed today." Mr. Bernard testified that he walked away because he "couldn't take it no more" when Mr. McNally kept dipping the stick; he regarded Mr. McNally's dipping the stick as "insulting" him, "insulting my intelligence." Mr. Bernard refused to discuss the incident further with Ms. Trumps and Ms. Matthews, claiming that he was "tortured every day" at work. (Bernard, pp. 270-271.) (Ms. Trumps was not questioned about this

14

meeting, or indeed about any aspect of the June 10 episode or the subsequent warning, at her deposition.)

60. Ms. Trumps and Ms. Matthews then met with Mr. McNally, who disclosed that on Friday June 6 he had discussed the fuel tank issue on the Ketch with Mr. Bernard because of a complaint from a MEBA member. (Exhibit 38, p. 2.) Both Mr. Shafer and Mr. Bernard said that the fuel could not be measured with a stick because of a curve in the fuel nozzle. On June 10 Mr. McNally was able to measure the fuel by dropping a wooden dowel rod into the tank, and as he was explaining this to Mr. Shafer, Mr. Bernard passed and Mr. McNally called him over and asked what the measurement problem was while demonstrating the use of the dowel. Mr. Bernard said, "that's good that you were able to figure it out" and walked away. Mr. McNally denied using a tone or language that could be humiliating. (A file memo by Mr. McNally recounting the June 10th incident on the Ketch is attached as Exhibit 39; in it, Mr. McNally recounts numerous issues reflecting poor maintenance of the Ketch, and states that he regarded Mr. Bernard's walking away during the conversation as insubordinate. Mr. Shafer, who was present on the Ketch, wrote a memo dated June 10, 2003, confirming the discussion regarding the measurement of fuel and Mr. Bernard's walking off. (Exhibit 40.))

61. Mr. McNally also told Ms. Trumps and Ms. Matthews on June 17 that Mr. Bernard had lost his work log, and that he had made errors on the boat inspection reports. (Exhibit 38, p. 2.) Mr. Bernard confirmed that he was unable to find the work log that Mr. McNally had asked him to keep and that he didn't understand the boat inspection report, which was new. (Bernard, pp. 272-273.)

62. On June 24, Mr. Bernard was issued a warning notice by Mr. McNally for unsatisfactory work quality and insubordination because of the Ketch incident, along with a brief explanatory memo. (Exhibit 35.) Mr. Bernard regards this warning as racially motivated and retaliatory because it was not issued until two weeks after the Ketch incident of June 10, and the issues were not discussed in Mr. McNally's lengthy memo (i.e., Exhibit 34) regarding his performance deficiencies dated June 11. (Bernard, p. 278; see also Exhibit 41, Mr. McNally's notes on the meeting at which he gave the disciplinary notice to Mr. Bernard.) Ms. Trumps and Ms. Matthews discussed the warning notice with Mr. Bernard on June 26, and concluded that he had been insubordinate on June 10, despite his insistence that virtually everything was false and that all of his problems with Mr. McNally were attributable to racism or retaliation. (Exhibit 42.)

63. During July there were problems regarding the maintenance and mechanical condition of one of the boats, the Bertram, as explained in memos written by Mr. McNally. (Exhibit 43.) Mr. Bernard did not receive any warnings as a result of these problems, and disagreed with everything in Mr. McNally's notes. Claiming that it was all lies, Mr. Bernard concluded that the criticisms were racially motivated and retaliatory. (Bernard, pp. 294-295.)

64. On August 15, Mr. Bernard resigned from his job at CMES in order to take another job. (See telefaxed letter from counsel, August 15, 2003, Exhibit 44.)

65. Mr. Bernard's new job, as a mechanic at Tidewater Yacht Maintenance in St. Michaels, pays more than his former job at CMES. (Bernard, pp. 9-10.)

15

Dated: Washington, D.C.
October 10, 2003

Respectfully submitted,

BEINS, AXELROD, KRAFT, GLEASON & GIBSON, P.C.

By:_____
Barbara Kraft, Esq.
1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C. 20036-2001
Attorneys for Defendant
CALHOON MEBA ENGINEERING SCHOOL

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By:_____
Neal I. Korval, Esq.
Jonathan A. Wexler, Esq.
805 Third Avenue
New York, New York 10022
Telephone: (212) 407-7700
Facsimile: (212) 407-7799
Attorneys for Defendant
CALHOON MEBA ENGINEERING SCHOOL

16