UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

EDWARD G. BERNARD, JR.,

　　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　Case No. AMD-03-CV-443

v.

CALHOON MEBA ENGINEERING SCHOOL,

　　　　　　　Defendant.

**EXHIBITS TO DEFENDANT'S STATEMENT OF UNCONTESTED
FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Barbara Kraft, Esq.
Beins, Axelrod, Kraft, Gleason & Gibson, P.C.
1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C. 20036-2001

Neal I. Korval, Esq.
Jonathan A. Wexler, Esq.
Vedder, Price, Kaufman & Kammholz, P.C.
805 Third Avenue
New York, New York  10022

October 10, 2003

**EXHIBIT 1**

1

1    IN THE UNITED STATES DISTRICT COURT FOR
          THE DISTRICT OF MARYLAND

2

3    - - - - - - - - - - - - - - - x
     EDWARD G. BERNARD, JR.          :
4    2 Brookletts Avenue             :
     Unit #A                         :
5    Easton, Maryland 21601          :
                                     :
6              Plaintiff,            :
                                     :
7         VS.              :Civil Action No.:
                          :  AMD03CV531
8    CALHOON MEBA ENGINEERING SCHOOL :
     27050 St. Michaels Road         :
9    Easton, Maryland 21601          :
                                     :
10   SERVE:                          :
                                     :
11   JOYCE MATTHEWS                  :
     27050 St. Michaels Road         :
12   Easton, Maryland 21601          :
                                     :
13           Defendant.    :
     - - - - - - - - - - - - - - - x
14
                    Baltimore, Maryland
15                  Thursday, August 21, 2003

16   The deposition of

17        EDWARD G. BERNARD, JR.,

18

19

20

21

9

1   Q   Would you state your full name for the

2   record?

3   A   Edward Gregory Bernard, Junior.

4   Q   And what is your home address?

5   A   2 Brooklet's Avenue, Easton, Maryland,

6   21601, Apartment A.

7   Q   Are you currently employed,

8   Mr. Bernard?

9   A   Yes, I am.

10   Q   By whom?

11   A   Tidewater Yacht Maintenance?

12   Q   And where they located?

13   A   Saints Michaels, Maryland.

14   Q   In what capacity are you employed?

15   A   Mechanic.

16   Q   When did you start that job?

17   A   The 18th of August.

18   Q   How is it that you came to get that

19   job?

20   A   I've been searching for the past three

21   months, and I went down there -- my girlfriend

10

1   went down and retrieved an application for me and

2   the guy smiled and said, come on in, we need you

3   real bad.

4       Q    Who is the guy?

5       A    His name is Franz.

6       Q    So Franz hired you?

7       A    Yes.

8       Q    At what rate of pay?

9       A    At 12.25 an hour.

10      Q    Do you know how much pay you were

11  earning?

12      A    11.81.

13      Q    So you're earning more money per hour

14  in your new job than you were earning when you

15  last worked for the Defendant?

16      A    That's correct.

17      Q    Do you also run a newspaper route for

18  someone named Bob Shafer?

19      A    No, I don't.

20      Q    Did you at any time?

21      A    Yes.

15

1    A    As far as?

2    Q    Well, you said you interviewed for the

3    job.  Did they make you an offer to come work for

4    them?

5    A    Yes.

6    Q    Who is it that extended that offer to

7    you?

8    A    Lee Kincaid and Henry Phillips.

9    Q    Was that verbally or in writing or by

10   the phone?

11   A    Verbally.

12   Q    Was it at that same meeting where you

13   were interviewed?

14   A    I think it was the second meeting.  I

15   think I had two interviews.  I think it was the

16   second meeting, if I'm not mistaken.  I'm not

17   quite sure.

18   Q    Do you recall the rate of pay that you

19   started out when they hired you?

20   A    I asked for 9.50 and they gave me

21   10.50.

16

1    Q    And that's an hourly rate?

2    A    Yes.

3    Q    So the school gave you more than you

4    asked for, correct?

5    A    True.

6    Q    And then in the course of your

7    employment with the school, from November of 2000

8    until the conclusion of your employment in August

9    of 2003, your pay increased from 10.50 an hour to

10   11.81 an hour, correct?

11   A    Yes.

12   Q    What position were you hired into?

13   A    Mechanic.

14   Q    To whom did you report when you first

15   started?

16   A    Bob Shafer.

17   Q    And during your interview for the

18   position with Mr. Shafer and Mr. Kincaid and

19   Mr. Phillips, did they describe the job to you?

20   A    Yes.

21   Q    What did they tell you about the job?

17

1      A    I would be taking care of the trucks,

2    the tractors, and the mowers.

3      Q    And did they also tell you that the

4    maintenance department works as a team and that

5    there would be other jobs required from time to

6    time?

7      A    They said that from time to time, very

8    rarely, I would be asked, but from time to time.

9    So rarely, I would say in those terms, would be

10   once in a very great while.

11     Q    So you said that they told you that

12   you'd be taking care of the trucks?

13     A    Trucks, tractors, and mowers.  Their

14   fleet of vehicles.

15   Q    Boats part of the fleet of vehicles?

16   A    No.

17   Q    Is a boat not a vehicle?

18   A    Not an over-the-road vehicle, no.

19   Q    They said over-the-road vehicles?

20   A    No.  They didn't limit it to

21   over-the-road vehicles, but they didn't state

18

1   anything about taking care of the boats.  The only

2   thing they stated about taking care of the boats

3   was that they had two diesel engines inside, a

4   Bertram and a Ketch, that would be need to be

5   repaired and serviced from time to time.

6        Q    That was mentioned to you in the

7   beginning?

8        A    Right.

9        Q    The Tidewater Yacht Company that you're

10  working for now as a mechanic, are you taking care

11  of the boats now?

12       A    Just the motors.

13       Q    The motors on the boats?

14       A    Right.

15       Q    Getting back to the MEBA Calhoon

16  Engineering School.  Were you given a written job

17  description for your initial job?

18       A    No, I wasn't.

19       Q    Did you ask for one?

20       A    No.

21       Q    You stated that you were hired into the

19

1 position of a maintenance mechanic. Were there

2 any changes made to your job title since you were

3 first hired by the school?

4     A     Yes.

5     Q     Changes to your job title, what were

6 those changes?

7     A     I received a demotion about, I would

8 say, it was a demotion in November to grounds

9 crew. I also was --

10     Q     Hang on before we get there.

11           That was November of 2002?

12     A     2002, yes.

13     Q     To grounds crew.

14           Now, was that a title that you were

15 given, grounds crew?

