188

1  quickly as we can.

2       BY MR. KORVAL:

3    Q    Mr. Bernard, Vernon Freeman is black,

4  correct?

5    A    Yes.

6    Q    You were aware that he and Will Helms

7  socialize with each other and have done so for

8  many years?

9    A    I recall them socializing, but for how

10  many years I'm not sure of.

11    Q    Would you describe them as friends?

12    A    Maybe they would describe themselves as

13  friends.

14    Q    Mr. Bernard, did you tell the EEOC, and

15  I quote, there is a guy named Kevin Young.  He

16  said that I am blowing this all out of proportion.

17  He said we call each other niggers all of the

18  time.  We all joke around like that.

19       Did you tell that to the EEOC?

20    A    Yes.

21    Q    Is Kevin Young black?

189

1    A    Yes.

2    Q    Did you meet with John McNally on or

3    around April 9th of 2003?

4    A    Well, I don't remember.

5        MR. KORVAL:  I'm going to ask the

6    reporter to mark as Exhibit 22, Deposition Exhibit

7    22, a personnel record signed by John McNally on

8    4/9/03.

9        (Whereupon, a document was marked as

10    Bernard Deposition Exhibit Number 22.)

11        BY MR. KORVAL:

12    Q    And my first question is:  Does this

13    refresh your recollection as to whether you met

14    with John McNally on that date?

15    A    I don't remember ever seeing this.

16    Q    It wasn't my question.

17        My question is:  Does this refresh your

18    memory as to whether there was a meeting on or

19    about that day?

20    A    No, it doesn't.  We have meetings all

21    of the time.

190

1    Q    Do you recall a meeting at which the

2    matters mentioned in here were discussed between

3    you and Mr. McNally?

4    A    Okay, I remember.

5    Q    Now, he had been employed in this

6    management capacity at the school for a little

7    over two months at this time, correct?

8    A    Yes.

9    Q    Do you recall telling him at that

10   meeting that since he began on February 1st, 2003,

11   that you had not been exposed to any

12   discriminatory retaliatory or offensive conduct?

13   A    Yes, I told him that, because I wasn't

14   around anybody, and he observed that I was never

15   around anybody.

16   Q    You had isolated yourself, as you

17   testified to earlier?

18   A    Right.

19   Q    And you also told him that you did not

20   report any post-September 4th, 2002, incidents to

21   anyone at the school, correct?

193

1  are not the words or actions of racists, wouldn't

2  you?

3  A   Those words aren't.

4      I'm not going to make it.

5  Q   Didn't they tell you to advise them

6  immediately if any such incidents occurred?

7  A   Yes.

8  Q   And hadn't Joyce Matthews also told you

9  that back in September and October?

10  A   I don't remember.

11      MS. META:  Do you want to take a walk

12  downstairs?

13      THE WITNESS:  It's not going to help.

14      MS. META:  Off the record.

15      (Discussion off the record.)

16      MR. KORVAL:  I'm going ask the reporter

17  to mark as Defendant's Exhibit Number 23 a charge

18  of discrimination filed with the Maryland

19  Commission on human rights and the EEOC dated

20  4/10/03.

21      (Whereupon, a document was marked as

194

1   Bernard Deposition Exhibit Number 23.)

2        BY MR. KORVAL:

3   Q    What is this, Mr. Bernard?

4   A    This is the additional retaliation

5   charge that I filed with the EEOC.

6   Q    And also with the Maryland Commission?

7   A    Right.

8   Q    And that's your signature down at the

9   bottom?

10  A    Yes.

11  Q    Are all of the allegations in here

12  true?

13  A    Yes.

14  Q    What's the demotion you're referring

15  to? Is that the demotion to the grounds crew that

16  you testified about earlier?

17  A    Right.

18  Q    The written notice that you're

19  referring to, was that the memo we looked at

20  before from Mr. D'Arcy making that --

21  A    The grounds crew and doing the boats, I

196

1   for; isn't that true?

2      A    No.

3      Q    You deny that they said that to you?

4      A    Yes.

5      Q    Is it your testimony that an employer

6   doesn't have the right to assign its employees

7   where they're needed?

8      A    Well, from time to time if they need

9   you in a spot, but every day, constantly every

10  day, I think that's false advertising.

11     Q    And if you didn't like the job you had

12  the ability to quit, correct?

13     A    I tried and tried.

14     Q    But you couldn't secure other

15  employment?

16     A    No.  Everything was pretty much locked

17  down until now.

18     Q    But you admit that there was no

19  reduction in your pay and benefits at the time of

20  the grounds crew transfer, right?

21     A    Correct.

198

1    Q    Well, if going from boats to grounds

2    crew was, in your mind, a demotion, can you

3    explain how going from grounds crew back to boats

4    was not a promotion?

5    A    I think they're both one in the same,

6    because I'm a skilled worker and I think my

7    talents are best served as turning a wrench, not

8    scrubbing a boat, not cutting bushes, not weed

9    wacking.

10        So I looked at all of that as being a

11    demotion because I wasn't hired to cut grass or

12    trim bushes or scrub boats.

13    Q    Who was turning the wrench?

14    A    Me.  That's a mechanical term.

15    Q    Who was doing it?

16    A    Me.

17    Q    You were doing it at the same time too,

18    right?  You were doing that and they were asking

19    you to do these additional responsibilities as

20    well, correct?

21    A    I didn't turn too many wrenches.

200

1    Q    What is it?

2    A    It's a written warning from Mark D'Arcy

3    the day after he dropped me off from having an

4    allergic reaction from the medicine Dr. Baine gave

5    me.

6    Q    What was this warning issued for?

7    A    Employee was absent and failed to call

8    supervisor.

9    Q    Why did you not sign this notice?

10    A    Because it wasn't true.

11    Q    Are you claiming that this warning

12    notice was an act of racial discrimination against

13    you?

14    A    Yes, I do because I told them, and I

15    had a doctor's note, for these occasions and I

16    told them I wouldn't be in the following day.

17    Q    Are you claiming that this warning

18    notice was an act of retaliation against you?

19    A    Yes.

20    Q    What's your evidence that this was an

21    act of retaliation against you?

201

1    A    I mean, he wrote me up.  He knew about

2    it the day before.

