**EXHIBIT 2**

1

1       In the United States District Court

2           The District of Maryland

3    ---------------------------------x

4    Edward G. Bernard, Jr.        :

5         Plaintiff,        : NO. SMF-03-CV-443

6             v.        :

7                    :

8    Calhoon MEBA Engineering        :

9     School            :

10           Defendant        :

11    ---------------------------------x

12           Wednesday, August 27, 2003

13    DEPOSITION OF:

14             Dawn Trumps,

15    a witness, called by counsel pursuant to notice,

16    commencing at 10:00 a.m., which was taken at 1007

17    Eastern Avenue, Baltimore, Maryland.

18

19

20

21

5

1    we begin?

2       A.  No.

3       Q.  Please state your full name and address.

4       A.  Dawn Marie Trumps.  2422 Parliament Drive,

5    Abington, Maryland 21009.

6       Q.  Who is your current employer?

7       A.  MEBA Benefit Plans.

8       Q.  Where are they located?

9       A.  1007 Eastern Avenue; Baltimore, Maryland

10   21202.

11      Q.  Can you tell me what the relationship is

12   between MEBA Benefit Plans and Calhoun MEBA School

13   of Engineering?

14      A.  The engineering school is actually what we

15   consider the MEBA training plan.  It is a benefit

16   that falls under the umbrella of MEBA Benefit Plans.

17   They just have a different location, different

18   facility.  We are physically located in Baltimore.

19   They are in Easton.  They are managed under the

20   umbrella of MEBA Benefit Plans.  We administer

21   benefits for the MEBA union.

6

1     Q.  What is the affiliation between the union

2  and the school?

3     A.  There is no direct affiliation.  The

4  school is managed by the benefit plans.  We

5  administer benefits for the union.  The union does

6  not have any ownership of the training plan, the

7  benefit plans.  We are governed by a board of

8  trustees that are elected union officials, as well

9  as company, shipping company owners or

10  representatives.

11     Q.  The individuals who attend the school; are

12  they union?

13     A.  They are MEBA union members.

14     Q.  What types of classes are offered at the

15  school?

16     A.  Things that are specific to the job of

17  being a marine engineer; such as firefighting,

18  diesel engineering, air-conditioning, refrigeration,

19  electronics.  Things having to do with how to run an

20  engine on a large U.S. flat vessel.

21     Q.  You worked for the MEBA Benefit Plans.

19

1    as opposed to maintenance.  It was a position of a

2    janitor.

3        Q.  You just reclassified that position.  Is

4    that a fair statement?

5        A.  Yes.

6        Q.  And the individual that was performing

7    that duty was simply reclassified?

8        A.  He started reporting to the housekeeping

9    supervisor as opposed to the maintenance supervisor.

10       Q.  What types of responsibilities are

11   performed by the housekeeping department?

12       A.  They would clean classrooms, dorm rooms,

13   any of the houses.  There are several properties on

14   campus that we call the houses.  They are individual

15   properties that we have dignitaries coming and

16   utilizing.

17       Q.  What responsibilities, kitchen services,

18   what responsibilities are they asked to perform?

19       A.  Prepare breakfast, lunch and dinner.

20       Q.  And maintenance, what are their

21   responsibilities?

20

1    A.   That's wide ranging.  That could be

2    landscaping, snow removal.  Obviously, seasonal need

3    for that.  Any maintenance, repair, boats.  We have

4    a fleet of boats.  We have a fleet of vehicles.  Any

5    sort of mechanical work on the fleet.

6        Q.   In the one circumstance where that

7    individual was reclassified that you were referring

8    to, was that a situation where the pay rate changed?

9        A.   No, ma'am.  The job did not change at all.

10   The job responsibilities did not change.  We just

11   felt it was better managed by housekeeping, because

12   it was a housekeeping function.

13       Q.   After an individual has been hired by the

14   school, what kind of interaction do they have with

15   you?

16       A.   I would meet with them to do an

17   orientation with that employee handbook.  And then

18   thereafter, they would see me upon my visits, you

19   know, if I needed to seek them out for some reason

20   or if they needed to see me for some reason.  But

21   usually it's not anything formal beyond the -- no

23

1    A.  For instance, the attendance policy was

2  one that I addressed on a couple of different

3  occasions.  I was involved in a harassment in the

4  workplace training in February of 2002.

5    Q.  Outside of the policy trainings, what else

6  was there?

7    A.  Policy revisions.

8    Q.  Then you had also mentioned the handbook.

9    A.  Yes.

10    Q.  When you are going out to the school, is

11  there a notice posted somewhere so if people want to

12  ask questions, that they would know this is the date

13  and time when you are available?

14    A.  They have a system where there are

15  televisions throughout all of the public buildings.

16  So they put all their notices about softball game at

17  6:00 p.m., just different notices for the

18  membership.

19      They would also put on there, you know,

20  plans HR manager will be here on Thursday, if Mr.

21  Szymczak had a meeting down there, they would put it

37

1    I don't know what predates me.

2        Q.  You said you are conducting sessions.

3    Have you just started doing these or --

4        A.  We are doing them as issues come up.  I do

5    have formalized training, presentations ready to go

6    on each category, whether it be harassment, FMLA,

7    ADA, whatever.

8        Q.  I'm confused as to whether or not these

9    are things you started doing or things you prepared

10   and they are ready to go?

11       A.  As issues have arisen, I will deal

12   directly with that supervisor and say, this is what

13   you should do, or this is what we need to do.  There

14   has not been any formalized training.  We have it

15   prepared.  It has not been delivered to the group of

16   supervisors as a whole specifically on how to handle

17   complaints.

18       Q.  When do you anticipate presenting that

19   training?

