**EXHIBIT 30**

EXHIBIT

Bernard 22

8/21/02

Edward Bernard                This a confidential personnel record

04/09/03

I met this afternoon with Ed and Bob Shafer to review the status of the boats. This is a weekly meeting that usually takes place Tuesday morning, but Ed requested that we re-schedule to accommodate his work on the boats. At the conclusion of the review of the boats I explained to Ed that I was made aware of incidents involving inappropriate behavior / remarks that were either said / done in his presence or were directed towards him last fall. It is my understanding that these incidents had been dealt with by the CMES at the time it was reported. I explained further that as I became more aware of the nature of the incidents I felt that I needed to be pro-active and ask him several questions:

First, from his perspective has he been exposed to or the subject of any discriminatory, retaliatory, offensive, vulgar or other inappropriate behaviors since I came to CMES on Feb. 1, 2003 ? He replied that no, he had not. He stated that he did sometimes wonder if the fact that I requested him to keep a log of his boat activities, meet with him weekly and provide weekly boat reports might be considered retaliatory, but he was still reserving judgement. He wondered why he might be asked to do things that others in the department were not. He also noted that he does not hang around the shop or his co-workers in an effort to limit the opportunity for such behavior. But he repeated that no, he had not felt that he has been subjected to any of the inappropriate behaviors since Feb. 1, 2003.

Secondly, from his perspective has he been exposed to or the subject of any discriminatory, retaliatory, offensive, vulgar or other inappropriate behaviors since the issues were addressed last Fall ? He answered that yes, he had. When I asked him to elaborate, he declined to cite any specifics. He stated that he did not want to discuss the situation. I asked him if he had reported any of these new incidents to anyone. He said that yes, he had reported them to Jeanie. When I asked who Jeanie was, he told me she is his lawyer. I explained that I meant had he reported the incidents to anyone in authority at the School. He said that he had not.

I then explained that due to the seriousness of these issues, I would like for him, Bob and me to meet with Joyce this afternoon so he could have the opportunity to let her know about these new incidents. At first he said he would rather not. I replied that while I respected his reluctance I felt that this was so important that I felt is was necessary that we do meet with Joyce this afternoon anyway. He asked if we could meet tomorrow. I said that Joyce was going to be out of town on Thursday and Friday and that this could not wait. Ed asked if he could make a phone call, to which I said yes. He left to use the phone in Bob's office. He came back a few minutes later and he said he would rather not meet with Joyce today. I expressed my disappointment in his answer, and told him that I could not force him to meet with Joyce, but that I had to be very clear that it was my understanding that he was refusing to meet with her. He acknowledged that he was refusing to meet with her today. I suggested that I schedule a meeting with Ed, Joyce, Bob and myself Monday morning. He said that would be fine. He did not interpret this to necessarily mean that Ed would meet with Joyce on Monday, but that it would give him some time to re-consider his position.

At this point the discussion turned more general. I tried to explain to Ed that my purpose in having him keep a log book and submit weekly reports evolved from my unfamiliarity with the boats, their status and the worked required to have them ready by May 1. During my first few weeks, I did not see progress being made on the boats, but also was willing to appreciate that work was being done that was not readily apparent. I felt that I needed a mechanism to help me better understand the progress of the work. Without going into details I said that I have questioned other mechanics about the outcome of their work and scrutinized their work performance when I found it wanting. I tried to base my judgements on outcomes and job performances, not a person's race, religion, national origin, etc. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ during this conversation that the inappropriate behaviors described ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. I reminded him that several weeks ago I had distributed copies of Staff Behaviors Indicators that described acceptable and unacceptable behaviors. While I did not distribute them in response to this situation, clearly they help define inappropriate behaviors. It was Bob's as well as my responsibility to be proactive in dealing with any situation of this type. Ed did not respond to my remarks, but my feeling was that he was wary of my motives, was not quite willing to trust me but that I had yet done anything that would cause him to distrust me.

Since Ed was still not going to accompany me to meet with Joyce, at this point we adjourned and went back to work.

jhm

John H McNally 4/9/03

**EXHIBIT 31**



# CALHOON MEBA ENGINEERING SCHOOL
27050 St. Michaels Road   Easton Maryland 21601   (410) 822-9600   Fax (410) 822-722

# MEMO

**Date:**        February 27, 2003
**To:**          Ed Bernard
**From:**        John H. McNally, Facilities Manager
**Subject:**     Boat Repairs

Thank you for meeting with Bob Shafer and me yesterday to bring me up to speed on the current status of the boats. The information you provided is very helpful. I have attached a copy of my recollection of our discussions. Please bring to my attention any mistakes or discrepancies you note.

As we discussed yesterday, since neither the Bertram nor the Ketch were winterized, I would like you to immediately inspect, assess and prepare a report for me on the current condition of these boats. You are to also immediately take any reasonable actions to winterize the boats to prevent additional damage.

I have provided you with a bound notebook that I would like for you to begin using as a daily log of work performed on the boats. It is not meant to used to document detailed information, but rather a general overview or journal of your daily activities on each boat. Until I become more familiar with the equipment and necessary work required, I believe this log will be helpful to me so I can better assist and provide the necessary resources to you.

Please do not hesitate to contact me if you have any questions or suggestions regarding this matter.

Thank you

cc:     B. Shafer

Jhm. ic. Bernard 30227 boat repairs

**EXHIBIT 32**

## Joyce Matthews

**From:**      John McNally [jmcnally@mebaschool.org]

**Sent:**      Monday, April 14, 2003 11:18 AM

**To:**        Joyce H. Matthews

**Subject:** Notes of Meeting with Ed Bernard 04/14/03

04/14/03

Following my meeting with Ed on Wednesday I scheduled a meeting with Joyce, Ed and myself for Monday morning at 9:30am. Friday afternoon I received a faxed copy of a letter form Ed's lawyer indicating that Ed would not participate in the meeting on Monday if we were going to discuss the pending lawsuit Ed has filed against CMES. This morning I explained to Ed that we were not going to discuss the lawsuit, rather we would address his comments to me on Wednesday that inappropriate behavior had continued since the issue had been dealt with last fall.