16     A     Right, I would be on the grounds crew.

17 Mark D'Arcy.

18     Q     Mark D'Arcy told you you're no longer

19 going to have the title of maintenance mechanic,

20 you're now going to have the title of grounds

21 crew, or was he describing what your job

20

1  responsibilities were going to be?

2     A    That I would be reporting to Vernon in

3  the morning, and he wrote up a letter stating that

4  I would be on the grounds crew, but I don't know

5  where that is right now.

6     Q    My question to you is:  Did he say that

7  your title was changing from maintenance mechanic

8  to grounds crew?

9     A    That's what he said, yes.

10     Q    Who was Mark D'Arcy?

11     A    I really don't know what role he plays.

12  He was supervisor/manager.  He's supposed to be an

13  instructor.

14     Q    And did he tell you at that time why

15  you were going to be going to the grounds crew?

16     A    No.

17     Q    Did you ask him?

18     A    No.

19     Q    Why didn't you ask him?

20     A    Because it seems like every time I

21  asked a question I get the smoking mirrors

21

1   routine, and nobody ever comes clean with me with

2   the truth as to why.

3         He said, this doesn't reflect on your

4   work.  He said, this isn't demotion in any way.

5   This is what he says to me.

6         And I just -- by that time this

7   November after filing the complaint, I didn't want

8   to make any waves.

9    Q    Did the school cut your pay at this

10  point in time?

11   A    No.

12   Q    Did the school cut your benefits at

13  this point in time?

14   A    No.

15   Q    So what were the changes in your job

16  responsibilities in November of 2002?

17   A    The changes would be that I wouldn't be

18  mainly focusing on the vehicles.

19   Q    Did you have still have some

20  responsibility for the vehicles and the motors?

21   A    Slightly.

22

1    Q    Weren't you doing boats by that time?

2    A    November?

3    Q    Well, in 2002, weren't you doing boats?

4    A    Right.  I had started doing the boats

5    as a favor to Bob Shafer because there was an

6    employee by the name of Wayne Barrett that was

7    there.  He was the one that took care of the

8    boats, all of the boats, the cosmetics, and the

9    only thing he didn't do was work on the diesel

10   engines.

11        So he left.  There was an argument with

12   him and Bob and management and Wayne left.  Bob

13   came to me one day and asked he if I would take

14   the boats for a little while.  I told Bob I didn't

15   want to take the boats.  I didn't want anything to

16   do with the boats except for working on the motors

17   of the diesel engines, and he hounded me and

18   hounded me, I need you, I need you.  I said, okay,

19   I'll do it for a couple of weeks until you find

20   somebody.

21   Q    Roughly when did that discussion occur

23

1   with Mr. Shafer?

2       A    That was right after Wayne Barrett

3   left. I have no idea exactly the date and the

4   time of when Wayne left, but it was in the makings

5   before Wayne had left.

6           Wayne went to vacation up in Michigan

7   and he didn't come back and Bob had whispered in

8   my ear, would you think about doing the boats? Do

9   you have a problem doing the boats? I said, Bob,

10  I don't want to do the boats.

11      Q    But the school told you it needed you

12  to work on the boats and ultimately you agreed to

13  do that, correct?

14      A    For a couple of weeks.

15      Q    But you actually ended up staying on

16  longer than a couple of weeks, didn't you?

17      A    Yes, against my will.

18      Q    The school needed you and you

19  cooperated with the school at that point in time,

20  correct?

21      A    Right.

24

1    Q    At that point in time you didn't mind

2  doing Mr. Shafer a favor?

3    A    Yes, I minded.

4    Q    You minded?

5    A    But I didn't have a choice to do the

6  boats.  It wasn't like I could say, no, Bob, I

7  don't wanted to the boats.  Well, you're going to

8  do the boats.

9    Q    Do you believe at the time he asked you

10  to do the boats that he chose you to do the boats

11  because of your race?

12    A    I can't really say that he chose me to

13  do the boats because of my race.

14    Q    Is it possible that all of this

15  occurred with respect to the assignment to the

16  boat fleet on or around July of 2001?

17    A    I don't recall.

18    Q    And that you stayed on boats for

19  approximately 15 or 16 months until this request

20  to work on the grounds crew was made to you?

21    A    I don't recall.

25

1    Q    Now, after the winter of -- strike

2  that.

3         During the winter of 2002, as in any

4  winter, are the boats in use?

5    A    No.

6    Q    They're in dock, right?

7    A    Right.

8    Q    So the need to maintain the boats is

9  less in the winter than it is during the months

10  that they're operating, correct?

11    A    No.

12    Q    I see.

13    A    You see, the boats -- when they take

14  the boats out, I think in the end of October,

15  that's when the breakdown comes in.  You're

16  checking lights, wires, switches, bottom paint,

17  waxing, scrubbing, cleaning.

18    Q    So who was doing that beginning in

19  November of 2002 when you were starting to do some

20  ground crew work?

21    A    That was me.

26

1    Q    So you continued to do the work on the

2  boats and you were also asked to do this ground

3  crew work?

4    A    Yes.

5    Q    The school was depending upon you,

6  correct?

7    A    Pretty much.

8    Q    The school wasn't taking away

9  responsibilities from you, it was giving you

10  additional responsibilities in and around this

11  period of November of 2002, correct?

12    A    Additional responsibilities that I

13  didn't want, yes.  You see, if Bob had been honest

14  with me in the beginning when he stated that he

15  would try to get my a couple of extra dollars and

16  a pay raise, I wouldn't have had a problem with

17  it; but months went by.

18        And after the raises came -- I think I

19  may have got a 10 cent or 20 cent raise and that

20  wasn't the type of raise that I was exactly

21  looking for.

27

1        In addition to boats, I also had to

2    take care of fuel logs, which meant I had to fuel

3    up the vehicles every day -- and this was Wayne's

4    job too -- and manage the fuel reports, how much

5    went in the boats; how much went into the

6    vehicles, and measuring the tack.

7        And all of these additional

8    responsibilities came with doing the boats.

9    Q    How long did you do grounds crew work

10    for?

11    A    I did ground crews work a few times.  I

12    remember one time I had a lot of vehicles to

13    service and Bob Shafer had asked me to go out and

14    trim bushes.  He asked me if I knew how to trim

15    bushes.

16        He said, I seen on your resume that you

17    landscape.  I said, yes.  He said, can you trim

18    bushes?  I said, yes, but I don't want to trim

19    bushes.

20        As another favor to Bob I went and

21    trimmed the bushes, a lot of bushes.

29

1   also painted. I've also moved furniture in and

2   out of the dorm rooms.

3      Q     Was that in the winter of 2002?

4      A     No, I think that was a little bit

5   before. I'm not quite sure exactly when the dorm

6   project started and when it ended because it was

7   so long, and I was also moving air conditioners

8   and stuff like that.