3    Q    Now, are you talking about the day

4    before he wrote you up, because the date of the

5    write-up is November 25th; the date of the

6    incident is November 15th?

7    A    Right.

8        They knew that -- they was well aware

9    of the absences.  As a matter of fact, I think it

10   was even marked up on our little board that we

11   have on Bob Shafer's office.

12   Q    Who was it that you claimed to have

13   notified that you wouldn't be in?

14   A    That would be Mark.

15   Q    So your testimony is that you told Mark

16   himself that you weren't going to be in on the

17   15th and that he still wrote you up on the 25th

18   because you didn't tell anybody that you wouldn't

19   be in?  That's your story?

20   A    Yes.

21   Q    And you're saying the advanced notice

202

1   that you wouldn't be in was also posted in

2   Mr. Shafer's office?

3       A   It should have been up like a little

4   magic marker board, whatever you call those

5   boards.

6       Q   I'm not asking you whether it should

7   have been up there.  I'm asking you whether you're

8   telling me it was up there?

9       A   Yes, it was up there.

10          MR. KORVAL:  I'm going to ask the

11  reporter to mark as Deposition Exhibit Number 25 a

12  warning dated November 25th, 2002.

13          (Whereupon, a document was marked as

14  Bernard Deposition Exhibit Number 25.)

15          BY MR. KORVAL:

16      Q   I ask you if you can identify that

17  document?

18      A   Yes, I remember it.

19      Q   Is this a warning notice that was

20  issued to you?

21      A   Yes.

210

1   right-hand side?

2       A    That's my signature.

3       Q    Why did you sign this one?

4       A    Because I agreed with it.

5       Q    You're warned in there that additional

6   incidents of absenteeism or lateness could result

7   in additional discipline, possibly even your

8   termination, correct?

9       A    True.

10      Q    And you agree with that, right?

11      A    Yes.

12      Q    Now, are you claiming that this warning

13  notice was an act of racial discrimination against

14  you?

15      A    No.  This one here, no.

16      Q    Are you claiming that this warning

17  notice was an act of retaliation notice against

18  you?

19      A    Not that one.

20          MR. KORVAL:  I'm going to ask the

21  reporter to mark as Defendant's Deposition

213

1  of the others, it covers additional absences and

2  additional latenesses, doesn't it?

3     A    Yes, it does.

4     Q    But it's the same as the others in the

5  sense that you're being warned here for excessive

6  absenteeism and/or lateness, correct?

7     A    Yes.

8     Q    And is that your signature there?

9     A    Yes.

10    Q    Did you sign it because you agreed with

11  it?

12    A    I signed it because at that time the

13  absence policy had changed.  So I really didn't

14  understand the attendance policy because it

15  changed over the points -- the point system.  So

16  instead of giving me a headache, I just signed it.

17    Q    Didn't you also put a check in the box

18  that says, I agree with the employer's statement?

19    A    No.

20    Q    You didn't put a check in there?

21    A    I don't put checks in boxes.

214

1    Q    So somebody else but that check in the

2  box, you just signed it?

3    A    It wouldn't surprise me, but, no, I

4  didn't put a check in it.

5    Q    At what point did you make an effort to

6  understand the employer's point system?

7    A    I still don't understand it.  I looked

8  it over and it's supposed to be revolving and

9  points are supposed to drop off after a certain

10  amount the of days.

11         I looked it over and still don't

12  understand that policy.  Dawn explained it to us

13  one day when the changeover came.

14    Q    Did you ask her questions about parts

15  of it that you didn't understand?

16    A    No.  I think everybody else did, but

17  everybody else's questions pretty much mine too.

18    Q    After the questions were answered did

19  you understand it?

20    A    No, I don't understand revolving point

21  systems.

217

1    A    Not all.

2    Q    Why do you believe this particular one

3    does?

4    A    I don't know.

5    Q    So you're claiming that this warning

6    notice was or was not an act of racial

7    discrimination?

8    A    This one here I just signed. I really

9    don't have a comment on that. I can't comment on

10   it.

11   Q    Well, as we sit here today, are you

12   claiming that it was an act of retaliation?

13   A    I don't know.

14   Q    Did there come a time that you

15   advised -- strike that.

16        On February 19th, 2003, didn't you

17   receive a verbal counseling in connection with a

18   verbal confrontation that you had with a

19   maintenance supervisor?

20   A    It must have been Bob. Yes, I think I

21   do remember that.

218

1    Q    In shorthand give us a brief summary of

2    that incident.

3    A    I think it was during -- I think we had

4    some snow, and I was the only one out there

5    shoving wet snow in an area that wasn't even mine.

6    So I told Bob I needed some help.  So it got a

7    little bit heated, that situation did.

8    Q    When you say an area that wasn't even

9    mine, is that because you refused to recognize

10    that the assignment to grounds crew was given to

11    you?

12    A    No.  Everybody has their own designated

13    area during the snow storm.  If my shop is

14    somewhere I clean my shop.  Like stuff was in

15    front of Scott Smith's area and that's his area to

16    clean.  That's usually how it works.

17    Q    So you were out there cleaning someone

18    else's area?

19    A    With a snow blower, wet snow.

20    Q    What was the confrontation that you had

21    with Mr. Shafer?

219

1    A    I told Bob it ain't fair that I'm out

2    here to doing this by myself, because that

3    basically what was it was about.

4    Q    What did he say?

5    A    He said, Ed, you just made yourself

6    look ridiculous right here, and that's about it, I

7    think.

8    Q    And then who counseled you about that

9    confrontation?

10    A    John McNally had a conversation with

11    me.

12    Q    What did he say?

13    A    I don't recall.

14    Q    Did you feel that you deserved the

15    verbal warning that Mr. McNally gave you?

16    A    No.

17    Q    Are you claiming that the verbal

18    warning was issued to you based on your race?

19    A    No.  I think that verbal warning was

20    based on a situation as to he didn't know what was

21    actually going on.

220

1    Q    Are you claiming that the verbal

2    warning was issued to you as an act of

3    retaliation?

4    A    No.  The verbal warning was given

5    because he didn't really know the extent of the

6    situation, what was going on.