20       A.  We have some training scheduled next week,

21   but not on that topic.  Probably in the fall.

39

1    A.  It depends on the nature of the subject

2    matter.  What I find to be very frequent is FLMA.

3    Lot of questions about that.  So I deal with that on

4    a case by case basis.

5        Specifically, with whatever manager needs

6    to deal with that issue.  Most of those matters come

7    through me.  That is such a nebulous topic that

8    really one person needs to be making decisions about

9    that.

10        That is kind of hard to -- we can give

11    guidance and training, but that is a difficult topic

12    matter to say; here, you determine whether or not

13    that is FLMA approved.

14    Q.  Have you encountered situations where you

15    have to do informal training of race complaints or

16    individuals that present them complaining of racial

17    discrimination?

18    A.  No.

19    Q.  How does a complaint come to your

20    attention?

21    A.  It can come to my attention through the

40

1    employee, through the supervisor or through the

2    director.

3        Q.  Personnel complaints that are made by

4    employees, I'm talking about once a complaint

5    reaches your desk, what steps do you take to

6    investigate?

7        A.  Again, we have to be more specific.  If

8    you're talking about complaints of a racial

9    discrimination nature.

10       Q.  Yes.

11       A.  I would, and have, speak with the

12   director, speak with the manager, speak with the

13   parties involved, or anybody else that the person

14   making the complaint says is a witness.  After an

15   investigation, speak with the director again about

16   what remedial action needs to take place, and carry

17   that out.  And document it.

18       Q.  In early September of 2002 you were

19   notified of a complaint of discrimination filed by

20   Mr. Bernard; is that correct?

21       A.  That's correct.

41

1    Q.  Who notified you of that?

2    A.  On September 3rd I was notified by a phone

3    call from Bob Shafer, who said -- actually, it was a

4    voice mail.  I didn't speak directly to him.  That

5    an employee had a complaint to make that was racial

6    discriminatory in nature.  And that he was handling

7    it.

8        I could not reach him that day.  I was

9    down there the next day.  Before I was able to talk

10   to Bob to question who it was, Ed sought me out.

11   Q.  What did Mr. Bernard say to you?

12   A.  On the 4th when he came to me, he told me

13   that a comment had been made by Will Helms on

14   August 30th in the afternoon.  The comment was:

15   They just want to make us all their niggers.  Ed

16   found that to be offensive, regardless how it was

17   used, whether it was directed at him or not.

18       He thought that Will had an agenda to get

19   him fired.  He thought that Will was influential in

20   the decision the previous week to eliminate the

21   position of assistant director of operations.  And

42

1    he thought proof of that was the fact that when all

2    the hourly staff went out to a happy hour on the

3    evening of August 30th, that the director and

4    administrator were present for that, he thought that

5    was proof that Will had influence.

6          And Will apparently was at this happy

7    hour.  And he said to me that, you know, other

8    African-Americans staff tolerated the joking.  He

9    did not find it funny.  Bob Shafer had called he and

10   Will together the previous day to have Will

11   apologize and shake his hand.  He was not satisfied

12   with that.

13       Q.  How did you respond to him?

14       A.  I told him that I thought it was

15   inappropriate.  That we would not tolerate it.  I

16   tried to reinforce that Will Helms had no authority

17   or any sort of influence over employment related

18   matters.

19          There was nothing in his personnel file

20   documented by his current supervisor, the current

21   director, the previous director about performance

43

1   related issues for him.

2       Q.  Talking about Will Helms?

3       A.  No.  Ed Bernard.  His issue was that Will

4   was trying to get him fired.  I said that the

5   celebration, happy hour, as he called it, I

6   documented that term, was not in fact something that

7   the director and the plans administrator attended.

8       They happened to be going out for dinner

9   that night.  They went into the restaurant where

10   this happy hour was going on.  They were waiting for

11   a table for 45 minutes.  They couldn't get a table.

12   They left and went to another restaurant.

13       I also reinforced the fact that, you know,

14   I would speak with Will Helms.  I would document the

15   situation in the file.  We would not tolerate.  We

16   would take further action, if we need to.  Nothing

17   else should occur.  I encouraged him to continue

18   talking to me if things did occur.

19       Q.  You said he approached you.  Was the

20   meeting outside and you are outside talking or in

21   your office behind closed doors?

44

1    A.  Yes, it was in my office.

2    Q.  Was Mr. Bernard satisfied with your

3  response?

4    A.  I believed him to be satisfied with my

5  response.  He told me he was glad that he talked to

6  me.  He told me he didn't feel like he needed to

7  pursue this matter.  That's what I documented.

8        May I add something.  He did tell me

9  during the course of the meeting that he had

10  contacted an attorney, and the attorney had advised

11  him to file a complaint with the Maryland Human

12  Relations Commission.

13    Q.  Did you have a response to that?

14    A.  We talked about what a hostile work

15  environment was.  We had done some training on

16  harassment in the workplace earlier in the year.  I

17  said I really don't feel this constitutes a hostile

18  work environment.  We'll certainly investigate it.

19  That's really all that I spoke of.

20    Q.  Did you at anytime on that day tell him

21  that he had no grounds to stand on?

49

1    A lead person.  This was someone who would assign,

2    if they get a bunch of work orders, maintenance

3    jobs, then the lead person in the absence of the

4    supervisor would handing out job assignments.  The

5    lead person had no authority to discipline or hire

6    or fire or do performance appraisals.

7        Q.  You said that you had a follow-up meeting

8    or meetings with Mr. Bernard regarding the events

9    that occurred?

10    A.  Yes.

11        Q.  How many meetings did you have?  Not

12    counting the initial meeting that you had with him.