When we met, Joyce asked Ed to elaborate on his comments to me. He declined. She explained very clearly that she would not tolerate this type of inappropriate behavior and that her purpose was to get to the bottom of any allegations that this type of behavior had continued. She reminded Ed that he had been instructed to contact her if it had continued in anyway, and since he had not made any effort to let her know otherwise, she had thought the issue had been resolved. Ed again declined to discuss the subject, stating that if he said anything, we would just be back at square one and he would have to deal with the fallout. When Joyce asked what he meant by that he made vague references to conversations stopping abruptly when he approached or overhearing comments from around a corner. He declined again to elaborate with any details at all. He stated that he did not think this was the proper forum for this discussion, but that everything would come out in the end. I suggested that this is the proper forum for this discussion so CMES could address these issues. I again stated that CMES, Joyce and I would not tolerate any inappropriate behavior but that we needed his assistance. Several times Joyce attempted to explain to Ed that we were trying to assist him and to establish any facts about his allegations that we could use to further investigate this matter. Ed made a reference to his health being affected by this situation and that he had missed a lot of work because of this. He did not want to discuss it at all. Joyce then reminded Ed of FMLA and that it might apply to him if his attendance problems were related to health issues. Joyce again instructed Ed to contact her if he changed his mind about being willing to discuss this issue.

Since it was obvious that Ed would not cooperate at all, it appeared that the meeting was over. I asked Ed to wait for me outside. He got up to leave, then stopped and stated that this is one of the things he was talking about, we were playing with his emotions unnecessarily and that he was causing him a lot of stress. He then left. After he left I explained to Joyce that I had wanted Ed to wait because I thought I could give Ed some additional information on FMLA.

Ed did not wait for me in the Admin. Building, but I did catch up with him at the Maintenance Barn. I explained FMLA to the best of my ability and how he might benefit from it. I told Ed I would get him some written information on it. I told Ed that I did not know if it could be applied retroactively or not, but if he was eligible for FMLA, it could not hurt to ask.

jhm

**EXHIBIT 33**

# EMPLOYEE WARNING NOTICE

EXHIBIT
Bernard 30
8/21/13

Employee  **ED BERNARD**          Date of Warning  **6/11/03**

Department  **MAINTENANCE DEPT.**   Supervisor  **BOB SHAFER**

## Type of Violation

| Absenteeism | | Carelessness | | Insubordination | |
|---|---|---|---|---|---|
| Lateness/Early Quit | | Failure to Follow Instructions | | Violation of Safety Rules | |
| Rudeness to Employees/Members | | Willful Damage to Material/Equipment/Property | | Working on Personal Matters | |
| Unsatisfactory Work Quality | ✓ | Violations of Company Policies or Procedures | | Other | |

## Previous Warnings

| | ORAL | WRITTEN | DATE | BY WHOM |
|---|---|---|---|---|
| 1st Warning | | ✓ | | |
| 2nd Warning | | | | |
| 3rd Warning | | | | |

**Employer Statement**
Date of Incident **5/28/03** Time **3:00 PM** APPX.

*CLEANESS ON THE WORK SITE*
*AFTER JOB IS COMPLETE.*

*ALSO - SEE ATTACHED LETTER.*

**Employee Statement**
I agree with the Employer's Statement. ☐
I disagree with the Employer's description of
violation for the following reasons:

Issuing Manager _____
Date  **6/11/03**

Employee Signature _____
Date _____

## Action to be taken

| | |
|---|---|
| Warning | ✓ |
| Probation | |
| Suspension | |
| Termination | |
| Other | |

Consequence should incident occur again:

I have read this Employee Warning Notice and understand it.
Signature of Employee
Manager Signature _____      Date  **6/11/03**

Routing _____      Date  **10/11/03**
Date _____
Date _____

*READ LETTER TO ED*
*ED REFUSES TO SIGN FORM.*

(P.1)

# EMPLOYEE NOTICE                                    6/11/03

## LIFE BOAT ISSUE

DURING EARLIER MEETINGS, ED TOLD JOHN AND MYSELF ABOUT THE CONDITION OF THE LIFEBOAT AND WHAT HE FELT WAS NEEDED TO PREPARE FOR THE SEASON. THERE WERE SEVERAL ISSUES BUT WOULD ONLY TAKE APPX 2 HOURS OF SERVICE. ONE OF THESE ISSUES WAS THE CLEANING OF THE BOAT. AFTER THE BOAT WAS DOWN IN THE WATER AND THE EXHAUST LINE WAS REPAIRED, THERE WERE STILL DEBRIS OF TRASH IN THE BOTTOM OF THE BOAT UNDER THE ENGINE. JOHN NOTICED IT, I NOTICED IT.

ON WEDNESDAY 5/28/03, I ASKED ED IF HE HAD CLEANED IT UP AND WAS IT HIS JOB. ED REPLIED THAT YES IT IS MY JOB. I WILL REMOVE IT BUT I HAVE NOT GOT TO IT YET.

THE NEXT DAY I ASKED ONE OF THE TEMPS TO CLEAN THE BOAT BECAUSE I NEEDED ED TO MAKE A REPAIR ON THE SAILBOAT FREEBIRD. I MADE THIS DECISION BECAUSE OF UPCOMING BAD WEATHER. HOWEVER, THERE IS STILL ONE GREASEY OIL PAD UNDER THE ENGINE.

I STILL NEED FOR ED TO REALIZE TO KEEP HIS BOATS, COMPANY TRUCKS AND WORKSHOP AT PERRY HALL CLEANER.

I FEEL THE RESULT OF THIS NOTICE AND IMPROVED COMMUNICATION ON THIS SUBJECT SHOULD RESULT IN A POSITIVE APPROACH OF THIS MATTER.

*Robt. L. Sel___*

(P. 2)

**EXHIBIT 34**

# CALHOON MEBA ENGINEERING SCHOOL

27050 St. Michaels Road  Easton Maryland 21601  (410) 822-9600  Fax (410) 822-722(

EXHIBIT

Bernard 31

# MEMO

**Date:** June 11, 2003
**To:** Ed Bernard
**From:** John H. McNally, Facilities Manager
**Copy:** Joyce Matthews, Director
Dawn Trumps, Human Resources
Bob Shafer
**Subject:** Job Performance

**COPY**

I am writing this memo in support of Bob Shafer's decision to complete an Employee Warning Notice and counsel you regarding your job performance. During the 4 months since I arrived at CMES, I have personally observed many instances where I found your performance to be substandard and lacking in professionalism, thoroughness or a level of expertise that I would expect from a mechanic with your experience.

In my opinion, on several occasions you have purposely withheld vital details relating to general questions until it was specifically requested of you, even when it was obvious that the information was important to the task at hand. Instead of taking proactive ownership for the maintenance of the boats, you have concentrated only on doing those tasks you have decided you should be responsible for or were specifically instructed to do. Even then I have found your work to be incomplete and unsatisfactory. You have failed to adequately address maintenance issues that you not only were aware of, but also in many instances, played a major part in creating. Despite many conversations that I have had with you regarding the wider range of your responsibilities, you continue to view your role as limited to simply engine repair or mechanical problems.