9      Q     But in November of 2002 when D'Arcy

10  told you he wanted you to be doing grounds crew

11  work more regularly, what type of work were you

12  asked to do?

13     A     Just to go and be with the grounds

14  crew.

15     Q     And what did that entail? What kind of

16  work did that entail?

17     A     That's pretty much servicing,

18  winterizing the vehicles for the spring, tractors,

19  not as far as vehicles, not saying cars, but

20  tractors.

21     Q     Now, who was your supervisor when you

33

1    A    No.  So it would have been 2001.  It

2    would have been April 2001?

3    Q    Now, after you did some grounds crew

4    work at Mr. D'Arcy's request and direction, were

5    you reassigned back to the boat fleet?

6    A    No.  No change every came about to

7    say -- to actually go back and work on the boats.

8    It was more or less is what I picked up on.  It

9    was time to service them and time to get things

10   done to them.

11   Q    So you continued to do the

12   responsibilities that you had since July of 2001

13   in connection with the boats, correct?

14   A    Right.

15   Q    Did there come a point when Mr. McNally

16   became the supervisor of yours?

17   A    I think he was like the manager.

18   Q    Of the whole maintenance department?

19   A    Right.

20   Q    So Mr. Shafer reported to him?

21   A    I don't really know what the workings

46

1    A    Right.

2    Q    Which of these other people would you

3    describe as mechanics that were working in the

4    maintenance department?

5    A    None of them.  Only mechanics I know

6    turn wrenches on motors, vehicles.  All other

7    fields fall under electricians, plumbing, air

8    conditioner, whatever your trade may be.

9        I look at maintenance mechanic being a

10   general as a person that can do everything, a jack

11   of all trades; but there was no jack of all trades

12   there because I didn't see anybody there helping

13   me do brake jobs or changing oil or spark plugs.

14   Q    Do you know any of those people that

15   you just mentioned had those skills?

16   A    None of them did.

17   Q    So it wouldn't make sense for any of

18   them to be assigned those tasks, correct?

19   A    That's true.

20   Q    But you had skills in the grounds

21   keeping area?  For instance, you had landscaping

50

1  think.

2    Q    What white people think that way?

3    A    Racists.

4    Q    Who in particular gave you the

5  assignment that we're talking about?

6    A    That would be Bob Shafer.

7    Q    And you've determined that Bob Shafer

8  is a racist of you said medium proportions, right?

9  You gave him a five out of a ten rating on your

10  scale of racists?

11    A    Yes.

12    Q    Was there someone assigned to perform

13  maintenance on the vehicle fleet?

14    A    Me.

15    Q    Was that a job that you wanted?

16    A    To work on the vehicles?

17    Q    Yes.

18    A    That's what I was hired to do.

19    Q    That job wasn't taken away from you,

20  correct?

21    A    It was taken away from me in the fact

51

1   that I'm a mechanic, I like to take care of the

2   vehicles, and when I see them in disrepair and I

3   can't work on them and I bring it to the attention

4   that the vehicles are in disrepair and I can't go

5   work on them; so, yes, I was I feel like I was

6   being taken off the vehicles.

7          I told them about the housekeeping van

8   for six seven months.  I said the tie rod needs to

9   be replaced.  I said we got to get parts for that.

10  Nothing every happened.

11         I asked them what did they want me to

12  do with the Chevy Silverado, did you want me to

13  work on it and get it running right.

14     Q    Management determined that there were

15  higher priorities at the time, correct?

16     A    I guess you could say management

17  thought there was higher priority, but I can't

18  figure how you would prioritize a job over

19  somebody's safety, because the housekeeping van

20  gets used by the housekeeping women, and if the

21  tie rod end goes up they serve off the road when

52

1   they're going to Peach Orchard or Perry Hall, that

2   would reflect back on me and they would ask me why

3   wasn't that work being done, and I would say I'm

4   pulling carpet.

5       Q    Now, back at the time that Henry

6   Phillips was still the director of the school --

7   by the way, do you remember when he left?

8       A    No, I don't.  I don't recall the exact

9   month and date that he left.

10      Q    Back during the time that he was still

11  director of the school, isn't it true that you

12  complained to Lee Kincaid and to Henry Phillips

13  about your job responsibilities?

14      A    I don't remember that.

15      Q    Isn't it true that Mr. Kincaid told you

16  that your job required you to do all types of

17  maintenance?

18      A    No, I don't recall that at all.

19      Q    Now, are you a member of a labor union,

20  Mr. Bernard?

21      A    Not that I know of, no.

53

1      Q    At some point during your employment at

2   the school, were you given a handbook of personnel

3   policies that were in effect at the school?

4      A    Yes.

5      Q    And in April of 2002 didn't you attend

6   a training presentation in connection with that

7   handbook?

8      A    I think the handbook came out in

9   February.  I think so, yes.

10     Q    I'm going to ask the reporter to mark

11   as Deposition Exhibit Number 1 a document which

12   says at the top 4/26/02, sign-in sheet, employee

13   handbook presentation.

14        (Whereupon, a document was marked as

15   Bernard Deposition Exhibit Number 1.)

16        BY MR. KORVAL:

17     Q    And, Mr. Bernard, looking at the

18   attendees for the 10:30 a.m. session, is that your

19   signature second to the last from the bottom?

20     A    Yes.

21     Q    And you recall attending that

54

1   presentation?

2       A   I guess so.  I don't -- we've had so

3   many meeting that I can't distinguish them one

4   from the other.

5       Q   You received the handbook?

6       A   Right.

7       Q   Did you read that personnel policy

8   manual cover to cover?

9       A   Not cover to cover.

10      Q   Were you aware while you were employed

11  at the school that the school maintained a policy

12  which prohibits harassment and discrimination

13  based on race?

14      A   It says it does not tolerate it.

15  Tolerate it in my mind says if I you do it, that's

16  it.

17      Q   And are you aware that the

18  anti-discrimination anti-harassment policy

19  provided a mechanism for complaining about

20  violations of that policy?

21      A   Yes.

55

1    Q    And are you aware that that

2    anti-discrimination anti-harassment policy

3    provided a mechanism for investigating complaints?

4    A    Yes.

5    Q    And are you aware that the policy also

6    provided for remedial action to be taken to stop

7    any discriminatory behavior?

8    A    Yes.

9    Q    And that policy was contained in the

10    handbook that you were given, correct?

11    A    The right.

12        MR. KORVAL:  At this point I'm going to

13    ask the reporter to mark as Deposition Exhibit

14    Number 2 a document entitled equal employment

15    opportunity and anti-harassment policy.