7    Q    About a month later on March 15th

8    didn't you receive another verbal counseling about

9    not completing a task that was assigned to you two

10   days earlier?

11   A    I don't recall.  I don't know what task

12   that was.

13   Q    You don't recall a verbal warning in

14   connection with that kind of an event?

15   A    No.

16   Q    Did there come a time that you advised

17   John McNally that you had intentionally failed a

18   safe boating course?

19   A    I was explaining to John McNally that I

20   didn't want to work on the boats and that I had

21   failed it.  I didn't say intentionally.

221

1        Actually, if I come back to think about

2   it, I did try to pass that test.  I didn't give it

3   100 percent, but I tried.

4        Q    When did you advise Mr. McNally that

5   you had failed the course?

6        A    I don't remember the date.

7        Q    It's your testimony here today that you

8   did not fail the course on purpose?

9        A    I didn't really fail it on purpose.  I

10  tried.  I think I might have mentioned to John

11  that I failed it because I didn't want to be a

12  part of the boats.

13       Q    You told Mr. McNally that you didn't

14  have to operate a boat on your job, correct?

15       A    Not to work on the boats.

16       Q    What?

17       A    Not to work on the boats.

18       Q    You told him you didn't have to operate

19  the boats, so why should have to pass the test

20  then?

21       A    The test is made up for people who like

224

1    A    No.

2    Q    Well, which is it; yes or no?

3    A    No.  I've been never been fine working

4  on the boats.  I never wanted to work on the

5  boats.  I explained to them I didn't want to work

6  on the boats plenty of time, but they forced me

7  into working on the boats.  I had no choice.

8        Heck, if I fought them they would write

9  me up.  For all they knew I probably was afraid of

10  water.  That's probably why I didn't want to be

11  around the boats.

12    Q    Have you since passed the boating test?

13    A    Yes, I passed.

14    Q    Why did you retake it?

15    A    Because I was forced to take it.

16    Q    Your employer wanted you to take it,

17  correct.

18    A    I was forced to take it, yes.

19    Q    By your employer, correct?

20    A    Yes.

21    Q    Was the act of your employer requesting

225

1  that you retake it an act of race discrimination

2  against you?

3      A    Yes.

4      Q    Your testimony is that the employer

5  wanted to you take that test because your black?

6      A    Yes.

7      Q    What evidence do you have?

8      A    Because I told him several times that I

9  didn't want to work on the boats.  I made it clear

10  that I didn't want to operate the boats in any

11  capacity.

12          I mean, I feel like, hey, if Bunky is

13  driving the boat from Tilghman all the way up to

14  the school, and he doesn't even work at the school

15  anymore, he doesn't have a safe boat course, he

16  didn't pass a safe boat course, I'm looking at why

17  should I have to take the safe boating course?

18  This man is not even working at the school.

19          And if it comes to you have to have a

20  safe boating course to operate the boat, why

21  doesn't he have to take the safe boating course to

226

1   operate the boat?

2       Carroll Miller, he operates the Ketch.

3   He brings the Ketch around.  He never took the

4   safe boating course at the time they wanted me to

5   take the safe boating course and I failed it; but

6   he drove the Ketch around from Tilghman Island.

7       He's been on the water all of his life,

8   but he took the safe boating course when I was in

9   there with him.  We all took it together.  All of

10  the maintenance took the safe boating course and I

11  think a couple of people failed.

12      Q    You weren't singled out to take that

13  course, correct?

14      A    The second time or the first time?

15      Q    The first time.

16      A    Yes.

17      Q    You were singled out?

18      A    Yes.

19      Q    I thought you said everyone?

20      A    The second time.  It was two tests.

21  The first one I failed.  The second one I took and

227

1  passed.

2        MR. KORVAL:  I'm going to on ask the

3  reporter to mark as Deposition Exhibit 30 a June

4  11th, 2003, employee warning notice issued to Ed

5  Bernard.

6        (Whereupon, a document was marked as

7  Bernard Deposition Exhibit Number 30.)

8        BY MR. KORVAL:

9    Q    What is this document, Mr. Bernard?

10   A    A warning for cleanliness on the

11  worksite.

12   Q    And this was issued to you by whom?

13   A    John McNally, but it says Bob Shafer up

14  here, but Bob told me he didn't want to issue

15  this.  This is all John McNally's doing.  He's

16  just trying to go along with it.  That's what he

17  told me.  He said, I don't have a problem with

18  your work at all, Ed.

19        I'm a mechanic and a mechanic is going

20  to be dirty.  I tried to keep the workplace clean

21  and Bob said this isn't my doing.  He told me

228

1   about it before he even was brought into the room.

2        Q     And this is a written warning issued

3   for unsatisfactory work quality, correct?

4        A     Yes.

5        Q     Now, attached to the front page of the

6   warning is a handwritten explanation of the

7   incident, correct?

8        A     Yes.

9        Q     And is that signed by Bob Shafer?

10       A     Yes.

11       Q     Now, you refused to sign this, didn't

12   you?

13       A     Yes.

14       Q     Why did you refuse to sign it?

15       A     Because it was false.

16       Q     What was false?

17       A     Well, let me go through this for a

18   minute.  This warning here as about the lifeboat

19   and what it would take to get it running.  I

20   explained to them that the lifeboat hadn't ran

21   until I got there.  I mean, I was -- I guess it

229

1   magic.

2       So I explained to them what was needed

3   to get the boat running and they started tacking

4   on additional things, and they slapped everything

5   in here that they thought should have been done;

6   but I explained to them what needed to be done for

7   the boat to run.

8       Q    What in here is false?  You said you

9   didn't sign this because it's untrue.

10      A    See, this conversation never took

11  place.

12      Q    When which one never took place?

13      A    On Wednesday I asked Ed if it had

14  cleaned it up.  Well, see Bob had told one of the

15  temps there to clean the bottom of the that boat

16  out because he assigned me a different job.  I was

17  hoping all over the place doing this.

18      Q    Why don't you read further.  The

19  assignment to the temp was the next day.  Are you

20  denying what Mr. Shafer wrote here is the truth

21  regarding the May 28th conversation?