13    A.  I'm recalling four.

14        Q.  When was the first one?

15    A.  That I was at?

16        Q.  Correct.

17    A.  There was a conference call to me on

18    October 3rd from Joyce.  Ed was in her office.  He

19    was upset that a coworker by the name of Connie

20    Erdell had commented to him about the maintenance

21    guys felt like he was prejudice against white boys

50

1   because he was isolating himself and didn't want,

2   you know, to be around all of them.  He feels upset

3   about the comment.

4       So Joyce immediately called me.  And we

5   did a little discussion on the phone.  I went out

6   there the next day.  The next day, on the 4th of

7   October, was the first time that I was physically in

8   his presence along with Joyce and conducted a

9   follow-up meeting.

10      Q.  Your recollection Connie Erdell had made a

11  comment about Mr. Bernard not wanting to socialize

12  or someone else had made a comment to Connie.  You

13  then forwarded that information to Mr. Bernard?

14      A.  Someone else made the comment.  Connie

15  regurgitated that to Ed.  Ed was upset about it and

16  came to Joyce immediately to complain.

17      Q.  Okay.  And then you had a meeting on

18  October 4th, the following day?

19      A.  Yes.

20      Q.  What happened at that meeting?

21      A.  There were a couple of issues on that

51

1  October 4th meeting.  One was the comment about him

2  being prejudiced against white boys.  Another was an

3  incident the day before where they were --

4      Q.  October 3rd?

5      A.  Yes.  Where there was some boat, I don't

6  know all the boats and all the schedules.  Some boat

7  was supposed to come around to the school from where

8  they kept it or where work was being performed.

9         Mark Darcy had asked Ed if he wanted to

10  come around on the boat.  It's about an hour trip by

11  boat.  And Ed didn't want to do that.  Because Mike

12  Matthews, the director's husband, and Carol Miller

13  were also going to be on board.

14      Q.  Who is Mark Darcy?

15      A.  At that point he was the acting facilities

16  manager.  He is currently an instructor.

17      Q.  Did Mr. Bernard say why he didn't want to

18  be on board?

19      A.  He said he didn't want to be on board

20  because Carol was friends with Will, and because

21  Mike Matthews had previously gone on a fishing trip

52

1   with Will.  So by association he felt that they were

2   friendly with Will and unfriendly toward him.  And

3   he did not want to be involved in that.

4         There were a couple issues going on.

5   During this whole time Ed had chosen to not go, you

6   know, to the lunchroom during the times when all the

7   employees were there.  Not to take breaks with the

8   rest of the employees.  He was really isolating

9   himself after this complaint.

10        He was sensitive to anything that was

11  going on relative to his situation and the complaint

12  the prior month.

13    Q.  There's no requirement that he associate

14  with the other employees?

15    A.  No, ma'am.

16    Q.  As long as he comes in and does his job

17  and leaves?

18    A.  The offer was made for him to come back on

19  the boat by Mark Darcy, sort of like a perk.  He

20  didn't want to.  That was fine with Mark.  We had a

21  little issue.  We investigated it.  Why do you feel

53

1    you don't want to be around Carol and Mike Matthews.

2    He said same thing he said last week. Birds of a

3    feather er flock together. By association they have

4    the same sentiments about me and black people as

5    Will Helms does.

6        Q.   The second meeting --

7        A.   I'm not finished with the 4th. It was

8    also on the 4th that -- we talked for over an hour.

9    He told us he was very stressed out. He wasn't

10   sleeping.

11       Nothing additional had been directed at

12   him. However, he recounted for us I believe in that

13   meeting the allegation from a temp that Will Helms

14   had made the comment to Darryl Glenn that he

15   couldn't count to 18.

16       He told us that he was frustrated about

17   having to work on the boats. He wasn't hired as a

18   mechanic. He was hired as a mechanic. He wasn't

19   hired to work on the boats. He did it as a favor

20   for Bob Shafer starting in July '01, until they

21   found somebody.

54

1          He had in the past questioned his job

2    description with Henry Phillips and Lee Kincaid.  He

3    was told by Lee Kincaid that he would be required to

4    do by whatever was asked.  Everybody in maintenance

5    would have to hop around and do different jobs,

6    whatever needed to be done that day.

7          He said you don't know what it feels like

8    to be me, he said to me.  I said, I'm trying to be

9    sensitive, Ed, I'm trying to understand.  That's why

10   we are asking you some of these questions.

11         He said, I'm just trying to feel -- just

12   trying to feel normal again.  I'm very stressed.

13   This is what spawns people to go postal.  That

14   comment during that conversation.

15         Later on in the conversation, I'm trying

16   to recall it all.  You're talking about something

17   that occurred ten months ago.  There was a comment

18   that, I'm not a violent person.  If I would have

19   done something, I would have done something before

20   now.  One day I may come in here and climb Will Helm

21   like a tree and snap his neck like a branch.  Or

55

1    something along those lines.

2         I immediately said, wait a minute.  That

3    was inappropriate.  And I can't remember what he

4    said.  He was starting to get a little

5    confrontational.  He said, I'll just let the NAACP

6    handle this.

7         And Joyce finished up.  I said, we are not

8    being produce here today.  Joyce finished up saying,

9    we are trying to understand what is going on,

10    investigate your complaints and, you know, do

11    something about them.  We are making changes here,

12    and I hope you can see that we are making changes.

13         We had the new acting facilities manager,

14    the whole organization structure was changing.  She

15    was using that as an example that, we are trying to

16    make things better.  So he left after about an hour.

17    That was the meeting on October 4th.

18    Q.  Okay.  Then was the next meeting?

19    A.  October 10th.

20    Q.  Did you have any follow-up conversation

21    between the 4th and 10th with Will Helms about

56

1    comments that he made, not counting to 18 comment?