I have listed a few of the incidents of which I am aware that have contributed to my perception of your performance. This list does not provide specific details of the incidents, rather it is intended only to demonstrate a continuing trend of behavior and level of performance that is unsatisfactory and does not appear to be improving.

Despite several conversations with you and reminders about the condition of the pulleys and lines at the docks, no improvements have been observed.

You failed to remove and throw away a large cardboard container as requested. When I asked you the next day why you had not completed the assignment you stated that you were unable to find it. When I asked you why you had not let me know that you could not complete the assignment, you came upset and accused me of picking on you over a stupid cardboard box. I attempted to use this incident to reinforce as previously discussed, what the appropriate response should be if you are unable to meet an expectation. You became very uncooperative and

# CALHOON MEBA ENGINEERING SCHOOL

27050 St. Michaels Road  Easton Maryland 21601  (410) 822-9600  Fax (410) 822-722(

demonstrated behavior that I could have easily interpreted as insubordinate. However, I chose to concentrate on counseling you on Customer Service issues rather than your immediate behavior.

When I inspected the condition of the Ketch immediately after you assisted in bringing it from the marina to the school, I found trash scattered throughout the boat, a significant amount of oil in the bilge. Overall condition of the boat could only be described as unsatisfactory, unkempt and messy. I felt this was uncalled for, given the amount of time you had to prepare the vessel.

After taking the Sea Squirt for it's initial run this Spring you advised me that the motor was "worn out and should be replaced". I sent the motor out for an independent assessment and was informed that the carburetor was clogged and would have to be cleaned before any evaluation of the motor could be made.

When I received a listing of all persons who have successfully completed the CMES Safe Boating Course I realized that your name was not included. This was after you and I had had a discussion about scheduling you for the annual course refresher. Not only did you purposely withhold this information during that discussion, you later informed me that you had taken the course but failed it on purpose because you did not think you should have to operate a boat in the performance of your job.

A month after being issued MARTS 6284 to you to clean and store all of the ice eaters for the season, an ice eater was found on the Peach Orchard dock.

You failed to take adequate steps to have the Bertram ready for a test run that you were aware had been scheduled for several weeks. Your actions significantly delayed the start of the test. In addition the fuel filters were found to be so fouled that replacement filters had to be purchased and installed, resulting in having to schedule a second test run later in the week. After we returned to the campus following the first test I learned that you had failed to place the Bertram on shore power and I had to send you back to the marina (a 30 minute drive one way) to complete the task.

You were aware of a missing bolt for the Freebird mast assembly and did nothing to replace it.

You neglected to bring all of the sails for the Freebird from Perry Hall.

On Friday 05/16 you failed to fuel the Chesapeake as part of your weekly routine.

jhm. staff. bernard. 30611 bernard

# CALHOON MEBA ENGINEERING SCHOOL
### 27050 St. Michaels Road   Easton Maryland 21601   (410) 822-9600   Fax (410) 822-7220

After being assured that Lifeboat was ready for use except for replacing a small exhaust hose, trash, debris and oily absorption pads were found left in the engine compartment. In addition, upon further inspection of the vessel, a significant number of items that require resolution prior to the Life Boat being used for training were noted. In my opinion you should have been aware of these items and either resolved or reported them to your supervisor for action.

It is my intention that by helping you identify and recognize your pattern of unsatisfactory performance you will be able to take the necessary steps to demonstrate a significant improvement. I will make myself available to you if you think I can assist you in any way in this effort. However, failure on your part to demonstrate a significant improvement in a timely fashion may result in additional disciplinary action which may include but not be limited to suspension or termination.

Thank you.

**EXHIBIT 35**

EXHIBIT

*Bernper 35*
*8/2/8*

# EMPLOYEE WARNING NOTICE

Employee _ED BERNARD_          Date of Warning _6/24/03_

Department _MAINTENANCE_          Supervisor _BOB SHAFER_

### Type of Violation

| | | | | | |
|---|---|---|---|---|---|
| Absenteeism | | Carelessness | | Insubordination | ✓ |
| Lateness/Early Quit | | Failure to Follow Instructions | | Violation of Safety Rules | |
| Rudeness to Employees/Members | | Willful Damage to Material/Equipment/Property | | Working on Personal Matters | |
| Unsatisfactory Work Quality | | Violations of Company Policies or Procedures | ✓ | Other | |

### Previous Warnings

| | ORAL | WRITTEN | DATE | BY WHOM |
|---|---|---|---|---|
| 1st Warning | | | | |
| 2nd Warning | | | | |
| 3rd Warning | | | | |

**Employer Statement**
Date of Incident _6/10/03_ Time _MID-AFTERNOON_

_See Attached Sheet_

Issuing Manager _John H McNally_
Date _6/24/03_

**Employee Statement**
I agree with the Employer's Statement. ☐
I disagree with the Employer's description of violation for the following reasons: ☐

Employee Signature _____
Date _____

**Action to be taken**
Warning ☐
Probation ☐
Suspension ☐
Termination ☐
Other ☐

Consequence should incident occur again:
_ADDITIONAL DISCIPLINARY ACTION THAT MAY INCLUDE BUT NOT BE LIMITED TO SUSPENSION OR TERMINATION._

**I have read this Employee Warning Notice and understand it.**
Signature of Employee      Date _____
Manager Signature _John HMcNally_    Date _6/24/03_

Routing _JHM___    Date _6/25/03_
      Date _____
      Date _____

NOTE: THE ATTACHED SHEET WAS READ TO Ed. HE DECLINED TO SIGN EITHER SHEET. _Jake (who)_ WAS PRESENT AT Ed's REQUEST
_Bob Shafer_

Attachment to Employee Warning Notice to Ed Bernard, 06/24/03

You are hereby counseled concerning your behavior on the boat dock on June 10, 2003. While discussing your response to reported maintenance issues on the Ketch with Bob Shafer & me, you abruptly walked away. Despite being asked to remain, you left anyway. I consider your decision to walk away in the manner that you did, to be an act of deliberate insubordination. In addition, your response to the reported issues with the fuel tank and starter switch was inadequate and unacceptable. You are further counseled that continued instances of unacceptable work or inappropriate behavior will result in additional disciplinary action that may include, but not be limited to, suspension or termination.