16        (Whereupon, a document was marked as

17    Bernard Deposition Exhibit Number 2.)

18        BY MR. KORVAL:

19    Q    Mr. Bernard, is the document marked as

20    Exhibit 2 the anti-discrimination and

21    anti-harassment policy that was contained in the

59

1    Q    Now, Mr. Bernard, did you answer?

2    A    Yes.

3    Q    Now, even before you were given a copy

4  of the handbook, isn't it true that you were given

5  a copy of the policy standing alone and that you

6  attended training in connection with that policy?

7    A    I don't remember.

8    Q    Well, let me show you a document that

9  I'm going to ask the reporter to mark as

10  Deposition Exhibit Number 3 entitled employee

11  acknowledgement form?

12        (Whereupon, a document was marked as

13  Bernard Deposition Exhibit Number 3.)

14        BY MR. KORVAL:

15    Q    My question to you, Mr. Bernard, is:

16  Is that your signature on the top line of that

17  form?

18    A    Yes.

19    Q    And that's dated 2/19/02, correct?

20    A    Right.

21    Q    Does this refresh your recollection as

61

1    A    Yes.

2    Q    And which employee is that?

3    A    Will Helm.

4    Q    And referring specifically to racial

5    comments that you personally heard, what was the

6    remark that Mr. Helms made?

7    A    You mean the joke?

8    Q    If you're saying it's a joke.

9    A    How do you get a black man out of a

10    tree, with everybody standing around in the

11    morning at the maintenance barn before we all

12    clock in.  That's usually how on the pow wow

13    starts off.  You cut the rope.

14    Q    Was there any other remark that you

15    directly heard Mr. Helms make?

16    A    How do you know how well a black man is

17    hung at -- that's kind of sick -- but by how tight

18    the rope is around his neck.

19    Q    Is there any other racial remark that

20    you ever heard Mr. Helms make?

21    A    Ed, I'm going to tell you right now, I

62

1   think they're all trying to make us their niggers,

2   and that's what sparked it off.

3       About a month or so before I left,

4   before Will Helms told me, he said, I will testify

5   on your behalf before I testify for them.  I tell

6   you, Ed, excuse my French, but they're trying to

7   make us all their niggers.  Yes, indeed.  Yes,

8   sir.  Right hand of God.  A month before I left,

9   didn't say anything about it.  Because this is

10  what I had to go through.

11      Q   So you're saying that Mr. Helms made

12  that comment in around July of 2003?

13      A   Yes.

14      Q   Did he ever make that same comment at

15  any time previously?

16      A   Yes, he did.

17      Q   Any other racial comments that you

18  directly heard Mr. Helms make?

19      A   Directly, that's just about it.

20      Q   Let's start with the first one, the one

21  you mentioned the joke, how do you get a black man

64

1    Q    I don't mean the time of the day as

2    much as I mean when calendarwise it was made.  Was

3    it made --

4    A    I don't know the exact time and date of

5    that.

6    Q    Let me break it down into two periods,

7    if this helps you.  There came a time when you

8    registered a complaint about Will Helms' comments,

9    and that was September of 2002, and we're going to

10   get into that in just a minute or two.

11   A    Right.

12   Q    The two jokes that you just referred to

13   that Mr. Helms made, the terrible taste jokes --

14   A    Right.

15   Q    -- were those made prior to your

16   complaining about Mr. Helms?

17   A    Right.  All of those jokes were made

18   before.

19   Q    Before you complained in September of

20   2002?

21   A    Well, before I made the complaint to

65

1   the EEOC, yes; but I told Bob Shafer on several

2   occasions -- I told the grounds crew, I said, man,

3   I don't see how you all put up with that.

4           And Vernon and Kevin said, that's how

5   Will is.  We all joke around like that.  I'm like

6   you two can joke like that.  I really don't choose

7   to joke around like that.

8       Q     Before we get turn to your reporting

9   these incidents to Mr. Shafer, there was a third

10  one you mentioned and that was they're all trying

11  to make us their niggers.

12          And you said one time that happened was

13  in around July of 2003, a month before you left,

14  and you said there was a prior time also?

15      A    Right.  That was before the complaint

16  too.

17      Q    Let's focus on that comment for a

18  second that they're all trying to make us their

19  niggers.  What did you understand Mr. Helms to

20  mean by that comment?

21      A    Any time I hear the word nigger hop out

67

1  niggers?

2    A    Right.

3    Q    Did you have an understanding --

4    A    I had an understanding when he uses the

5  word nigger it was directed forwards me.  So I

6  understand the word he was saying --

7    Q    The word is they that I'm asking you

8  about.  Do you know who they was?

9    A    I don't know who they was.

10    Q    Do you have an understanding of who us

11  was?

12    A    I would say maintenance and

13  everybody -- okay. Over Perry Hall was me and

14  William Freeman that day.  Vernon wasn't there.  I

15  don't think Kevin was there either.

16        I was sitting at the desk, will Helm

17  was sitting over at the corner, and William was

18  standing.  And it was something going on at the

19  school and it the made Will Helms say, I think

20  they're all trying to make us all their niggers.

21        If he's saying they're trying to make

68

1  us -- referring to I guess they would be the

2  administration or the supervisors or the

3  hierarchy, I guess that would mean they.  The us

4  part would refer to as me and William.

5      Q    So he was including himself in the

6  group that the administration was trying to make,

7  quote unquote, niggers?

8      A    I've never heard a white man call

9  himself a nigger before.

10     Q    Did you understand him to be referring

11 at that time to himself in the us?

12     A    No.

13     Q    Who was William that you were just

14 talking about?

15     A    William is black.

16     Q    William who?

17     A    Freeman.

18     Q    I see.  So other than the three –

19 strike that.

20          Did you ever hear a racial remark at

21 the school from someone other than Will Helm?

69

1    A    Yes.  I would you ever some say Bob

2    Shafer made a racial remark to a young fellow by

3    the name of Jay.  He was white.  Jay was

4    dressing -- I guess Bob told me like he come from

5    Port Street.  Port Street is a place in Easton

6    where it's the majority black.  So I would say

7    that's a racial comment.

8    Q    Bob said to you that Jay is dressing

9    like he comes from Port Street?

10    A    Right.

11    Q    When did Mr. Shafer make that comment?

12    A    It was when Jay was working.  I don't

13    know the exact time frame.

14    Q    Other than that comment by Mr. Shafer,

15    did you ever hear anyone else at the school utter

16    a racial remark besides the comments you've

17    testified to from Mr. Helms?