230

1   A   100 percent false.

2   Q   You're saying he's lying?

3   A   Yes.

4   Q   Anything else in here a lie?

5   A   All of it.

6   Q   I see.  All right.

7       Now, are you claiming that this warning

8   was issued to you because you're black?

9   A   Yes.

10   Q   What evidence do you have that this

11   warning was issued to you because you're black?

12   A   Just the wording.

13   Q   Which particular --

14   A   Picking at me for things I didn't say;

15   things that never happened.  You know, this stuff

16   it never happened like this.

17   Q   Other than the conversation which you

18   say never happened, the conversation of May 28th,

19   what else are you claiming never happened?

20   A   I mean, the work area -- my work area

21   is not nearly as dirty as everybody else's.

231

1    Q    Whose work area is dirtier than yours?

2    A    The carpenter shop is a mess; the barn

3    itself is a mess, stuff all over the place.  They

4    probably had time to clean all of that stuff up

5    now.  It's false.  Everything in it is false.

6    Q    Are you also claiming that this warning

7    notice was an act of retaliation against you?

8    A    Yes.

9    Q    What evidence do you have that this was

10   issued to you for a retaliatory purpose?

11   A    Because it's a lie.

12        MR. KORVAL:  I'm going to ask the

13   reporter to mark a memo dated June 11th, 2003 from

14   John McNally to Ed Bernard as the next exhibit.

15        (Whereupon, a document was marked as

16   Bernard Deposition Exhibit Number 31.)

17        BY MR. KORVAL:

18   Q    Can you identify this document,

19   Mr. Bernard?

20   A    Yes?

21   Q    What is this?

232

1    A    This is a lie.

2    Q    Well, before we characterize it, can

3  you tell us what it is?  Did you receive this?

4    A    Yes.

5    Q    Is it a memo concerning your job

6  performance issued by facilities manager John H.

7  McNally?

8    A    Yes.

9    Q    Dated June 11th, 2003?

10    A    Yes.

11    Q    Did you receive it at or about that

12  time?

13    A    I don't remember.  Hold on.

14    Q    Mr. McNally states in the first

15  paragraph, and I quote, during the four months

16  since I arrived at CMES, I have personally

17  observed many instances where I found the

18  performance to be substandard and lacking in

19  professionalism on the thoroughness or a level of

20  expertise that I would expect from a mechanic with

21  your experience.

233

1       Do you agree with his assessment?

2    A    No.

3    Q    Are you claiming that that assessment

4    was based on --

5    A    Yes.

6    Q    -- your race?

7    A    Yes.

8    Q    What evidence do you have that that

9    assessment was based on your race?

10    A    Because it's a lie, and Bob Shafer told

11    me about this meeting before it even came across

12    the pike.

13    Q    Are you claiming in this case that

14    Mr. McNally's assessment was in retaliation for

15    your complaining about racial harassment?

16    A    I think so, yes.

17    Q    What evidence do you have that his

18    assessment was given for a retaliatory purpose?

19    A    Because I had never been written up

20    before for cleanliness.  I've always received

21    praises from Bob Shafer on the good job I do on

234

1   the boats, even though I don't like them; thanks

2   for getting the motor running on the lifeboat,

3   which they had specialists from the outside come

4   and try to get it running and nobody could.  All

5   of this right here --

6      Q    Looking at the second paragraph of that

7   memo, what discussions have you had with

8   Mr. McNally concerning the breath of your

9   responsibilities on boat maintenance?

10     A    Just general.  He just wanted to know

11  generally how the boats operated and basically

12  what I did on the boats.

13     Q    Would you agree that there were times

14  when he found your work to be incomplete and

15  unsatisfactorily?

16     A    No.

17     Q    Would you agree that you did not take

18  proactive ownership for the maintenance of boats,

19  but instead you concentrated, quote, only on doing

20  those tasks you have decided that you should be

21  responsible for?  Close quote.

235

1    A    No.

2    Q    Do you agree that you have failed to

3    adequately address maintenance issues?

4    A    No.

5    Q    And reading the last sentence of

6    paragraph 2 it says, quote, despite many

7    conversations that I have had with you regarding

8    the wider range of your responsibilities, you

9    continue to view your role as limited to simply

10   engine repair or mechanical problems.  Close

11   quote.

12         Mr. Bernard, would you agree with that

13   statement?

14   A    Which paragraph was that?

15   Q    The last sentence of paragraph 2.

16   A    No.  He never said anything about a

17   wide range of my responsibilities.  He never knew

18   what actually I did there when he first started.

19   Q    Now, what discussions have you had with

20   John McNally with regard to the condition of

21   pulleys or lines at the dock?

236

1    A    He wanted them changed out because he

2    didn't think they were the right size pulleys, and

3    Bob Shafer stated that he was going to be in

4    charge of the changing the pulleys on the dock.

5    Q    Isn't it true Mr. McNally had several

6    conversations with you about that and had to

7    remind you about their condition several times?

8    A    No, because Bob Shafer told him that he

9    was going to be taking care of the pulleys.  Bob

10    Shafer was the supervisor at the time, that's what

11    Bob told me.  He said he's going to talk it over

12    John and tell John he's going to take care of the

13    pulleys, because the pulleys were the right size.

14    John knows nothing about boats at all, and he

15    wanted to change the pulleys for the boats.

16        So after several conversations I told

17    John that the pulleys were okay, the right size

18    rope.  I said, the way you're looking at it from

19    the dock it looks a little bit different until you

20    get up on it.

21        He said, I don't think they're right.

237

1    I think the rope might be a little bit too big or

2    too small.  That was the very first discussion,

3    and Bob said he was going to take care of it

4    because I had other things to do.

5        Q    You mentioned Bob doesn't know the

6    first thing about boats?

7        A    Not Bob, John.

8        Q    I'm sorry.

9            That John doesn't know the first thing

10   about boats at all?

11       A    Right.

12       Q    Who is that ultimately figured out how

13   to measure the fuel inside of the Ketch?

14       A    Oh, man, you want to talk about that?

15   John.

16       Q    I see.  Not bad for a guy that doesn't

17   know the first thing about boats?

18       A    Well, you just take a stab at it and

19   get lucky sometimes.

20       Q    Can you describe the incident with

21   regard to your failure to throw away a large

238

1  cardboard container that's discussed in the fifth

2  paragraph?