2        A.  Yes.

3        Q.  What was the nature of that conversation?

4        A.  The 10th was the next day.  We saw Will

5    before we saw Ed.  There were a couple meetings that

6    occurred on the 10th.  And Will emphatically denied

7    making that comment to anyone.

8        Q.  Did you believe him?

9        A.  I believed him to be sincere.  He said he

10   hadn't talked to Ed since the original complaint,

11   since September 3rd, is what he had said, since he

12   and Bob and Ed worked together.  He had no occasion

13   to talk to him.

14           Ed had isolated himself.  He didn't want

15   to be around anybody.  And, again, he recounted

16   that, I could take offense because people call me

17   chief.  And, again, we said to him that is

18   inappropriate for anybody to be saying to you, we

19   don't want anybody talking to each other like that

20   in the work place.

21       Q.  Just for one second.  We --

57

1    A.  Joyce was present.  Will said he had very

2    little contact with -- at that point we were

3    questioning him if he had any contact with Michael

4    Thomas.

5        Q.  Who is that?

6        A.  Michael Thomas was at that time a previous

7    employee who had been employed less than three

8    months.  But was named on the original letter

9    received by Ed's attorney as being a client, a

10   co-client of Ed's.

11        We were questioning Will at that time

12   about conversation with Michael Thomas, as well as

13   Darryl Glenn.

14        Q.  What was the conversation regarding

15   Michael Thomas; were there allegations made that

16   Will Helms had said things about Michael Thomas as

17   well?

18        A.  We were not clear, because we had not been

19   given anything -- Ed did not report to us anything

20   about Michael Thomas.  However, Michael was named as

21   a co-client of Mr. Burgmier's letter.  Michael

58

1    Thomas was not employed there any longer.  I didn't

2    know what the nature of Michael Thomas'

3    participation was in the whole process.  I assumed

4    it had to do with Will Helms.  That's why we were

5    questioning him.

6        Q.  What did Mr. Helms say about Mr. Thomas?

7        A.  He said, I have not talked to that guy the

8    whole time he was working here.  My son knew him

9    from school.  He was a drug head, or I forget the

10   language he used.  He said he was really into drugs.

11   I just stay away.  Not the kind of person I want to

12   associate with.

13       Q.  There were no allegations that you are

14   aware of, or nothing was brought to your attention

15   regarding comments about, he looks like somebody who

16   lives on Court Street?

17       A.  The first time I heard that was during

18   Ed's deposition.  That comment was, Ed attributed

19   that comment to another or about another employee,

20   not about Michael Thomas.

21       Q.  So you really had no knowledge as to what

59

1    Michael Thomas, what his involvement was.  Do you

2    have any knowledge, did you uncover any relationship

3    or allegations at anytime?

4        A.  No.

5        Q.  So at this point you have no idea why

6    Michael Thomas was ever mentioned?

7        A.  No.  We couldn't reach him.  We tried to

8    reach him to find out.  I couldn't reach him.  We

9    never heard anymore from the attorney or through any

10    other source that there was an issue with Michael

11    Thomas.

12        Q.  He said he was a previous employee?

13        A.  Yes.

14        Q.  Was he terminated for performance issues?

15        A.  Yes, he was.

16        Q.  What is the probationary period there?

17        A.  90 days.

18        Q.  What was the result of your discussions

19    with Will Helms regarding Darryl Glenn?

20        A.  On October 10th I had a couple of

21    discussions with Will Helms.  On October 10th we

60

1    were unable to determine -- it was our belief that

2    nothing additional had happened since the original

3    complaint of 9-3 to that date.  And we found Will to

4    be credible.

5        Q.  How did you reach those conclusions,

6    starting with nothing had happened?

7        A.  I feel it made sense that Will would have

8    had very little contact with Mr. Thomas or Mr.

9    Glenn, other than at break times.  Will was one of

10   the more skilled maintenance workers.  So he would

11   be assigned different jobs.  What Michael Thomas

12   would have been doing.  Just found him to be

13   believable.

14       Q.  Did you talk to anyone else -- did you

15   actually have a conversation with Mr. Glenn about

16   the events?

17       A.  Yes.

18       Q.  What did Mr. Glenn say?

19       A.  I spoke with Mr. Glenn on October 10th.

20   Mr. Glenn said that Will was a racist; that Will had

21   made comments about -- made some of the same jokes,

66

1     BY MS. META:

2     Q.  Let's go to the meeting on the 10th.

3     A.  We called him in, Joyce and I.  To address

4     those comments.  Because we felt they were

5     inappropriate.  We wanted to make sure that he did

6     not act on those.  We have a policy in our handbook

7     about violence in the workplace.  I think in this

8     day and age you can't be too proactive in addressing

9     these things.  Things you read about in the

10    newspaper every day.

11         I felt it was important to address it with

12    him.  We wanted to get assurances that he wasn't

13    going to act on those comments.  And he was

14    immediately confrontational, as soon as we called

15    him in.

16    Q.  What do you mean, he was confrontational?

17    A.  His first comment out of his mouth, I felt

18    a migraine headache coming on as soon as you and

19    Joyce called me around here.  Not even; hello, good

20    afternoon.  That's what he said when he walked in.

21    We tried to talk with him very respectfully.  Not in

67

1    a condescending fashion.  Just that we were

2    concerned about those comments.  We had an

3    obligation to follow up, and we wanted assurances

4    from him specifically in writing that he wasn't

5    going to act on them.

6         And then, you know, he starts saying, the

7    pen is mightier than the sword.  I'm contacting

8    NAACP.  I'm going to let them handle it.  You're

9    just going to use this as a way to fire me.  I said

10   to him, this is not about retaliation.  You said

11   something very specific that concerned me.  And he

12   tried to justify the fact that, I was telling you

13   the way I felt, not that I was going to do it.