John H. McNally    6/24/03
John H. McNally
Facilities Manager

**EXHIBIT 36**

Received from ED BERNARD without
COMMENT on Wed 06/11/03 — James H McNelly

I'm left with no other choice but
to file a complaint with the MEBA trustee
on which a list was given to me by
Lee Kincaid

The situation that took place June 10, 2003
on the Ketch was a clear demonstration of
prejudice by insulting my intelligence
as an Black man which has not only
taken place with me but with others
of my race as well. This also by all
means constitutes a clear case of
harassment because of my race, and
for relatiation. A copy of this will be
sent to the EEOC and the NAACP

EXHIBIT

Bernard 32
8/21/03

(69)

**EXHIBIT 37**



June 12, 2003

Dear Sirs:

A charge of Discrimination and Retaliation, charge number (AMD03CV531) has been filed in THE UNITED STATES DISTRICT COURT FOR THE STATE OF MARYLAND on February 27, 2003.  Edward G. Bernard, Jr. Vs Calhoon MEBA Engineering School.

Due to extremely poor management practices, several more suits are about to be filed by other employees.

You have a serious and detrimental situation on your hands that maybe or should I say NEEDS your immediate attention before matters so already are out of hand.

If you have any questions, PLEASE feel free to contact:

Jean D. Meta, Esquire
Law Office of Jean D. Meta
133 Defense Highway, Suite 111
Annapolis, Maryland 21401
(410) 224-0755
(410) 224-7079

Sincerely,

Edward G. Bernard, Jr.

cc:

PWJ Fisher
Ron Davis
Don Keefe
Thomas Murphy
Marc Huber
Dennis McCarthy
Edward Morgan
Cecil McIntyre
William VanLoo
Jack Craft, Jr.
Eugene Albert
Dale Moses
Lou Marciello
John McCurdy
William Cole
Duncan Ballenger
Al Camelio
Louie Jacque
Jack Sullivan
Saunders Jones
Michael Cameron
NBC with (Enclosures)
CBS with (Enclosures)
FOX News LIVE with (Enclosures)
WJZ 13 with (Enclosures)
CNN with (Enclosures)
NAACP with (Enclosures)

**EXHIBIT 38**

EXHIBIT

Bernard 34

5/21/07

June 19, 2003

To: Employee File of Ed Bernard

From: Dawn Trumps

Re: Investigation of Harassment Complaint Dated 6/11/03

On June 17, 2003 Joyce Matthews and myself met with Ed Bernard regarding a handwritten complaint dated 6/11/03 alleging racial harassment and retaliation. The meeting was held in Joyce's office at the Calhoon MEBA Engineering School.

When Ed arrived, he asked what we wanted to speak with him about and Joyce explained that we were investigating his written complaint of the previous week. He said, "You're just hearing about this now? You should have gotten something on this already." Joyce explained that this was the first opportunity that she and I could coordinate our schedules to meet with him.

Joyce asked Ed to explain what had occurred on June 10, 2003. He replied, "Joyce, you honestly don't know about John's humiliation of people and how he twists words around"? She told him that she was not aware of any problem.

Ed went on to explain about an issue on the Ketch (sailboat) and how John had inquired about how we knew when the fuel tank was full. Apparently, this discussion had been going on for several days. On 6/10, Ed was walking toward the boat dock when John McNally and Bob Shafer called him over to the Ketch. According to Ed:

John: "What is the problem in not being able to determine the fuel level?"
Ed: "I haven't been down to look at it yet."
John: (restated the question) and demonstrated with a dowel rod that a fuel level could be ascertained when used like a dip stick
Ed: "I haven't been down to look at it yet."
John: continued to demonstrate that the dowel rod dropped directly in the tank and could be used for a fuel level reading
Ed: "I'm glad that you figured it out." (Ed started to walk away at this point.)
John: "Ed, come back. I'm not done speaking with you about this yet."
Ed: "I don't feel like being harassed today." (Ed walked away.)

Ed explained that the Ketch had never run out of fuel before and that when it was filled early in the season, it ran all season on the same tank of gas. He said that he was familiar with the usage of the Ketch, that it never had a fuel gauge on it in the last two years, and that when the fuel pump catchs it meant that it was full.

Ed said that Bob was present for the conversation on 6/10 but that he wouldn't comment on Bob's opinion of the matter. Joyce asked if Ed objected to the way that John talked to him. At this point, Ed said that he wouldn't discuss it any further. He said that he is "tortured every day" when he comes to work and that he "puts up with lies and twisting of words". He said that is why he keeps to himself. He also commented on the fact that Connie told him earlier in the day that John was upset with him for going off campus to buy a part for a truck he had been working on.

Joyce asked him if any other employee had issues with John and Ed responded that he wouldn't comment on anyone else's dealings with John. "I want the truth to come out. My story will be told only in another forum. I will not comment further."

(3)

I asked two specific questions: *"Why do you believe that this incident occurred as a consequence of your race?"* and *"Was there any prejudicial comment or language used by John (referencing Ed's written allegation of prejudice)?"* Ed's response was that he wouldn't comment further and that he wanted to get back to work.

I also asked him to repeat the verbal exchange that occurred on the ketch between he and John to ensure that I was documenting it properly. He refused to do so.

Ed said that he didn't want to talk anymore without his attorney present. Joyce explained that we had an obligation to investigate his complaint and would continue the investigation without his participation. He asked if he could be excused to return to work and Joyce agreed.

Joyce and I then met with John McNally to investigate his version of the incident. John recounted a conversation he had with Ed on Friday 6/6 regarding the fuel issue on the Ketch. Apparently a member commented that when he stepped on the starboard side of the vessel, fuel overflowed from the vent. Ed explained that there was no other way to determine how much fuel was in the tank other than visually seeing the overflow. John told him that he didn't think that was an acceptable practice and to investigate further and give him a recommendation.

When a member tried to take a fuel measurement with a stick, John passed that information along to Bob and Ed who both responded that it couldn't be done due to a curve in the fill nozzle.

On Tuesday 6/10, John found that a fuel reading could be determined if you dropped a wooden dowel rod into the tank. As he was explaining this to Bob, Ed walked near the area and John called him over. John claims that he asked Ed, "Help me understand what the problem is in measuring the fuel level" while he demonstrated that he could utilize the dowel rod. John claimed that Ed responded, "that's good that you were able to figure it out" and walked away.

I asked John if the tone or language that he used during the conversation with Ed could be construed as humiliating. He said that he didn't believe so. He believes that Ed should have felt embarrassed as a mechanic to have overlooked something so obvious. John claims that he did not raise his voice or speak in a condescending manner. John says he is direct when he speaks with employees, especially when something is not done correctly.