18    A    Told directly to me or indirectly?

19    Q    That you heard --

20    A    No.

21    Q    Now, did you ever complain to anyone in

72

1    Q    Well, Mr. Shafer was your supervisor.

2    Let's consider him part on the management?

3    A    I complained all of the time.  I told

4    Bob I didn't appreciate how Will was talking about

5    me behind my back telling me I wouldn't be able to

6    tell everybody I wouldn't be able to get lifeboat

7    running after it had been sitting there for a

8    while.

9    Q    Let me correct my question.  My

10   question was not when was the first time you

11   complained to Bob Shafer about Will Helms.

12       When was the first time you complained

13   to Bob Shafer about Will Helms either acting as a

14   racist or making racial remarks?

15   A    I been telling Bob Shafer that every

16   since I started working there I didn't appreciate

17   how Will was cracking a whole bunch of jokes and

18   stuff like that.  I told him plenty of times.

19       The last straw was when I filed the

20   complaint.  The last straw was when the transition

21   was being made Bob Shafer felt like his job was on

73

1   the line and he decided to call up Dawn Trumps and

2   let her know that Will Helms was making these

3   comments in order to save his job.

4       Q    Let's take a step back.

5           On September 3rd, 2002, did you

6   complain to Bob Shafer about Will Helms making the

7   comment concerning they are trying to make us all

8   their niggers?

9       A    I told him everything.

10      Q    Do you recall having that discussion

11  with Mr. Shafer around September 13th of 2002?

12      A    It may have been around September 3rd.

13  It might have been before that.

14      Q    Well, was a gentleman by the name of

15  Barry Lofland there at the time you complained to

16  Mr. Shafer?

17      A    Barry Lofland was supposed to attend,

18  but he didn't.

19      Q    What race is Mr. Lofland?

20      A    He's black.  He's the one that had the

21  table thrown at him by Bob Shafer.

76

1    meeting of September 3rd, 2002, signed by Robert

2    the Shafer Junior?

3        (Whereupon, a document was marked as

4    Bernard Deposition Exhibit Number 4.)

5        BY MR. KORVAL:

6    Q    Mr. Bernard, if you look at the section

7    of these notes signed by Mr. Shafer entitled

8    results, would you agree that Mr. Helms promised

9    that this would not happen again in the future?

10    A    No.

11    Q    Now, the day after this meeting on

12    September 4th, 2002, isn't it true that you

13    discussed the matter with Dawn Trumps?

14    A    Yes.

15    Q    And who is Ms. Trumps?

16    A    She was just elected the human

17    resources director, I guess.

18    Q    Now, are you claiming that Ms. Trumps

19    is a racist?

20    A    I would have to say yes.

21    Q    What evidence do you have that

77

1  Ms. Trumps is a racist?

2      A    Because when I informed Ms. Trumps that

3  I was going to inform the EEOC about this matter

4  she informed me that I didn't have grounds to

5  stand on. So by that comment I would say yes.

6      Q    Other than that comment, is there any

7  evidence in which you're relying in your calling

8  Ms. Trumps a racist?

9      A    Well, before I left MEBA Will Helms

10  used the N word again. So that leads me to

11  believe that nothing was ever done to curb his

12  appetite for him using that remark.

13      Q    Now, where did the meeting with

14  Ms. Trumps take place on September 4th?

15      A    I guess it was on the 4th. When I

16  spoke to Dawn it was over in the Duby Center in

17  her office on MEBA campus.

18      Q    In Easton?

19      A    Yes.

20      Q    Why did you seek out Mr. Trumps if

21  Mr. Helms, in fact, apologized the day before and

78

1  agreed to cease using such language in the future?

2      A    I didn't see any honesty in his eyes

3  when he said it, no compassion, no remorse,

4  nothing.

5      Q    So you didn't believe that he was

6  really going to stop it in the future?

7      A    No.

8      Q    Even though he said he was going to

9  stop it in the future?

10     A    Right.

11     Q    Why didn't you just give it a chance

12  and see whether he would be true to his word?

13     A    I'll tell you why.  When I first

14  started working at MEBA in November, I think it

15  was right before Thanksgiving, -- I was lucky

16  enough to get in before Thanksgiving, and I was

17  just getting to know everybody.

18          I think it was during one of the

19  graduation parties and some of the people from

20  maintenance stayed over.  Will didn't really know

21  me.  Will said, come on, Eddie, get in truck.

79

1   Let's go for a ride over to Peach Orchard.  We had

2   all be drinking and everything.

3        Will said to me, he said, you know

4   what, Ed, you're all right for a black boy.

5   You're all right for a black boy.

6   Q    When did that comment --

7   A    That was maybe a few weeks after I

8   started.  It was like a graduation ceremony for

9   the students and a few of the maintenance

10  employees stayed over and partook in the

11  festivities and that's when that comment was made.

12  Q    And because of that comment you decided

13  not even to give his apology a chance to see

14  whether or not he would be true to it?

15  A    Well, if he hadn't have been making

16  those comments -- you know, I been listening to

17  this for like two years now, two full years.

18  Q    Now, in your meeting with Dawn Trumps

19  on September 4th, did you tell Dawn Trumps that

20  you were not satisfied with Will Helms' apology?

21  A    No, because she told me I didn't have

80

1  grounds to stand on.

2      Q    So it's your testimony that you did not

3  tell Ms. Trumps that you were dissatisfied with

4  Will Helms' apology?

5          Is that your testimony?

6      A    Yes.

7      Q    Were you dissatisfied with his apology?

8      A    Yes, I was.

9      Q    Why were you dissatisfied?

10      A    Because he didn't have any sincerity in

11  his heart or eyes.  You can look a man deep into

12  his eyes and see what he's thinking, at least I

13  can, and I didn't see any compassion, no remorse

14  there at all.

15      Q    Now, isn't it true that in your meeting

16  with Dawn Trumps she assured you that she would

17  counsel Mr. Helms directly about his inappropriate

18  conduct and that she also document his personnel

19  file?

20      A    No.  All I recall is she said she was

21  going to talk to Will Helms.  That's all I

94

1   Exhibit Number 6, a document entitled notes on Ed

2   Bernard's complaint.  It's just signed by Joyce

3   Matthews.

4        (Whereupon, a document was marked as

5   Bernard Deposition Exhibit Number 6.)

6        BY MR. KORVAL:

7        Q    Mr. Bernard, my question is:  Looking

8   at the section of that memo dated 9/6/02, does

9   that accurately reflect your September 6th meeting

10   with Ms. Matthews?

11       A    It was a short meeting.  I mean, we

12   were standing in the hallway.  It wasn't a

13   sit-down meeting because I told her -- she said

14   she was going to have a meeting, but I didn't want

15   to be there because everyone else was going to be

16   there and everyone knew what I had done and I

17   didn't want to be around them because just I felt

18   like everybody was talking about me.