3  A    That's the box. I was talking to John

4  one day and John asked me about -- he asked me to

5  do him a favor; would I go and retrieve a box in

6  between administration and the office --

7  administration and the annex.

8       So I looked all over for that box, all

9  over, and I didn't see the box. I figured that

10  the grounds crew had picked up the box because

11  that's what they do, they go around and that's

12  what they do, they pick up the trash. I didn't

13  see the box. I didn't pick up the box.

14       John tells me, after I was getting

15  ready to go out the door after the meeting, he

16  said, about that box; I said, yes. He said, you

17  didn't tell me about the box. You didn't pick up

18  the box. How many you didn't report back to me

19  and tell me the cardboard box, that you couldn't

20  find it?

21       He said, he had to throw it away

239

1    himself. I told him I said, thank you very much,

2    John I really appreciate it. I didn't see that

3    box, but I really appreciate it. I thought the

4    grounds crew had picked it up.

5        I was about to walk about the door, he

6    said, come back here. You didn't specifically

7    come back and tell me that you did not pick that

8    box up. Good night, John, it's a cardboard box.

9    Thanks for picking it up. I thought the grounds

10   crew had picked that up. He just made a great big

11   issue out of it.

12    Q    Wouldn't you agree that your behavior

13   towards him was insubordinate?

14    A    No. I believe his behavior towards me

15   was racist. I guess I'm the black trash man. I

16   apologized to him. I apologized. I was sincere

17   about it. I said, John, thank you very much. I'm

18   sorry I didn't see that box. I appreciate it.

19   Thank you.

20        He says, I had to physically put that

21   cardboard box in the proper reciprocal myself,

240

1  using these big words. I said, I'm sorry, John.

2  I'm not going to be sitting back and be drilled

3  and insulted like that. The box deal, that really

4  gets my heart pumping.

5      Q    What was the incident with respect to

6  the trash and oil found in the Ketch after you

7  brought it from the marina to the school?

8      A    The boats -- this is the routine on the

9  boats. I go down in the wintertime, or just

10  before the season starts, and I made sure that

11  everything is operating in the way it's supposed

12  to be.

13        The issue with the Ketch in the Bertram

14  was they were planning on selling the boat. So

15  when we took the boat down to Tilghman they were

16  going to sell the Ketch and Bertram. They said,

17  don't do anything. Don't winterize them; don't do

18  anything to them because we're going to sell them.

19  This is Mark D'Arcy --

20      Q    I'm talking about when you brought it

21  from the marina to the school.

241

1    A    We don't clean the boats up until they

2    get back to the school.  We don't clean them down

3    at the Tilghman Island.

4    Q    Didn't Mr. McNally expect the boat to

5    be cleaned?

6    A    No.  We explained to John that when the

7    boats come back that's when we clean them.  All we

8    do is paint the bottoms of them down here.

9    Q    Let me read you what Mr. McNally wrote.

10   He says, quote, when I inspected the condition of

11   the Ketch immediately after you assisted in

12   bringing it from the marina to the school I found

13   trash scattered throughout the boat, a significant

14   amount of oil in the bilge.  Close quote.

15        Was he accurate in that?

16   A    No.  I don't believe there was much oil

17   in the bilge, and as a far as a significant amount

18   of trash, that was traveling working trash to get

19   the boat around; but I don't agree with how he put

20   that in context, no.

21   Q    He goes on.  Quote, overall condition

242

1   of the boat could only be described as

2   unsatisfactory, unkept, and messy. I felt this

3   was uncalled for given the amount of time you had

4   to prepare the vessels. Close quote.

5       Do you agree with that statement?

6   A    No. I'm to prepare the vessel to come

7   around to the school.

8   Q    So if Mr. McNally says that you've got

9   to get the boat looking good, rid of trash, rid of

10  oil in the bilge, you don't view that as your job?

11  A    He never said anything about getting

12  the trash out of the boat or getting the oil out

13  of the bilge.

14      Do you know anything about your boats?

15  You're questioning me, I'm sorry.

16      If you take a boat from point A to

17  point B you're going to have a little bit of oil

18  in the bilge. Boats leak oil. I don't know what

19  to tell you.

20  Q    What was the incident regarding the

21  clogged carburator on the Seasquirt?

243

1    A    The Seasquirt after coming back off of

2    vacation school shut down there was a problem with

3    it. It didn't have power anymore. So I told John

4    I said, John, I think the Seasquirt, I think I

5    might want to just go ahead and get a new motor

6    for the Seasquirt.

7        John says, well -- and I was telling

8    Bob the same thing. I told Bob I cleaned the

9    carburators out. I told Bob when I took those

10   carburators off there I told him, I said, Bob, I

11   have never in my life seen a carburator that clean

12   coming off of anything before in my life. It was

13   spotless.

14       John took it upon himself to want to

15   get a second opinion. I told Bob, I said, okay,

16   Bob, I said, we can get a second opinion on it. I

17   said, maybe we can go out and get the compression

18   and everything checked. Bob asked me, where do

19   you want to take it to? I said, I don't know.

20   It's up to you. We can't go to Quinby's anymore

21   because we had a falling out with them.

244

1       He said, what about the Honda place?  I

2   said, well, Saint Michael's, that's where I'm

3   working now, I said, they don't work on Mercury's.

4   They don't work on Mercury's down there.  And he

5   said, well, Bob said we'll send it down to the

6   Honda place.  Get it down to the Honda place they

7   say the carburators are fouled and need to be

8   cleaned.

9       Q    This is the carburator that you said

10  was spotless, correct?

11      A    Spotless.

12      Q    But they say the carburator was

13  disgusting and clogged and that it would have to

14  be cleaned before any evaluation of the motor

15  could even be made; isn't that correct?

16      A    It was spotless.

17      Q    Isn't that what they said?

18      A    That's what they said.  They don't even

19  work on Mercuries or Evinrude.  This is the type

20  of motor this was.  They don't work on them.  This

21  is a Mercury motor.

245

1     Q     But you're saying they don't know what

2   a clogged carburator looks like?