14        He used the example that, it's like saying

15   I feel like I'm going to explode.  I said, I don't

16   see that as being a fair analogy.  I feel like I'm

17   going to explode is non-specific.  When you say, I'm

18   going to climb Will Helms like a tree and snap his

19   neck, that is very specific.  I just want to know

20   that you are not going to do anything.

21        Again, he was agitated.  Just kept saying,

68

1    you know, I'll let the powers that be handle it.  I

2    imagine he meant his attorney or the EEOC or the

3    NAACP, or whomever he was referring to having made

4    this complaint to the outside to.

5         At one point he said, you know, just write

6    up whatever and I'll sign it.  Kind of like that

7    same tone.  And, you know, after he left the meeting

8    we did just that.

9    Q.  Did he ever during the course of your

10   conversation with him, did he ever say, I'm not

11   going to do that, or I didn't mean to say that?

12   A.  I understood it, even though he was upset

13   and confrontational with us, I understood him to say

14   during the second session that he would not.  He

15   said, I'm not a violent person.

16   Q.  What do you mean during the second

17   session.

18   A.  October 10th.

19   Q.  You only met with him once on

20   October 10th?

21   A.  That is right.  As a follow-up to

69

1    October 4th.  We believed him, that he was not going

2    to act.  Would we have liked to have gotten it in

3    writing; yes.  Did we get it; no.

4        Q.  Now we are on meeting number 2.  We have

5    two more left.  What is the next meeting?

6        A.  There is a lot of time span that goes by

7    that I know you're going to want some information.

8    The next time we met with Ed Bernard formally was in

9    the middle of June.

10       Q.  What was the November meeting?

11       A.  I had a meeting with Will Helms

12   November 7th.

13       Q.  Let's go to that meeting on November 7th.

14       A.  Joyce and I called Will Helms to follow up

15   on some of the allegations made by Darryl Glenn.

16   This was the first opportunity, she had been

17   travelling for a number of weeks.

18       Q.  Joyce had been travelling?

19       A.  Yes.  This was the first time, she and I

20   were both on campus.  I did not want to have that

21   discussion with Will without her presence.

71

1  implying something because he lived in Trappe?

2      A.  I understood it to mean that people, you

3  know, I'm not making a comment about whether or not

4  the comment was appropriate or not.  I understood it

5  to mean that people from Trappe are dumb.  That's

6  what he was implying.

7      Q.  Is Luke Outten black or white?

8      A.  White.

9      Q.  How did that conversation end that you had

10  with Will Helms?

11      A.  Again, Will Helms was adamant that he did

12  not have any conversations with Darryl Glenn.  That

13  none of what was alligated had occurred.  Again, he

14  was agitated from having been called in again.

15      Q.  Was this meeting on November 7th, did Will

16  Helms have advance knowledge of it?

17      A.  No.

18      Q.  And the meeting ended with him saying, I

19  didn't do this.  Good-bye?

20      A.  He wanted to know that this was over with.

21  That he wouldn't be called in anymore.

80

1    A.  Edward.  The same flow backward.  John was

2  hearing stuff back from Ed and back from Bob.  He

3  thought it was a translation issue.

4    Q.  Was there any information written down and

5  put into that discrimination file that you described

6  earlier?

7    A.  Yes.

8    Q.  Okay.  How did the conversation with John

9  McNally end?

10   A.  I think, again, we determined that there

11  were a number of issues, performance issues on

12  June 11th warning, that they were for the most part

13  valid, that they were not going to rescind the

14  warning.

15     We asked John, just to slow down a little

16  bit, not specifically with Ed, but with everybody in

17  general.  Being a new manager, I think he was very

18  enthusiastic about making change and getting things

19  done.  People weren't ready for him.  He was doing

20  too much too soon.  Slow down on the pace.

21   Q.  When did he start working for the school?

82

1        BY MS. META:

2        Q.  It's now 1~:05.  We took a break, I

3    believe 10 minutes after 12:00.  We agreed to come

4    back at 1:00.  There was some delay on the part of

5    Ms. Trumps and Mr. Wexler.  We are now ready to get

6    started again.

7            Ms. Trumps, you stated to me that you

8    don't really know much about how things work at the

9    school in terms of positions people might hold, and

10    there might be a change in their position, and

11    duties they might have day-to-day.  Is that correct?

12        A.  No, that is not.  When you're talking

13    about positions, I'm aware of positions.  I'm aware

14    of general functions.  When you talk about

15    day-to-day assignments, I'm less familiar with that.

16        Q.  Do you have any knowledge of the positions

17    that Mr. Bernard held during the course of his

18    employment?

19        A.  I believe that he was hired as a mechanic

20    and that he has always been classified as a

21    mechanic.  There has never been any change to his

83

1    job title.

2        Q.   Do you have any knowledge, and not talking

3    about information you may have learned about

4    deposition with Mr. Bernard last week, do you have

5    any knowledge as to the types of positions, the

6    types of assignments that he was asked to perform?

7        A.   Only from, outside of his deposition, only

8    from what he has shared with me during

9    conversations.

10       Q.   What types of things has he shared with

11   you?

12       A.   Working on the boats most recently has

13   been his job assignment.  I believe when he was

14   initially hired, he worked on the fleet of vehicles.

15   We have quite a few trucks and tractors and vans

16   that the housekeeping department uses.  And more

17   recently he spent some time on the grounds crew in a

18   temporary capacity.

19       Q.   Do you have any idea how long he held

20   that?

21       A.   Approximately three weeks.

90

1    knowledge because I wasn't there.