John also commented on Ed's misplacing the journal (work log) and errors on Boat Inspection Reports. Both of these incidents are documented in John's most recent personnel notes on Ed Bernard.

*(4)*

**EXHIBIT 39**

Background information concerning incident referred to in EWN to Ed Bernard 06/24/03.
Attached here for easy reference.

06/10/03            (Tues)

On Thursday evening (06/05) the Ketch was taken out by a member on its maiden voyage this season. The member reported 2 significant problems with the vessel. The first was that he had to "jump out" the starting solenoid to start the engine and the second was that when he stepped on the starboard gunwale, fuel poured out of the overflow vent on that side of the boat.
I reviewed both of these issues with Bob Shafer (supervisor) and Ed early Friday morning. When I spoke with Ed seemed puzzled by the problem with the started but told me he would check it out. He explained to me that he was not surprised by the fuel issue, as there was no way to determine how much fuel was in the tank when it was being filled except when the level reached the vent and began to overflow. He further explained that this meant that until enough fuel was used, anytime someone stepped on the starboard side of the vessel, fuel would then overflow. When I expressed the opinion that this cannot be acceptable and that there must be some other way to measure the amount of fuel in the tank, he insisted that there was not, that everyone knows this and it was accepted practice. I replied that even if what he said was true, we have to find some means of measuring the amount of fuel in the tank and coming up with procedures that do not result in fuel being routinely dumped overboard. I told him that I wanted him to investigate and give me a recommendation on how to accomplish this.
On Friday evening a member attempted to take the ketch out but was unable to start the engine due to a dead battery. That was reported to me and I contacted Bob Shafer at home. Bob told me where a battery charger was and Mark D'Arcy and I hooked it up to the Ketch.
On Sunday another member attempted to take the Ketch out. This member was very familiar with sailboats in general and the Ketch in particular. He found several problems that he resolved. He found an on-board 30amp marine charger in the engine compartment that had been disconnected. He reconnected it and successfully charged the batteries. He found the radio connected only to the #1 battery, which meant when the vessel was switched to the #2 battery the radio was inoperative. He re-connected the radio to both batteries. He also noted that there was excessive oil in the bilge. I looked for the absorbent pads that should be stored on the dock but could not find any. I borrowed some from the machine shop. The member was able to start the engine and left the dock with his party at app. 10:30am. I also left the dock area and went tot he cafeteria. When I returned from the cafeteria I noticed that the Ketch had been returned and the member took out a different boat. Later that evening I sought out the member and inquired as to why he switched boats, he explained that once he was underway he checked the fuel filter and found it so fouled he had to assume he was pulling fuel off the bottom of an almost empty tank. Early Monday morning I shared this information with both Bob and Ed and asked that Ed check the fuel filter, the fuel level and the starter switch. Later that day I was told by Bob that Ed had changed the fuel filter and the switch. At the end of the day I asked Ed if he changed the switch he said that he had not. He had checked it out and felt that it was ok. I asked him if he had changed the filter, he said that he had not, that he had checked it out, cleaned it and it was ok. On Tuesday I learned from Mark D'Arcy that the member had also checked the fuel level by using a stick. When I passed this information on to Bob & Ed I was told that this was not possible due to a curve in the fill nozzle to the tank. Mark D'Arcy and I went to the Ketch and investigated on our own. We found no reason that the tank could not be checked by using a

stick. Within 15 minutes I was able to locate a ¼ x 48" wooden dowel and accurately measure the tank. With a few simple calculations I was able to determine that the tank holds approximately 30 gals.

I asked Bob to meet me on the Ketch where I showed him the results of my efforts. We discussed how Bob could improve his performance, especially in verifying information that is shared with him by the mechanics, especially when common sense would lead you to question it. At that point Ed came down to the Ketch and I asked him to come over to where we were sitting. I asked him if he had replaced the starter switch and he said he had not that he checked it out and it was ok. I showed him that when you turned the key all the way to the right it sounded like it was trying to start by\ut immediately "died". However if you slowly tuned the key to the right it seemed to hit a "sweet spot' and the engine did start. I suggested that this situation could mislead someone to think that the engine would not start and that we should go ahead and replace the switch as we originally planned. Ed made no comment. We also discussed the fact that the switch is a 3 position switch with a "kill switch" plunger" that would have to be in the correct position to start the engine. I suggested that he write some instructions that we can have mounted to clarify how to start the engine. Ed made no comment.

I asked Ed to explain to me again the problem with determining how much fuel was in the tank. When he did not seem to understand what I was talking about, I demonstrated how easy it was to use the dowel to check the fuel level. He said something to the effect "that's good that you were able to figure that out" and started to walk off. I asked Ed not to leave, as we were not finished. He replied that he was not in the mood to be picked on and left.

I am of the opinion that either Ed's job performance demonstrates a lack of general mechanical knowledge and expertise or he demonstrates a degree of negligence and lack of thoroughness that I find unacceptable. I also feel that his behavior on the Ketch was insubordinate. JHMc

**EXHIBIT 40**

# EMPLOYEE WARNING NOTICE LETTER    6/10/03

ON TUESDAY AFTERNOON 6/10/03, JOHN CALLED FOR MYSELF TO MEET HIM DOWN ON THE KECTH-BOAT. WE WERE DISCUSSING THE CHECKING OF THE FUEL IN THE GAS TANK. ED STARTED WALKING TORWARD THE BOAT AND JOHN CALLED HIM OVER. JOHN SAID HE FOUND A WAY TO CHECK THE TANK LEVEL AND ASKED ED WHY HE DID NOT CHECK IT YET. THEY BOTH HAD AN EXCHANGE OF WORDS ABOUT HOW JOHN FOUND A WAY TO CHECK IT. JOHN ASKED ED WHY HE DID NOT CHECK THE TANK AGAIN. ED THEN SAID I'am GLAD YOU FOUND A WAY TO CHECK IT JOHN AND STARTED WALKING AWAY. JOHN SAID ED COME BACK I'am NOT FINISHED. ED STARTED AGAIN TO WALK AWAY AND SAID I DON'T FEEL LIKE BEING HARASED TODAY. JOHN AND I BOTH AGREE THAT ED SHOULD NOT HAVE WALKED AWAY.

SUPERVISOR

**EXHIBIT 41**

06/24/03            (Tuesday)
I had decided to give Ed an Employee Warning Notice based on his unsatisfactory job performance in responding to maintenance issues reported on the Ketch (see notes from 06/10/03) and his behavior when Bob and I tried to review his actions. The following is attached to the EWN.