19       Q    Reading in that section there up until

20   point number two, which continues on to the next

21   page, is there anything inaccurate in

103

1   or everybody that's black.

2      Q    Isn't it true that Joyce Matthews met

3   with you on September 20th in response to

4   Mr. Bergmeier's letter?

5      A    I don't remember the date.

6      Q    But do you recall meeting with her in

7   response to Mr. Bergmeier's letter?

8      A    I had some meetings, I don't remember

9   which meeting happened first, second, or third.

10     Q    Well, do you recall meeting with Joyce

11  Matthews shortly after Mr. Bergmeier's letter and

12  telling her that you denied that there were any

13  incidents of a racially offensive nature after

14  September 4th?

15     A    Yes.  After the September 4th, yes

16  because I wasn't around anybody.  I punched in and

17  came in bright and early before everybody else got

18  there, went off to Perry Hall, did my job.  So I

19  wasn't around nobody for the whole day for months.

20     Q    So there was the incident before

21  September 3rd?  There was the apology on September

104

1    3rd and September 4th.  Then there were no

2    incidents after that, and you met with

3    Ms. Matthews after Mr. Bergmeier's letter and you

4    told her that.

5    A    I wasn't around anybody, that's what I

6    told her.

7    Q    And --

8    A    She asked he if there was anymore

9    incidents, and I said, Joyce, I said, in one of

10   the meetings, I don't know which meeting it was,

11   but I told her that, you know, every time she

12   asked me about these meetings I said I'm not

13   around anybody else.

14          I come in -- like everybody else gets

15   there around 7:30.  I'll get there around ten

16   after 7:00.  I punch in.  I'm in the truck.  I'm

17   over to Perry Hall.  And when everybody leaves I'm

18   like, 4:05, punching out, when everybody leaves

19   punching outs I was never around for months.

20          I didn't even eat in the kitchen or the

21   cafeteria anymore because I separated myself from

105

1  everybody, isolated myself from everyone for

2  months.  Even Vernon and William, didn't say much

3  to them either.

4      Q    Would you consider that the behavior of

5  a team player, Mr. Bernard?

6      A    I consider that the actions of a person

7  who doesn't want to be around insults.  In

8  somebody need a helping hand, yes, I'm ready to

9  give it to you; but as far as putting myself out

10  there on the chopping block being assaulted,

11  talked act, criticized -- I know what my job is

12  and I do doing my job every day.

13      Q    Weren't you given assurances from the

14  school's policy, from school's training in regard

15  to that policy, and from your meetings with

16  Mr. Shafer and your meetings with Ms. Trumps and

17  your meetings with Ms. Matthews, that there would

18  be no more racial insults?

19      A    In passing.  It wasn't like etched in

20  stone.

21      Q    In addition to telling Ms. Matthews

113

1    At this October the 4th meeting with

2    Ms. Matthews and Ms. Trumps, didn't you tell them

3    that there had been no other racial comments or

4    issues directed at you since the comment by Will

5    Helms on August 30th?

6    A    I believe I did mention it to her, and

7    I stated to her that I'm not around anybody.

8    Q    Now, didn't you tell Joyce Matthews and

9    Dawn Trumps on October 4th that people like Will

10   Helms spawned people to, quote, go postal, close

11   quote?

12   A    That's what's I waiting to get to.

13   Q    We're here.

14   A    That's not what I said.

15   Q    You deny saying that?

16   A    Do you want me to explain to you how

17   that was said?

18   Q    We'll get there in a minute.

19   A    Okay.

20   Q    Did you tell Joyce Matthews and Dawn

21   Trumps at this October 4th meeting that one day

116

1    A    No, that's not correct.

2    Q    In a minute I'm going to ask you to

3    tell me what you actually said, but first why

4    don't you finish the thought that your attorney

5    started?

6    A    One day I asked Will what he was

7    working on and he said he doing nigger work.  I

8    remember that.  I think he was digging a hole, or

9    something like that.

10    Q    About how much before your initial

11    complaints to Bob Shafer made on September 3rd did

12    that occur?

13    A    I don't remember, but I do remember him

14    saying that, and I'll admit on that I kind of

15    chuckled when I walked away.

16    Q    Was it weeks before, months before, was

17    it a year before?

18    A    I don't remember.

19    Q    But it certainly was before?

20    A    I don't remember when he said it.  I

21    don't know the exact date, but I do remember him

117

1   saying that one day.  I do know it was hot.  It

2   was hot.  So it must have been spring or summer.

3      Q    All right.

4          Now, you've testified that there's some

5   inaccuracy in the description of your threat to

6   Will Helms.  Why don't you tell us what you recall

7   actually saying at that October 4th meeting?

8      A    Well, this was after they kept asking

9   me to come in and meet with them and meet with

10   them, and I was tired, I was really tired of

11   coming up and explaining things.  And, you know,

12   from what I've seen nothing was actually done.

13          I said I understand how a postal

14   workers are like they are.  And as far as

15   climbing --

16      Q    What was that intended to mean?

17      A    I just understand the stress of how

18   postal workers are.  I understand their stress.

19      Q    Are you talking about postal workers

20   that go off and shoot co-workers?

21      A    I'm just saying the postal workers as

118

1  their stress.

2      Q    Are you talking about the particular

3  group of postal workers who have been known to go

4  and --

5      A    No.  I'm talking about the stress of

6  the postal worker.

7      Q    Just the regular mail carrier?

8      A    Right, the postal worker.

9      Q    You perceive them to be a particularly

10  stressed out group of employees, postal workers?

11      A    Yes.  The mail has to come, sun or

12  shine, rain or storm.

13      Q    So you weren't talking about violent

14  postal workers; is that your testimony here today?

15      A    No.  And I said, if I was a violent

16  person, I would have already climbed Will Helms

17  like a tree, stating if I was.

18      Q    But the words, if I was a violent

19  person, don't appear in this memo, correct?

20      A    Yes, like a lot of other things.

21      Q    And then six days later on October 10th

120

1    correct?

2        A    Yes.  She wrote that up and typed it

3    up.

4        Q    Did you sign it?

5        A    No, I didn't.

6        Q    Why not?

7        A    Because that's not how I phrased it.

8    That's not how I meant that.  I wasn't saying I'm

9    a postal worker, I'm stressed out, I'm going to

10   come up here and shot at people.  I didn't say I

11   was going to come in here and Will Helms like a

12   tree and snap his neck.

13       Q    Didn't you tell will Joyce Matthews or

14   Dawn Trumps to write something up that would you

15   sign?

16       A    No, I don't remember that.

17       Q    You're telling me that you did not tell

18   them to write this up?  Is that what your

19   testimony is on the record?