3     A     They know what a clogged carburator

4   looks like, but after I went down to a place on

5   Route 50, I explained to -- I forget what his name

6   is -- but I explained to him that everybody thinks

7   the carburator is clogged.  I told him I pulled

8   the carburators off there and they were spotless.

9          He said, the carburators ain't your

10   problem.  He said, the electrical system is your

11   problem.  That's what he said.

12          I came back and told them the exact

13   same thing he told me, and they wrote up a whole

14   list of things for me to purchase from the Mercury

15   place and I brought it back to MEBA and the motor

16   is still on the boat to this day.  The motor is

17   still on the boat to this day.  So all of that is

18   hogwash.

19     Q     Now, in the next paragraph Mr. McNally

20   makes the claim that you informed him that you had

21   taken the safe boating course, but that you failed

246

1   it on purpose because you did not think you should

2   have to operate a boat in the performance of your

3   job.

4        Does this refresh your memory as to

5   whether you admitted to Mr. McNally that you

6   failed that course on purpose?

7   A   No.

8   Q   All right.

9        Is it true that an ice eater was found

10  on the Peach Orchard porch after you were

11  instructed to clean and store all of the ice

12  eaters for the season?

13  A   That would be a dock.  Yes, there was a

14  whole bunch of ice eaters around.  I pulled that

15  ice eater up out of the water and got I pulled

16  that up out of the water and got sidetracked

17  working on something else and I forget all about

18  that ice eater over there.

19  Q   That's an accurate statement?

20  A   Right.  I forget all about it.

21  Q   What was the incident with the Bertram

247

1   test run?  I'm not talking about the July incident

2   with the Bertram.  I'm talking about the earlier

3   incident.

4       A    The test run of the Bertram?

5       Q    Yes.

6       A    They were going to sell the Bertram.

7   They didn't want to do anything with the Bertram.

8   The Bertram had an oil pan leak.  So they were

9   going to have an outside contractor come in there

10  named Albin Tractor to replace the oil plan.

11          So I told John I said, John, I said, if

12  Albin is going to come here and do a test run on

13  it, do you want me to go and ahead and service the

14  engines?  No, no, don't worry about servicing the

15  engines because Albin is going to come down and

16  change the oil pan and that would be a waste.  I

17  said, are you sure?  He said, I'm positive.  I

18  said, okay.

19          We get down there and Albin is getting

20  ready to take the boat out.  They found that the

21  fuel filters was clogged.  This is a part of the

248

1   servicing the motor.

2        So Albin said, no problem, I can come

3   back and we'll go ahead -- and we don't to have

4   worry about the fuel filter.

5    Q    Did you make that clear to Mr. McNally

6   that you were not going to have clean filters

7   installed on the Bertram?  Did you make that

8   clear?

9    A    I told John, we have to service the

10  motor.

11   Q    Did you tell him that you were not

12  going to be installing new filters?

13   A    No, I didn't tell him I wasn't going to

14  install new filters.

15   Q    In fact, you failed to have clean

16  filters installed, correct?

17   A    Because he said he didn't want to

18  service the motor.

19   Q    Did you also fail to place the Bertram

20  on shore power?

21   A    The shore power deal.  Let's get back

249

1   to the running of the boat.  This is what

2   happened.  They took the boat out.  Bunky is

3   driving it, the one that I said didn't pass the

4   safe boat course, that didn't take it.  The water

5   was so rough and choppy, Bunky didn't want to go

6   out.

7       Q    What's Bunky's real name?

8       A    I just know him as Bunky.  He's an

9   older guy.  He's pretty cool.  But Bunky decided

10  we better turn this boat around and we'll try it

11  the next day.

12          So the run was only supposed to be that

13  day and the boat was supposed to come out of the

14  water.

15          So I get up to bob after about quarter

16  to 4:00 after I come back from Tilghman from

17  securing everything, I say, Bob, look, I said,

18  man, if that boat is going to be in the water we

19  might want to go ahead and put it on shore power

20  because we put two brand-new batteries in it and I

21  said it's taking on water like a sive.  I said,

250

1    the packings are leaking and everything.

2          And he said, yes, you're right, maybe

3    we should go down there in the morning and put it

4    on shore power.  The next day John comes up and

5    says, Ed, will you go down and put it on shore

6    power?  I said, yes, I already know what I got to

7    do.

8          The boat was supposed to come out of

9    that water that day.  The fuel filter should have

10   been changed when I asked him if he wanted me to

11   service the motor.

12         I remember that deal very well.  The

13   water as rough.  You ever seen that movie the

14   Perfect Storm?

15   Q    I saw it.

16   A    I did too firsthand that day.

17   Q    Isn't it true that Mr. McNally had to

18   send you back to the marina in order to put it on

19   shore power?

20   A    Right.  Because we weren't aware that

21   the boat was going to sit down there all night

251

1   long.  The boat was supposed to come out of the

2   water.  If I didn't say anything to Bob Shafer

3   about shore power the boat be sitting right in the

4   bottom of the water right now.

5       Q    What was the incident involving a

6   missing bolt with respect to the Freebird?

7       A    I don't know anything.  During that

8   time Bob said he was goes to be working on the

9   Freebird, and he also says he was going to bring

10  the sails over from Perry Hall.  Yes I did on 5/16

11  fail to fuel the Chesapeake up.

12      Q    So earlier when you testified that this

13  is was all lies, some of this stuff in here was

14  accurate and some of it you disagree with,

15  correct?

16      A    The big stuff I disagree with.  The

17  little tiny lines on Friday, 15/16, failed to fuel

18  Chesapeake up, yes, that slipped my mind.

19          He neglected to bring the sails over

20  from Perry Hall, Bob Shafer said he was going to

21  do that.  The missing bolt, I wasn't aware of any

252

1    missing bolt.  I thought everything was locked

2    down tight.  Bob said he was going to be working

3    on the Freebird.

4        Q    What was the incident involving the

5    trash and oily absorption pads found on the

6    lifeboat?

7        A    That's when they had the temp guys over

8    there trying to clean the boat out, and I think

9    the day after that I took and slipped on one

10    because they didn't do a good job.  I had to go to

11    the emergency room because I twisted my angle.

12        Q    There was a lot of stuff found left in

13    the engine compartment, wasn't there?