2        Q.  Who did the documentation?

3        A.  You don't have, and I believe John McNally

4    also documented.

5        Q.  Is that information contained in Mr.

6    Bernard's file?

7        A.  Yes.

8        Q.  Was Will Helms ever giving a written

9    notice for the events that occurred in early October

10    involving the count to 18 comment?

11        A.  No.

12        Q.  Okay.  Is the true there was a finding on

13    your investigation that those events did not occur

14    the way that they were originally conveyed to you?

15        A.  That's correct.

16        Q.  Okay.  Was Will Helms ever written up or

17    given a warning for the events that Ed Bernard

18    complained of in September and late August?

19        A.  When you say written up, yes.  I think I

20    shared in earlier testimony that the same

21    documentation that went in Bernard's file went in

91

1    hemp's file.  Was he given a written notice, no.  He

2    was verbally counseled and it was documented in his

3    file.

4        Q.  Even though there was a finding after your

5    investigation that those comments were made, all he

6    received was verbal counselling?

7        A.  That's correct.  That was documented as

8    well and placed in the file.

9        Q.  There was no filling out of the standard

10   warning notices?

11       A.  No.

12       Q.  Why did you choose just to discipline Mr.

13   Helms through verbal counselling?

14       A.  Because I felt that we addressed the

15   situation.  That what we originally counseled him on

16   in September had occurred again.

17       Q.  Prior to the August 30th, the events that

18   occurred on August 30th and were subsequently

19   complained of by Mr. Bernard in early September, had

20   you heard, had you been told anything else from

21   anyone else regarding derogatory or discriminatory

93

1    A.  The current one?

2    Q.  Correct.

3    A.  The current attendance policy became

4    effective the first of February 2003.  And it's

5    based upon a point system.  So that incidents of

6    absence or lateness or early leave are given a point

7    value.  And the accumulation of points would warrant

8    progressive discipline.

9        Points are not assigned to incidents of

10   absenteeism until the employee has exhausted all

11   forms of their paid time, like vacation time, or

12   what we call variable time.  With the exception of

13   lateness.  That is a situation where paid time is

14   forced, as well as points are assigned.

15       The accumulation of four points would

16   warrant a first warning.  Eight points is a final

17   and 12 points, I believe, is termination under the

18   current policy.

19   Q.  Do these points have a cycle where the

20   beginning points would drop off and end points would

21   move into a next cycle?

98

1    incidents a final warning, and nine incidents a

2    termination.

3         That, again, was not, didn't give any

4    bearing or weight to how much absence occurred, be

5    it a whole day or half an hour.  So, again, when we

6    changed the policy in 2003, we were thinking along

7    those lines as well.

8    Q.  You had mentioned briefly in your earlier

9    testimony, you used the phrase rescinding warnings.

10   Is there a policy for rescinding warnings?

11   A.  Not a formal policy.  That was my

12   impression of what Mr. Bernard wanted us to do by

13   meeting with us on both occasions in June.

14   Q.  Have you ever had an occasion to rescind a

15   warning in the past?

16   A.  Yes.  Specifically for Ed Bernard we have.

17   Q.  When did that occur?

18   A.  The whole November, payroll error thing.

19   Q.  Is there a formal document for rescinding

20   warnings?

21   A.  No.

99

1    Q.  How does the process --

2    A.  I usually notate whatever the situation

3  was.  In his case those dates would have been

4  excused, warning not valid.  Something along those

5  lines.

6    Q.  Okay.  Employee warning notice for Ed

7  Bernard.  9-25-2002.

8        (Whereupon the proffered item was

9  marked as exhibit number 3.)

10    BY MS. META:

11    Q.  For the ease of questioning, I'm going to

12  go ahead and admit these two.  Date of warning is

13  12-9-2002.  Number 4.

14        (Whereupon the proffered item was

15  marked as exhibit number 4.)

16    MS. META:  And the third exhibit is

17  employee warning notice to employee, Ed Bernard.

18  Date of warning is 11-25-2002.

19        (Whereupon the proffered item was

20  marked as exhibit number 5.)

21    BY MS. META:

100

1    Q.  Review all three of these documents.  Do

2  you recognize these employee warning notices?

3    A.  I recognize the one that I generated.  I

4  did see these last week.

5    Q.  What was that?

6    A.  I did see these other two last week.  I

7  believe they are kept -- these two I don't believe

8  are in the employee file.  I believe these two

9  issued by Mark Darcy are out at the school.

10    Q.  Number 4 and 5?

11    A.  Yes.

12    Q.  Do you have any reason to believe 4 and 5

13  are inaccurate?

14    A.  No.

15    Q.  The three warnings, being Plaintiff's

16  Exhibit 3 through 5, what are they for?

17    A.  3 is for accumulating six incidents under

18  the attendance policy.  Number 4 is for accumulating

19  7 incidents under the attendance policy.  And number

20  5 is for not calling in within one hour after start

21  of shift, for violation of company policy.

101

1    Q.  So then 3 and 5 would be for absenteeism?

2    A.  Yes.  3 and 4.

3    Q.  And 5 would be for absenteeism?

4    A.  Failure to call in.

5    Q.  Can you explain to me why Mr. Bernard is

6  being written up for some of the same dates.

7  Looking at 9-25 on both the Plaintiff's Exhibit 3

8  and on Plaintiff's Exhibit No. 4?

9    A.  No.

10    Q.  Okay.  Can you explain to me why Mr.

11  Bernard is being written up, the date of warning

12  being 11-25, which is Exhibit No. 5, why he's being

13  written up for the date of incident being 11-15,

14  that same incident being identified in Plaintiff's

15  Exhibit 4?

16    A.  Yes.  Because it's for a different thing.

17  Plaintiff 5, this warning is not for the actual

18  absence.  It's for the failure to call in and report

19  the absence within an hour.