*****
Attachment to Employee Warning Notice to Ed Bernard, 06/24/03

You are hereby counseled concerning your behavior on the boat dock on June 10, 2003. While discussing your response to reported maintenance issues on the Ketch with Bob Shafer & me, you abruptly walked away. Despite being asked to remain, you left anyway. I consider your decision to walk away in the manner that you did, to be an act of deliberate insubordination. In addition, your response to the reported issues with the fuel tank and starter switch was inadequate and unacceptable. You are further counseled that continued instances of unacceptable work or inappropriate behavior will result in additional disciplinary action that may include, but not be limited to, suspension or termination.


John H. McNally
Facilities Manager

********

Notes from meeting:
I requested Bob Shafer to ask Ed to join us at 3:30pm today so I could present Ed with the Employee Warning Notice. As soon as we were seated and I began to present the Warning, Ed suggested that I wait until Joyce returns so she and Dawn could be present. I said that I was not willing to wait. Before I could proceed Ed asked if someone else from the maintenance staff could serve as a witness. I agreed and asked him who he would like to join us. He said he did not care, he would go over to the Barn and get some one. In a few moments he returned with Luke. I asked Luke if he understood why he was joining us. He said he was not sure. I explained that he was here at Ed's request as a witness to a disciplinary proceeding. I reminded Luke that these proceeding were confidential and he was not to discuss anything he learned with anyone else. He said that he understood. I presented the Employee Warning Notice to Ed and asked him to read it and sign it. He refused so I read it to him, so noted that on the bottom of the form and asked Bob to initial it, which he did. During the proceedings Ed accused me of unfairly picking on him and being a racist, based at least partly on the fact that I did not include this incident in the Employee Warning Notice that Bob Shafer had presented him on 06/11 and the fact that 14 days had passed since the incident. He further stated that many of the notes I had made concerning his past actions were lies and he wondered how I could sleep at night. Ed stated that he would communicate his position with the Trustees and Ron Davis.

I attempted to explain why I had chosen to take this action but it was clear that Ed was not willing to listen or consider that I was taking this action because of his performance. After I provided Ed with a copy of the EWN and the attached sheet Ed left. I then reminded Luke of the confidentiality of the situation.

After Luke left I spoke with Bob for a few minutes. I asked Bob if he remembered the discussion he and I had on the Ketch before Ed came over, which he said he did. I asked Bob if he remembered that it was a frank and candid discussion where I had expressed my dissatisfaction with his performance regarding the starter and the fuel tank. He said he did. I then asked him if I was more or less "gentle" with him than I was in my discussion with Ed. He said that I was more "gentle" with Ed.

Comments

The time frame between the incident on 06/10 and today was approximately the same between the incident of 05/28 and Bob's counseling session on 06/11.

The counseling on 06/11 was a result of Bob Shafer's decision with supporting information from me.

Both counseling sessions were given only after serious deliberation to ensure that they were, given the circumstances, fair and not an overreaction. As I stated in my memo in support of Bob's EWN on 06/11, I see a pattern of unsatisfactory work performances that continues. Rather than considering that his performance could be a factor, Ed uses the accusation of racism and discrimination to deflect the attention from his performance to others,

JHMc

**EXHIBIT 42**



EXHIBIT

Bernard 37

July 1, 2003

To: Employee File of Ed Bernard

From: Dawn Trumps

Re: Disciplinary Warning Dated 6/24/03

On 6/24/03 Ed Bernard was served with a written warning for insubordination by John McNally, Facilities Manager. That afternoon, Ed went to the Administration Office and requested a meeting with Joyce Matthews and myself. Patty Kiss explained to Ed that Joyce was out of town at the Trustee's Meeting but she would schedule a meeting upon Joyce's return.

Joyce and I met with Ed on Thursday 6/26/03 at approximately 1:30pm. He told us that he did not agree with John's warning and didn't understand why it took 14 days to serve it. The warning referenced an incident on the boat dock on 6/10/03 relating to the Ketch and determining fuel levels.

According to Ed:

- Bob Shafer (Maintenance Supervisor) told him that he had originally written up the warning on 6/11 but didn't serve it because another performance warning was issued that day relating to cleanliness on the lifeboat. Bob told him that he recommended to Joyce that the warning be "buried" and to let things alone for awhile.

- He feels that there is a double standard for black men and that he is the only person getting so many warnings and that they are in retaliation for the current litigation.

- John's three page documentation supporting Bob's warning to Ed on 6/11 is all lies and that proves that he is a racist. He went through each point and spoke of the specific dialog, mechanical work requested and performed for four points referenced in John's documentation. The only incidents that were documented properly were "the box" and "the Chesapeake".

- The written warnings are not what Bob Shafer wants but what John McNally wants. Bob does not agree with John's assessment of Ed.

- He was hired as a Mechanic to work on lawn equipment and vehicles. When he was moved over to the boats, it was "only temporary" until they found a replacement.

- He feels that Joyce and I turn a blind eye to what is going on. I explained that this was the first time in many months that he has communicated to us very openly and cooperatively. Since September, our meetings have always turned confrontational.

- He feels that as soon as he started to complain about racism, the retaliation started (by John). "Now that John is in charge, everything is going haywire."

- Bob Shafer gave him a copy of all warnings before he met with John.

Ed feels that all of John's counseling and written warnings concerning performance were acts of retaliation. Ed said all of his coworkers agree that he is being harassed and he believes that John needs to go.

Joyce and I told Ed that we would investigate his complaints with both John and Bob and would follow up with him regarding the insubordination warning.

Joyce and I then met with Bob and John. Asked directly whether he believed that Ed was insubordinate on the Ketch, Bob agreed and admitted to verbally counseling Ed the same day about the inappropriate response. Bob said that he wrote up the insubordination warning because he thought that was what John wanted, although John did not specifically request it.

Bob said that Ed's performance is okay, that he is not an exceptional employee, and that his current performance is no different than what it has always been. John explained that he and Bob had a discussion regarding Ed about whether we were "raising the bar" relative to performance or accepting substandard performance. John thought they agreed that the issues raised to counsel Ed were due to his not following up on tasks and taking ownership.

When asked whether he had supplied Ed with copies of warnings prior to any disciplinary meeting, Bob responded in the negative. He admitted to telling Ed that he advised Joyce against the insubordination warning only because he wanted things to settle down. I explained to Bob that as a manager of the CMES, whatever he says to an employee represents the CMES' position and that he needed to exercise more caution specifically with a case in litigation.