20       A    Why would I tell them to write

21   something up that I didn't say?

125

1  them. I'm sorry, I disagree with that.

2  Q    If it were you that somebody uttered

3  those threats again as contained in Ms. Trumps'

4  memo, wouldn't you want them to have investigated

5  such a threat against you thoroughly?

6  A    No because those aren't the words that

7  I said. All of that stuff is out of context.

8      So if somebody said if I was angry I

9  would climb Ed like a tree and snap his neck,

10  that's if, that's an if.

11  Q    That's thinking like a violent person,

12  Mr. Bernard, isn't it?

13  A    No, it's explaining that you're not a

14  violate person.

15  Q    Why would a nonviolent person think

16  about such acts at all?

17  A    Because of the very first statement

18  they said that I said about postal workers going

19  off, and they said something about that. I said,

20  look, I'm not a violent person, if I was.

21  Q    The school told you it want assurances

136

1  identify it.

2    A    Yes.

3    Q    Is that your signature down at the

4  bottom?

5    A    Yes.

6    Q    Why did you file this in October, late

7  October of 2002?

8    A    Because my nerves were bad; things

9  weren't going right, and they haven't been going

10  right since.

11    Q    But there hadn't been any incidents

12  directed against you since August 30th, correct?

13    A    I hadn't been around anybody.

14    Q    You had chosen to isolate yourself and

15  the incidents stopped.  So what was it that was

16  happening between the time of Helms apology on

17  September 3rd and October 22nd that caused you to

18  file this?

19    A    Because they didn't do anything to Will

20  Helms, nothing was done.

21    Q    You would have been happy if they fired

137

1  Will Helms?

2    A    No, I don't think a man should be

3  fired.

4    Q    What do you think they should have

5  done?

6    A    I don't know.  Do something, because

7  obviously whatever they did it didn't work,

8  because I always reflect back to the month before

9  I left and he used the exact same phrase again.

10    Q    That doesn't mean the school didn't

11  try, does it?

12    A    Yes.

13    Q    It means that?

14    A    Yes.

15    Q    Now, in here, in your EEOC charge, you

16  refer to racially derogatory comments and jokes.

17  And are those the comments and jokes that Will

18  Helms made prior to August 30th that you've

19  testified to already?

20    A    Yes, and a couple of others.  One was,

21  bend over, I need me a black boy today.

138

1    Q    Who made that comment?

2    A    That was Will Helms.

3    Q    When did he make that comment?

4    A    I don't have the date and time.

5    Q    But before September 3rd, 2002?

6    A    Right.

7    Q    And anything else?

8    A    No.

9    Q    In what way was the hostile environment

10   continuing as of October 22nd, 2002, as you allege

11   in paragraph 1?

12   A    The constant drilling and asking me

13   questions.

14   Q    Well, was it improper for the school to

15   investigate additional allegations called to their

16   attention by your attorney?

17   A    No.

18   Q    Was it improper for the school to

19   attempt to meet with you to discuss that?

20   A    We had already discussed it and nothing

21   was being done about it.

140

1  know; but something more should have been done.

2  Q    Wouldn't you agree that there were no

3  incidents tolerated since his September 3rd

4  apology as of the date you wrote this form?

5  A    I wasn't around him.

6  Q    And so you're not aware of any

7  incidents, correct?

8  A    I'm not aware because I wasn't around

9  him.

10  Q    Are you aware that the EEOC dismissed

11  your charges has having no evidence to support it?

12  A    No.

13  Q    You're not aware of that?

14  A    No.

15  Q    I'm going to show you a document called

16  dismissal and notice of rights, and I'm going to

17  ask the reporter to mark this as Defendant's

18  Deposition Exhibit 16.

19        (Whereupon, a document was marked as

20  Bernard Deposition Exhibit Number 16.)

21        BY MR. KORVAL:

144

1       Do you recall that now?

2    A   Yes.

3    Q   And isn't it true that William Freeman

4  was out on disability during that time?

5    A   Yes.

6    Q   And Mr. Freeman was on the grounds

7  crew, right?

8    A   Right.

9    Q   This is also going into the winter of

10  2002/2003, correct?

11   A   Right.

12   Q   Do you remember that being a

13  particularly harsh winter?

14   A   Yes.

15   Q   Very cold, a lot of snow?

16   A   Yes.

17   Q   A lot of ice?

18   A   I don't remember snow and ice.

19   Q   This past winter.

20   A   This past winter was interesting.

21   Q   It's one of the harshest winters on

152

1    A    Yes.

2    Q    Are all of the allegations in here true

3    to the best of your knowledge?

4    A    Can I write on this?

5    Q    Not on that.  I'll give you an extra

6    one.

7         MS. META:  You can write on this one.

8         THE WITNESS:  Except for 15 and 17.

9         BY MR. KORVAL:

10   Q    And in which way is 15 untrue?

11   A    The long-term relationship with a white

12   woman.  That's more or less Scott Smith's deal.

13   Q    Scott Smith criticizes you for that,

14   not Mr. Helms?

15   A    It was more of things that came about

16   when I was walking past him and he said, Ed, you

17   like those white woman.

18   Q    Walking by Mr. Smith?

19   A    Me walking by Scott Smith.

20   Q    So 15 should say Mr. Smith?

21   A    Right.

155

1    A    Except for the fact that -- no, because

2    I hadn't been around.  I wasn't around at the

3    time.

4    Q    So 20 is not a true statement at the

5    time this complaint was signed, correct?

6    A    Correct.

7    Q    Taking a look at paragraph 22 of the

8    complaint.  Can you describe the unjustified

9    deductions from your weekly pay?

10    A    Can I describe what happened?

11    Q    Yes.

12         What is it that you're talking about

13    when you talk about unjustified deductions?

14    A    They took money out of my check.  They

15    were paying me for my vacation time and they -- I

16    think it was a week before Christmas I got a check

17    for like 300 and some dollars, and then Mark

18    D'Arcy, after I asked for my timecards and my

19    personnel records from the front office, Mark

20    D'Arcy comes over to Perry Hall and gives me $100

21    bill out of his pocket and says to me, please,

156

1    don't hold this against the school.  It was a

2    mistake.

3           How you take one full week's pay out of

4    a person's check, I don't see how that could be a

5    mistake.

6    Q    Isn't it true that you were mistakenly

7    paid one week vacation pay before you actually

8    earned it?

9    A    No, I don't recall that.

10    Q    Isn't it true that the school was

11    having you pay that money back through the payroll

12    deduction?

13    A    No, I don't remember that.

14    Q    Didn't you tell Ms. Matthews that this

15    was causing me financial hardship, I can't pay my

16    rent?