14        A    Because the temps was supposed to clean

15    that out.  The were assigned to do that.

16        Q    Mr. McNally said that, you know,

17    regardless of who was going to do it, you should

18    have been aware of it, should have fixed the

19    problem or should have reported them to Bob

20    Shafer, correct?

21        A    I didn't know.  I didn't know.

253

1    Q    Exactly.  Mr. McNally is saying that

2    you should have know, correct?

3    A    No, I shouldn't have known because Bob

4    Shafer told the temps to clean the boat out.  I

5    was on other things.

6    Q    Do you agree that you failed to bring

7    several items to your superior's attention?

8    A    No.

9    Q    Let me read you the last paragraph in

10   here.  Quote, it is my intention that by helping

11   you identify and recognize your pattern of

12   unsatisfactory performance you will be able to

13   take the necessary steps to demonstrate a

14   significant improvement.

15        I will make myself available to you if

16   you think I can assist you in any way in this

17   effort.  However, failure on your part to

18   demonstrate a significant improvement in a timely

19   fashion may result in additional disciplinary

20   action which may include, but not be limited to,

21   suspension or termination.

254

1          Now, was that a fair thing for

2    Mr. McNally to say, that he was going to make

3    himself available to you to assist you so that you

4    could succeed?

5          A    How can somebody assist me when I told

6    them and explained to them everything in this.

7    How can you assist me on my work performance when

8    all of this here I was the one that said, hey you

9    got to do this, you got to do that?

10          No, that's not fair.  That's a head

11    hunt, not a witch hunt, that's a head hunt.  No

12    sooner than this was written up, it was shipped to

13    you, then she shipped to her, then she calls me

14    and giving you, I guess the defense -- and I was

15    shocked.  I was amazed at that.  I'm still amazed

16    at everything that's written in these two, or

17    three, four pieces of paper.

18          Q    Is it your testimony that this memo was

19    based on your race?

20          A    Yes, retaliation, everything.  That is

21    just -- that was -- especially the Bertram.

255

1    You're blaming the running on the Bertram on me

2    and it was bad weather, and I told you, hey, let

3    the me service the motors, and that's just false.

4        Q    Other than your counsel, with whom have

5    you discussed your claims against the school?

6        A    Other than my counsel?

7        Q    Yes.

8        A    My girlfriend, my mother.  You mean

9    what's been going on?

10        Q    Your claims in this lawsuit.

11        A    What's been done to me?

12        Q    Yes.

13        A    My mother, my you think also, my buddy.

14        Q    Which buddy?

15        A    That would be Jay Reynolds; that would

16    be Donald Harper; my two my very best friends, my

17    very best friend, Jim Wheel.  And by some strange

18    coincidence they're all white.  99 percent of my

19    friends are white.

20        Q    Lee Kincaid is white, isn't he?

21        A    Yes, the last time I seen him he was.

262

1  when you spoke with him on that day?

2      A    Yes.  I think I was trying to see how

3  he was doing because, Connie, she talks to him.  I

4  ask Connie every now and then how is Lee doing.

5          So I told her that day I was going to

6  give Lee a call and she gave me the number, but I

7  don't remember when or how I asked for that stuff;

8  but he gave me what I needed.

9      Q    In this memo you refer to a situation

10  that took place the day before on the Ketch.  What

11  was that situation that you're referring to?

12      A    John McNally had asked me if I had

13  checked the fuel tank on the Ketch.  So I told

14  John, I said, I hadn't been down there to check

15  the Ketch.  I don't know how we can check the fuel

16  tank on the Ketch.  I've never looked at the

17  Ketch.

18          He says, well, why haven't you checked

19  it?  I said, for one, I couldn't figure out how to

20  check because I didn't look at how to check it.  I

21  told him I figured the tube was twisted.

263

1        So John gets this stick, he has this

2   stick that him and Mark D'Arcy rigged up, with

3   tape on it.  So he's dropping it in like that.  He

4   says, what's the problem?  I said, John, I haven't

5   been down here to look at tank.  I said, I don't

6   know.  I said, but I'm glad you figured out how to

7   check it.  What was so hard about this?  Why

8   couldn't you have done this?

9   Q    And you're referring to dip sticking --

10  A    Right, the tank.  I said, John, I

11  haven't been down here.  I haven't been down here

12  to at this.  I've been doing other things.  I told

13  him I said, you know that.  Look at my work

14  catalog that I have to keep filled out every day.

15  Q    You described that situation in this

16  little handwritten memo as a clear demonstration

17  of prejudice.

18  A    Right.

19  Q    Can you tell me how that constitutes a

20  clear demonstration of prejudice?

21  A    I can explain it, but I think it would

264

1    go on forever.  You just -- you're dropping a

2    stick and looking at me as if I'm ignorant after I

3    told you that I haven't been down here to look at

4    the thing.  Like he's discovered the wheel.

5            MR. KORVAL:  I'm going to ask the

6    reporter to mark as Deposition Exhibit 33 a June

7    12th letter from Mr. Bernard addressed dear sirs.

8    And second page is a list of several people who

9    include the trustees of the MEBA plans and also

10   some media entities.

11           THE WITNESS:  Oh, those letters made

12   it?

13           (Whereupon, a document was marked as

14   Bernard Deposition Exhibit Number 33.)

15           BY MR. KORVAL:

16   Q    Is this the letter that you wrote and

17   put in the envelope that you had prepared months

18   earlier?

19   A    Yes.

20   Q    And did you prepare this letter?

21   A    Yes.

266

1    in the preparation of this letter?

2    A    No.

3    Q    In the second paragraph here you say

4    that several more suits are about to be filed by

5    other employees?

6    A    Yes.

7    Q    Who are the other employees that you're

8    referring to?

9    A    Well, since everybody is scared,

10   they're not going to do that anymore.

11   Q    Who was it that you were expecting was

12   going to file suit?

13   A    Just about half of maintenance was mad.

14   Q    Which half of maintenance?

15   A    Mainly the white half.

16   Q    The white half was mad.

17   A    Yes.

18   Q    Who were they made at?

19   A    They were mad at John McNally.

20   Q    Why were they made at John McNally?

21   A    I have no idea.

270

1  humiliates people and twists words around?