20      I did not issue it, so if you are asking

21  me for the rationale; but it makes sense to me.

103

1   Engineering School, directed to Joyce Matthews.

2   Dated October 11, 2002.  No signature.

3           (Whereupon the proffered item was

4       marked as exhibit number 6.)

5       BY MS. META:

6       Q.  Earlier in your testimony you referred to

7   a letter.  Is this a copy of that letter?

8       A.  Yes.

9       Q.  Who prepared this letter?

10      A.  I did.

11      Q.  Why did you prepare it?

12      A.  Again, we wanted to get assurances in

13  writing that he was not going to act on those

14  comments.  And he had said during the course of that

15  meeting, just write something up and I'll sign it.

16  Exactly like that.

17      Q.  When did you present this letter to Mr.

18  Bernard?

19      A.  I personally did not present the letter to

20  Mr. Bernard.

21      Q.  Who presented the letter?

108

1    A.  I don't recall if he told me he was going

2    to specifically have a meeting to present this.  I

3    know we had weekly staff meetings.  I have been

4    present during his staff meetings.

5    Q.  Were you present at all on the day that he

6    presented this document?

7    A.  No.

8    Q.  Okay.  Is this information to your

9    knowledge posted anywhere on the premises at the

10    school?

11    A.  I don't know.

12    Q.  Does John McNally have an office?

13    A.  Yes.

14    Q.  I would like to talk to you about the

15    policy regarding vacation pay.  Get you to explain

16    that policy for me.  I can present documents

17    surrounding that issue as exhibits and we can review

18    them.  If you could explain the policy.

19    A.  Employees earn vacation pay based upon

20    their length of service.  Typically, it is awarded

21    or what we call posted on the anniversary date.

109

1    They have 15 months from the posting date in which

2    to use it.  To use it or lose it policy.

3         They have to use the vacation in 8 hour

4    increments.  We prefer that they give us I believe

5    15 days notice to take vacation, although we will

6    grant unscheduled vacation time.  We do force people

7    to take their paid time before unpaid time.

8         So if somebody had vacation time or

9    variable time to take, and they made to take a day

10   off, they are forced to use that pay time instead of

11   going without pay for that day.

12   Q.  Okay.  If Mr. Bernard was hired today,

13   which is August 27, 2003, would his anniversary date

14   then be considered August 24th, 2004.  August 27?

15   A.  As long as he was actively employed all 52

16   weeks, and wasn't off the off payroll for five

17   consecutive days, as stated in the employee

18   handbook.

19   Q.  How much vacation time would accrue on the

20   anniversary date?

21   A.  In the case of Mr. Bernard, 10 days.

110

1      Q.  When you say in the case of Mr. Bernard,

2   are there other --

3      A.  Employees with less than five years of

4   service are awarded two weeks of vacation time per

5   year.  That vacation increases with length of

6   service.

7      Q.  Okay.  Are you currently in a position

8   that you could describe to me the events that

9   occurred surrounding the dispute over the vacation

10  pay?

11     A.  I'll try.

12     Q.  I can present the exhibit for you, and we

13  can go over that together.  That will make it easier

14  for us to understand.

15        This is an e.mail that appears to have

16  come from Dawn Trumps' computer.  It's from Joyce

17  Matthews.  It was sent to Dawn Trumps and other

18  individuals that I'm unable to identify.

19        There are attachments to the e.mail, to

20  the document, but not the e.mail itself, which are

21  time cards for Ed Bernard.  Two of those.  Then

111

1   there is a second e.mail from Dawn Trumps to

2   Jennifer Stam Jones.  It's dated November 25th.  And

3   with that there is a time card for November 16,

4   2002.  And a payroll sheet for November 22nd, 2002.

5        Then the third e.mail is from Jennifer

6   Stam Jones to Dawn Trumps, dated November 25th,

7   2002.  I will have all those documents together

8   marked as Plaintiff's Exhibit 8.

9        (Whereupon the proffered item was

10       marked as exhibit number 8.)

11       BY MS. META:

12       Q.  If you could first review those documents

13   to see if I accurately reflected for the record the

14   information that's contained in that packet of

15   documents.

16            (Pause)

17       BY MS. META:

18       Q.  Is it accurate?

19       A.  Yes.

20       Q.  Having all the documents in front of you,

21   I would like for you to tell me what happened in

112

1   this particular session and where there was

2   confusion over the vacation pay?

3      A.  The week of 11-11 it appears that Ed was

4   out on 11-12, 11-13 and 11-15.  Monday 11-11 was a

5   holiday.  And the way we do our payroll is kind of

6   unusual, because we pay up-to-date as opposed to a

7   week behind.

8      So I think in order to get this processed

9   it came up as the administrative person down at the

10   school forced him to use his time for those missing

11   dates as vacation time.  We paid it.  We actually

12   paid the time.

13      Q.  For the missing dates.  You mean the 12th

14   and the 13th of November?

15      A.  12th, 13th and 15th was a forced 24 hours

16   of vacation.  It was actually paid on that payroll

17   processing; it was paid.

18      Q.  Which document would that be; November 22,

19   2002?

20      A.  Yes.  Payroll date 11-22-02.

21      Q.  The record should reflect this is a

113

1    document listing a series of individuals.  The

2    title, Easton School Employees Maintenance and

3    Housekeeping.

4        A.  Like a total hour log that she uses to

5    enter from this into the payroll system.

6        He was actually paid.  And upon reviewing

7    this after the fact Joyce questioned it and called

8    me.  And said that she wanted me to take a look at

9    it.