Bob digressed for a few minutes making the topic of the meeting his employment and performance as a supervisor. He feels that he is not right for the Supervisor's position and that he often goes along with John's ideas because he doesn't feel that his opinion is heard. He says that he tries to keep the peace and since John came to the CMBS (and the Maintenance employees have a "common enemy"), they're getting along better amongst themselves and more work is getting done. John and Joyce were both quick to point out that many routine maintenance issues were still not attended to timely.

John asked Bob to be more forthright with his opinions about employee matters.

After the two left, Joyce and I discussed the matter further. We concur that:
- Bob's behavior is problematic
- Ed's claim that John's documentation was all lies appears to be miscommunication between all parties involved
- Joyce would speak with several other members of the Maintenance Department to gauge response to John's management
- Joyce would suggest to John that he meet with the Maintenance Department and ~~apologize for making so many changes at one time~~ and slow down the pace for a while *tell them perhaps were*
- Joyce would meet with Ed Bernard and give him feedback about our investigatory meetings of 6/26. Basically, we acknowledge that there has been some miscommunication and misunderstandings but we feel that he was truly insubordinate on 6/10 and that many of the minor performance issues that John raises are legitimate concerns

*trying to affect change + miebly*

*Also Fri 6/27*

**EXHIBIT 43**



<u>Compose</u>  <u>Addresses</u>  <u>Folders</u>  <u>Options</u>  <u>Search</u>  <u>Help</u>                                              SquirrelMail

Joyce,

This is my recollection of the discussions I had with Ed concerning the
Bertram over the last few days.

07/15/03                    (Tuesday)
Last week in the presence of Bob Shafer, I asked Ed to prepare the Bertram
for being brought back to the school. He was to pay particular attention
to the starboard engine and the generator. Alban Tractor will be there as
part of their work on the port engine. The exact day was changed from
Wednesday to Tuesday. On Friday Bob Shafer reported to me that the
starboard engine was fully ready as was the generator. He said there was
still a problem with the trim tabs. He said he had confirmed that the tabs
themselves were not seized and could move freely. He described it as a
control problem that he could easily repair once the boat was back at the
school.
On Monday Mark D'Arcy went down to Knapps Narrows to see the Bertram and
called me about his concerns about the appearance of the inside of the
cabin. In his opinion it was cluttered and unkempt. I contacted Ed and he
assured me that in his opinion it was acceptable. He deliberately left the
table he out of place because Alban Tractor would have to access the engine
compartment. When I raised the question of trash and clutter, he said that
there was not that much and that this was a working trip not a joy ride and
he did not share my concerns. I later rode down to the Bertram and looked
for myself. I had to agree with mark's assessment. I saw a lot of
unnecessary trash and clutter that could have very easily been cleaned up
before hand.
During this conversation Ed mentioned that he had been unable to change the
fuel filters on the generator last week. He said that he tried to unscrew
them but could not do so. He intended to use his pneumatic tools to remove
the filter bracket once the Bertram was back at the school. I told him
that Bob had reported to me that Ed had checked out the generator and it
everything checked out. Ed said he could not explain that, that he had
told Bob about the situation. I then asked Ed what Bob had shared with him
about the Chesapeake bilge pump. Ed said that Bob told him that Mark had
replaced it.     I then explained the situation as I shared it with Bob, that
Mark had attempted to use the Chesapeake on Sunday, found the bilge pump
not working, contacted me, I purchased a replacement (with an internal
float) returned to the school, by then Mark had determined that the problem
was in the original external float not the pump. We changed out the pump
temporaily, just to get a working pump on board. I instructed Bob that
the pump had to be permanently installed and wired, and that it should be
fused on the automatic side and the manual side run through the console
switch. Ed said none of that was shared with him but that he now
understood what was needed and would take care of it.

EXHIBIT
Barnes 38

On Tuesday Ed came in at 7:00am as agreed so we could get an early start on going to the boatyard.  As he walked by me he said something to the effect "I don't think I will be able to go on the mission today" and walked out of the barn.  I did not see Ed again for about 15 minutes.  When I was able to catch up with him, I asked him what he meant he said he was not feeling well and did not think he was up to a boat ride.  I asked him if he could at least accompany us to the boatyard in the van.  He said he would have to think about it.  A few minutes later I spoke to him again about the situation and he said that he thought he was unable to even ride down to the boatyard.  I explained that if he was too sick to do his job that he was too sick to be at work and that he needed to make a decision.  He said that he would go home.  He then asked if he could get someone to give him a ride home as he did not have a vehicle.  I made arrangements for Bob to take him home.

After we got to the boatyard and inspected the Bertram, we found that we could activate both trim tabs successfully but found that there was a hydraulic leak on the hose fitting to the port trim tab cylinder.  It leaked whenever fluid was pumped through the line.  We eventually secured the trim tabs in an acceptable position and proceeded.

We found that the engine blower fan did not work and the aft bilge pump did not work.  We also found that the generator fuel filters could be changed by hand once a locking cap bolt on top of the filter was loosened.  When we arrived at the school I contacted Bob Shafer and he had the bilge pump replaced, changed the generator fuel filters and ordered a replacement blower fan.  He also began cleaning the boat and checking out the other systems.

We were also unable to screw the female end of the shore power cable to the vessel's shore power connection.  I asked Luke to investigate and try to resolve.

JHMc


Let me know if you have any questions.  Thank you
John


Download this as a file

07/16/03     (Tuesday)

As background - On the Monday after the CAA Picnic it had been reported (by Mark D'Arcy) that the throttle on the Sea Strike II was broken. I submitted a MARTS form to have it repaired. Shortly afterwards Ed reported to both Bob and me that to replace the broken plastic piece the entire assembly would have to be purchased at a cost of around $650.00. He was able to get just the plastic piece from a local dealer (Tidewater Yacht ?) without cost. He said that he would have to disassemble the throttle to repair it, that it would take several hours and he thought it wise to wait until the weather and his other duties permitted him to complete the repairs without interruption. Bob and I agreed.