17    A    I told her taking that money out of my

18    check like that was messing me up and asked why

19    did she do it.

20    Q    Isn't it true then that she undertook

21    steps to get a check cut for you to give the money

157

1  back.

2      A    Not until I asked for my personnel

3  records and my timecards.  If I had never asked

4  for those two things I would have never received

5  that money because it was already taken out of my

6  check.

7      Q    But isn't it true that after you

8  complained to Ms. Matthews about the financial

9  hardship it was causing you, that she arranged to

10  get a check cut for you to get that money paid

11  back to you?

12      A    It would have never happened if I

13  hadn't asked for the timecards and the records.

14  It would never have happened until this day.

15          MR. KORVAL:  I'm going to ask the

16  reporter to mark Defendant's Exhibit 19, a

17  collection of e-mails and some payroll records.

18          (Whereupon, a document was marked as

19  Bernard Deposition Exhibit Number 19.)

20          BY MR. KORVAL:

21      Q    Now, looking at the numbered paragraphs

159

1    A    Yes. After I asked for my timecards

2    and my attendance record to see why they made

3    those deductions, because it says right in the

4    employee handbook that each of employee receives

5    their vacation pay on their anniversary. My

6    anniversary date was November the 13th not

7    December the 12th.

8        If you get married today your

9    anniversary is not two weeks later, or two weeks

10   before. That's what it says in the handbook, on

11   the anniversary date.

12   Q    So there's a disagreement as to the

13   interpretation of the policy initially, correct?

14   A    It's their book. They wrote it.

15   Q    Is it your claim that initially when

16   the vacation was deducted from you it was deducted

17   based on your race?

18   A    The vacation, as far as them taking my

19   pay?

20   Q    Yes.

21   A    I base that on the fact they received

160

1   something from the EEOC.

2   Q   So you're saying that was retaliatory

3   and your race, that they took that from you, but

4   then they gave it back to you, correct.

5   A   After I asked.  We don't want to forget

6   that.  After I asked for the timecards.  They just

7   can't say they up and gave me --

8   Q   How many weeks passed?

9   A   How many weeks had passed?

10   Q   Yes.

11   A   One full week -- after they gave me the

12   money back?

13   Q   Right.

14   A   A week and a couple of days, I think.

15   Q   You explained your position to

16   Ms. Matthews as to your entitlement to vacation,

17   correct?

18   A   I explained to her that some money was

19   missing out of my check.

20   Q   You explained to her why you thought

21   you were entitled to vacation, correct?

174

1    Q    The school sought, attempted, to

2    conduct an investigation into the allegations in

3    your federal complaint, correct?

4    A    I don't know if they did any real

5    investigation or not.  I mean, an investigation

6    could be in depth or an investigation could be

7    just a question.  I don't know.

8    Q    But you know there was some kind of

9    investigation, and they wanted to meet with you to

10   discuss the allegations, correct?

11   A    Right.

12   Q    And you refused to participate,

13   correct?

14   A    Pretty much.

15   Q    Your refusal to participate in the

16   school's investigation was contrary to the request

17   of Mr. Bergmeier and the representation of

18   Mr. Bergmeier that he had made earlier, correct?

19   A    I don't understand the question.

20   Q    Well, let me show you a letter from

21   Mr. Bergmeier dated October 16th, 2002, which I'm

175

1  going to ask the reporter to mark as Deposition

2  Exhibit Number 20.

3        (Whereupon, a document was marked as

4  Bernard Deposition Exhibit Number 20.)

5        BY MR. KORVAL:

6    Q   Didn't Mr. Bergmeier represent to the

7  school and request of you that you, quote,

8  cooperate with any investigation by the school,

9  close quote?

10   A   That's what he told me.

11   Q   But you chose not to cooperate?

12   A   It was giving me headaches.  A torture

13  session every day.  Every Thursday or Friday --

14   Q   Who is John McNally?

15   A   I guess John McNally is now the manager

16  or facilities manager, I guess.

17   Q   When was he hired?

18   A   I think he came on in February 2003.

19   Q   Who did he replace?

20   A   I don't know because that position was

21  just conjured up by the air.  I don't know who he

178

1    Q    What evidence do you have that he

2  treats people who are similarly situated

3  differently?

4    A    Could you explain that question?

5    Q    You just said he's not even-handed,

6  meaning he's treating people in the same situation

7  differently.  I'm asking what you evidence do you

8  have of people being in the same --

9    A    He was torturing me about a cardboard

10  box that I apologized for that missed, because he

11  asked me to pick it up.  And he said I had to

12  physically place that cardboard box in the

13  receptacle myself, and I apologized to the utmost

14  to John about that.  I said, man, I said I'm

15  sorry.  I apologize.

16    Q    You screwed up?

17    A    No.  He said, why didn't you report

18  back to me?  And I said, I figured the grounds

19  crew had picked that cardboard box up.

20        I said, I'm sorry, I didn't see it; but

21  I figured the grounds crew picked it up.  He said,

179

1   well, why didn't you report back to me?  I said,

2   well it's just a cardboard box.  They go around

3   picking up the trash.

4       Q    Now, shortly after Mr. McNally came on

5   board in February of 2003, didn't he share with

6   the maintenance staff a list of behaviors which he

7   deemed to be unacceptable?

8       A    I think I missed that day.

9       Q    Now, you say you think you missed that

10  day.  Weren't there two meetings, one on March

11  13th, 2003, and another on March 20th, 2003?

12      A    I don't know.

13      Q    And didn't you attend the one on March

14  13, 2003, but missed the one on March 20th, 2003?

15      A    I don't remember.

16          MR. KORVAL:  Now, I'm going to ask the

17  reporter to mark as Defendant's Exhibit 21 a list

18  of behavioral indicators.

19          (Whereupon, a document was marked as

20  Bernard Deposition Exhibit Number 21.)

21          BY MR. KORVAL:

180

1    Q    Didn't Mr. McNally read this list to

2    the maintenance staff at a meeting that you

3    attended?

4    A    I wasn't here on that date.

5    Q    You didn't attend such a meeting?

6    A    No.

7    Q    Wasn't this list also stored in the

8    maintenance shop?  Wasn't this posted in the

9    maintenance shop?

10    A    I don't know.  I never look at the

11    walls in the maintenance shop?

12    Q    Never look at the walls.

13        So is it your testimony that you never

14    saw this list?

15    A    I asked John about the meeting one day

16    and he went over a few things with me.

17    Q    Now, I'm going to represent to you that

18    this is the list of behavioral indicators that

19    Mr. McNally went over with the maintenance staff

20    both on March 13th and March 20th and also posted

21    in the shop.