2  A    Yes.

3  Q    Did you admit to Dawn Trumps and Joyce

4  Matthews that you walked way from Mr. McNally when

5  he told you he was not yet done speaking to you

6  about the Ketch fuel level reading incident?

7  A    I told them I walked.  I told John I

8  didn't feel like being picked on today, because it

9  was hot.

10  Q    He was talking to you and he told you

11  he wanted to talk to you some more and you walked

12  away?

13  A    Right, after he kept dropping the stick

14  in the tank, I couldn't take it no more.

15  Q    But you admit that you told that to

16  Dawn and Joyce, correct?

17  A    Right.

18  Q    Did you tell Dawn and Joyce that you

19  wouldn't discuss the matter any further with them?

20  A    There wasn't nothing to discuss.

21  Q    Well, when you told them that you

271

1  wouldn't discuss the matter any further with them

2  and then they asked you why; isn't that correct?

3      A    I don't remember.

4      Q    Didn't you tell them that you believed

5  the incident was due to your race?

6      A    I don't remember.

7      Q    What evidence do you have that

8  Mr. McNally speaking to you about measuring the

9  fuel level was based on your race?

10      A    He was just insulting me.  Just dipping

11  the stick insulted my intelligence.

12      Q    Did you tell Ms. Trumps and

13  Ms. Matthews that it was due to retaliation?

14      A    I don't remember.

15      Q    What happened with respect to your

16  misplacing the work log and errors on the boat

17  inspection report?

18      A    Could you repeat that?

19      Q    What happened with respect to an

20  incident involving your misplacing the work log

21  and errors on the boat inspection report?

272

1    A    I don't know what happened to that work

2    log.  They sent me home to find that work log.  I

3    still haven't found it.

4    Q    Was this a work log that was in your

5    possession?

6    A    That was a work log that I was asked to

7    fill out as soon as John McNally got there, and

8    nobody else was filling out a daily work log but

9    me.  Everybody was shocked that I was filling out

10   a work log.

11   Q    But yours is missing?

12   A    Nobody else had one.

13   Q    I understand that, but the one that you

14   kept turned out to be missing and you couldn't

15   locate it, right?

16   A    No.

17   Q    And what happened about errors on the

18   boat inspection report?  Is that something that

19   you recall?

20   A    No.

21   Q    You don't recall anyone speaking to you

273

1   about errors on a boat inspection report?

2       A    Well, the boat inspection report was

3   something that John had just came up with, and he

4   was trying to work the bugs out of it and I didn't

5   understand how it works worked.  That was all new.

6   It was all introduced new.

7           I never had to fill out an inspection

8   sheet on the boats before.  He had like -- you

9   know, that was all new.

10      Q    What happened with respect to your

11  leaving campus to purchase a truck part?

12      A    I think that day we needed a part and

13  we always -- I always, went in town to get my own

14  parts.

15      Q    Weren't you supposed to obtain

16  permission to leave the campus?

17      A    I got permission from Bob.

18      Q    Are you saying that in this incident

19  where Connie reported that John was upset with you

20  that you had Bob's permission to leave the campus?

21      A    This is before.  Connie told me that

278

1    with a write-up.

2        If this happened on 6/10 and he writes

3    me up on June 11th, which is a long, long, long,

4    write-up, how come he didn't throw this in with

5    that.

6    Q    And that's your evidence that it's

7    based on your race?

8    A    Plan and simple.

9    Q    Are you claiming that Mr. McNally's

10   warning to you for insubordination was issued in

11   retaliation for your claiming about racial

12   harassment?

13   A    Yes, I do.

14   Q    What's your evidence that it was issued

15   for retaliatory purposes?

16   A    Because, I mean, the date of the

17   incident was 6/24 and we're -- we got a June 11.

18   You write me up here, but you didn't include this

19   with this.  Exhibit 31 with 35, you didn't include

20   that.

21   Q    Now, you met the with Mr. McNally on

294

1  cleaned so Albin could get to the bottom of the

2  motors. The motors are in the floor.

3       Now, getting back to your bilge pump

4  question. That's what happened with the bilge

5  pump, it failed.

6    Q    And they had to buy a replacement?

7    A    Yes, the bilge pump failed during the

8  weekend, I think it was.

9       MR. KORVAL: I'll ask the reporter to

10  mark as Exhibit 38 some of the John McNally's

11  notes from mid-July.

12       (Whereupon, a document was marked as

13  Bernard Deposition Exhibit Number 38.)

14       BY MR. KORVAL:

15    Q    My question to you is whether these

16  notes reflecting the discussions of July 15th and

17  16th are largely accurate?

18    A    I don't believe none of this is true.

19    Q    Well, do you claim that these

20  discussions were had with you due to your race?

21    A    Yes, I really do.

295

1     Q    What evidence do you have that the

2   discussions were had with you due to your race?

3     A    Because these are all lies.

4     Q    You say everything in there are lies?

5     A    Yes.

6     Q    Do you claim these discussions were had

7   with you because you complained about racial

8   harassment, in other words, they are retaliatory?

9     A    I believe so.

10    Q    What evidence do you have that --

11    A    Because none of this is true.  These

12  long -- no conversation ever took place like that,

13  no long conversations.

14    Q    Now, let me show you a document which

15  I'm going to ask the reporter to mark as

16  Deposition Exhibit Number 39.

17        (Whereupon, a document was marked as

18  Bernard Deposition Exhibit Number 39.)

19        BY MR. KORVAL:

20    Q    This is a warning notice dated July

21  21st and issued to Ed Bernard.

296

1       Can you identify this document,

2   Mr. Bernard?

3       A    Yes.

4       Q    What is this?

5       A    It was a beginning of a new life on

6   these days.  I was in search of a job, and I got

7   one.

8       Q    These are the days that you're marked

9   absent here?

10      A    Right.

11      Q    So this is a written warning for

12  absenteeism, correct?

13      A    Correct.

14      Q    And do you agree with this warning?

15      A    Yes.  Even though I didn't understand

16  the points policy, I just signed it because I knew

17  that it was almost over and I was going to be

18  starting a new job.

19      Q    So you agreed with it?  You accepted it

20  and -- now, at the time of this, did you know

21  about the new job yet?