10        So the first question I had was, on the

11    absence of 11-12, which was the day after a holiday,

12    he had not at this point given us, had not reached

13    the office at Easton or me here in Baltimore, a

14    doctor's note as per our policy.  You have to work

15    the day before and the day after a holiday in order

16    to get holiday pay.  So that was one issue.  Until

17    we had documentation for that day after we would

18    rescind holiday pay.

19        Q.  Did he provide you with that

20    documentation?

21        A.  Later we did receive it.

114

1    Q.  Was he paid for that day?

2    A.  Yes.

3    Q.  Okay.

4    A.  Then the other dates were the forced

5    vacation was put through.  We questioned that

6    because he hadn't actually posted his vacation time.

7    His posting date-- I have to look to see where it

8    was.  Anniversary date for the posting of vacation

9    was not November 13th of 2002.  Because at some

10   point in time he had been off the payroll.  So his

11   posting date had been adjusted.

12       Q.  In order to be off the payroll, it would

13   be a period of five consecutive days?

14   A.  Yes.

15       Q.  Do you have any knowledge as to why he was

16   off the payroll for those five days?

17       A.  It predated me.  There was a Workers Comp

18   accident, and he was off the payroll for a couple

19   weeks.  I don't know the dates.

20       So the situation was then, since he

21   doesn't post, do we want to advance vacation time

115

1    when the employee hadn't requested it in advance.

2    So after discussing it with Joyce, I instructed

3    Jenny Stam Jones, our payroll person here, to

4    rescind payment on the next check for those dates,

5    which we did.

6        Q.  The next check being --

7        A.  Paid biweekly.  If we were paid 11-22, I

8    believe it would have been December 6th, would have

9    been the next Friday payday.

10        Q.  So the vacation pay was rescinded on the

11    next December 6th?

12        A.  Right.  I believe his posting date ended

13    up being sometime in mid December.  That payroll

14    adjustment did occur on December 6.  Ed spoke with

15    Joyce about it, and expressed, he had asked, I

16    believe, for his time cards.  And didn't agree with

17    it.

18        He said he did not understand the policy

19    when he read it to show that the vacation posting

20    date would be adjusted with time off the payroll.

21    He understood it to mean that vacation is always

116

1    granted on the anniversary date.  He had already in

2    his mind needed that money or spent that money on

3    Christmas presents, and needed his money.

4         And Joyce reversed that decision.  We went

5    ahead and cut him a check, and overnighted it within

6    a couple of days from this e.mail.  Monday,

7    December 9th, when Joyce instructed myself and Jenny

8    to go ahead and reverse the payroll error.

9         Q.  And then you stated that that was noted on

10    the warning that Mr. Bernard received, which would

11    be Plaintiff's Exhibit -- would that be Plaintiff's

12    Exhibit 4.  Would that be the statement at the

13    bottom.  It may be difficult for you to read.

14         A.  It appears, what I can make out is a note

15    from Joyce in her file that these absences are

16    excused.

17         Q.  Okay.  The absences that she excuses?

18         A.  11-12, 11-14 and 11-15 on Plaintiff's 4

19    check.

20         Q.  Plaintiff's 5 would that mean this should

21    have been rescinded as well?

117

1      A.  In my mind; no.  You still have to call

2    in.  The policy is, you call in within an hour.  So

3    I don't believe, I don't know what was done with it.

4    In my opinion it should not have been rescinded.  I

5    know there was some testimony last week about

6    whether or not we knew he was out that day.  But

7    that is the first I'm hearing of that.

8      Q.  Even still going, not in an effort to get

9    argumentative with you, but for the purposes of

10   clarification.  If he was given the pay and allowed

11   to keep the money, and given vacation time for these

12   dates, then this would have been vacation time for

13   him; correct?

14     A.  Right.  I still want an employee to call

15   in and tell me they are not coming in to work.  I

16   think an employee has an obligation to let his

17   employer know.

18     Q.  Can you tell me whether or not in the

19   employee file the dates of 12, 14, 15, 2002 are

20   marked as holidays or paid vacation?

21     A.  They are.

118

1    Q.  Again, not to be argumentative with you,

2    but would not then, he would not have had a

3    responsibility to call in on the date for which the

4    employee warning notice was written?

5    A.  I guess I don't understand your question.

6    If somebody is, in my mind, if somebody is taking a

7    day at a time, we don't know they are going to be

8    out the next two days, they don't give us, I'm

9    assuming that he did not give us notice.  I don't

10   have any direct knowledge, other than hearing his

11   testimony last week.

12        But, if somebody calls in sick today, and

13   calls in sick tomorrow, we have no prior notice they

14   are going to be out both days.  I still want to hear

15   from them.  If somebody calls me and says, look, I

16   may be out the rest of the week because I'm feeling

17   bad.  I can know they are still sick from the flu or

18   whatever they called me.  I believe employees have

19   an obligation to call in.  It takes all of 30

20   seconds.

21        Q.  If this has been classified as holiday

119

1    pay --

2        MR. WEXLER:  The question was, what was in

3    his mind on that day.

4        THE WITNESS:  None of these were holidays.

5        MR. WEXLER:  Now is the third time.  Maybe

6    you should ask it a different way.  You are getting

7    the same answer.

8        BY MS. META:

9        Q.  If this is marked in your records as

10   vacation pay, then one of those dates being 11-15,

11   then 11-15 would still be vacation, in which case

12   would he have responsibility to call?

13       A.  Yes.  If it was not pre-scheduled.  If

14   he's requesting that day as vacation, on that day he

15   still needs to call us.  It's not a point of, is he

16   getting paid or not.  I think that is a separate

17   issue. The issue is, does an employee have an

18   obligation to call and say I'm not coming in.

19   Absolutely.  Whatever the situation is, you should

20   call in.

21       (Pause)