In general discussion with Bob first thing this morning, we determined that ED should repair the throttle today. Later this morning I was with the Fire Sprinkler inspection contractor at the Fire Pump when Ed called me on the radio and then drove over to see me. He wanted me to go look at the throttle control mechanism on the Sea Strike II. He stated that whoever had used the Sea Strike II last had broken more than the just the plastic piece, he would not be able repair it. I said I did not understand the situation and asked "what do we know now that we did not know last week ?" Ed replied something to the effect that he was not told that there were additional parts broken, he thought that the only broken part was the plastic piece that was visible. I called Bob on the radio and asked him to meet Ed and me in my office. Once there we explained the situation to Bob. I asked Bob to whom he had assigned the task of repairing the throttle and who had determined which parts needed to be replaced. Bob said it was Ed. I asked Ed if he agreed with that. Ed said that was true, but he had never opened up the throttle assembly before this morning. When I asked him why and he said he was under the impression that the only broken piece was the plastic one that was visible. He then tried to link second hand comments he had heard that Mark had diagnosed the problem as just the plastic piece. I suggested that he should have investigated more thoroughly last week on his own. I suggested that he determine the parts ./ assembly needed and get the information to Connie so she could prepare a Purchase Order and order the correct part.

Ed then brought up the subject of the trim tabs on the Bertram. He wanted to know what the issue was. I then asked him to go over with Bob and me his understanding of the problem with the trim tab. He said that last Friday at the Perry Hall Boat Shed he told me that there was a hydraulic leak at the port trim tab cylinder. At that point I offered a different recollection. Last Thursday in a meeting with Bob and me, Ed told us that he had checked out the trim tabs and the tabs moved freely but that there was control problem inside that boat and that he would be able to fix it once the boat was at the school. I met with Bob on Friday and Bob told me that Ed had reported to him that the starboard engine was checked out and ready. He also reported that the generator had also been completely checked out, filters changed and was ready. There was no mention of additional information on the trim tabs.

On Monday afternoon I received a call from Mark D'Arcy with concerns about the appearance of the Bertram. I contacted Ed by radio and then went to Perry Hall Boat Shed to talk to him about that particular issue. That conversation is already documented. Ed agreed that he had confused the two days and that the Perry hall conversation occurred on Monday afternoon. He insisted that he told me about the trim tab leak as part of that conversation. I replied that I had no recollection of that. He asked me if I was calling him a liar. I said, "no, I am saying I have no recollection of you mentioning the trim tabs at that time."

I have absolutely no recollection of any comment regarding a hydraulic leak on the trim tabs at any time prior to the launching of the Bertram on Tuesday morning.

I told Ed that at this point we would have to agree to disagree about our respective recollections of that issue. Other than that part, we did agree on the tone and contents of the conversation at Perry Hall..

I then asked this question – even if Ed had mentioned the hydraulic leak to me during that conversation, what was his plan to repair the leak prior to the Bertram going in the water ?

He said that he poured JB Weld over the fitting, was waiting to see if that would take care of it, and he was going to talk to me about it. He said that he had also looked up some parts in a catalogue. I asked him if he attempted to place an order, he said no Connie was off that afternoon. I asked him if he had attempted to contact Bob Shafer and he said no, Bob had also left early. I asked him if he had attempted to contact me and he reminded me that he told me about it during the conversation at Perry Hall. I replied that again I had no recollection of any comments about the trim tabs but even so, I had initiated that conversation due Mark's concerns at approximately 3:15pm. When I met with him he was working on fiberglassing the Jon Boat not working on the trim tab problem. At that point Ed left to work on the Sea Strike II throttle.

After Ed left I asked Bob to paraphrase back to me his understanding of the events and this discussion and if they corresponding to mine. He did so and we agreed on the tone and contents.

After I complete this documentation of my recollections I will ask Bob to read it over, make comments as he feels appropriate and initial it.

JHMc

*John H McNally 7/17/03*

*Bob Shafer Jr. 7/17/03*

(9)

**EXHIBIT 44**

EXHIBIT

*Bernard 40*

LAW OFFICE OF

JEAN D. META

133 DEFENSE HIGHWAY, SUITE III

ANNAPOLIS, MARYLAND 21401

TELEPHONE: (410) 224-0755                                        WWW.JMETALAW.COM

FACSIMILE: (410) 224-7079                                        JMETA@JMETALAW.COM

August 15, 2003

**VIA FACSIMILE:  (212) 407-7799 AND FIRST CLASS U.S. MAIL**

Neal I. Korval, Esquire

Jonathan A. Wexler, Esquire

Vedder, Price, Kaufman & Kammholz, P.C.

805 Third Avenue

New York, New York 10022

RE:    **Bernard v. Calhoon MEBA Engineering School**
       **U.S. District Court/Maryland**
       **Case No.:  03 CV 0531**

Dear Counsel:

The purpose of this correspondence is to advise you that my client will be resigning from his position as maintenance mechanic with the Calhoon MEBA Engineering School ("Calhoon") this afternoon.  His resignation will be effective *immediately*.

Mr. Bernard has accepted an offer of employment with another company.  It was his intention to give Calhoon a letter of resignation and two (2) weeks notice this afternoon. However, Mr. Bernard received word from his new employer that they would like him to start as soon as possible.

Mr. Bernard has already asked his new employer for time off to attend depositions in late August.  I do not anticipate the need for rescheduling Mr. Bernard's deposition, which is set for **Thursday, August 21, 2003 at 10:00 a.m. at the MEBA Benefits Plans office in Baltimore.**

If you have any questions, please do not hesitate to contact me.

Sincerely,

Jean D. Meta

cc:    Mr. Edward Bernard (via First Class U.S. Mail)

# LAW OFFICE OF JEAN D. META

133 Defense Highway, Suite 111
Annapolis, Maryland 21401
Telephone: (410) 224-0755
Facsimile: (410) 224-7079
http://www.jmetalaw.com
jmeta@jmetalaw.com

## FACSIMILE COVER SHEET

| Send to: Neal I. Korval, Esquire Jonathan A. Wexler, Esquire | From: Jean D. Meta, Esquire |
|---|---|
| RE: Bernard v. Calhoon MEBA | Date: August 15, 2003 |
| Fax Number: 212 407 7799 | Phone Number: 410 224 0755 |

☐ Urgent
☐ Reply ASAP
☐ Please comment
X Please review
☐ For your information

Please note:
I have been attempting
this fax all day but the
circuits have been
busy. jdm

Total pages, including cover: 2

**Comments:**

Please see attached. The same has been sent via First Class U.S. Mail.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Jean D. Meta, Esquire

CONFIDENTIALITY NOTICE: The documents accompanying this facsimile transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended or named recipient, you are not authorized to read, disclose, copy, distribute or take any action in reliance on the information contained herein. Any action other than immediate delivery to the named recipient is strictly prohibited. If you have received this facsimile in error, please immediately notify the Law Office of Jean D. Meta by telephone or arrange for the return of the documents to the sender. If you are the named recipient, you are not authorized to reveal any of this information to any unauthorized person and are hereby instructed to destroy the information when no longer desired.