UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

---

**EDWARD G. BERNARD, JR.,**

        Plaintiff,

v.

**CALHOON MEBA ENGINEERING SCHOOL,**

        Defendant.

Case No. 1:03-CV-0531-AMD

---

### DEFENDANT'S SUPPLEMENTAL MEMORANDUM
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated: Washington, D.C.
       March 5, 2004

BEINS, AXELROD, KRAFT, GLEASON & GIBSON, P.C.
   Barbara Kraft, Esq.
   1717 Massachusetts Avenue, N.W., Suite 704
   Washington, D.C. 20036-2001
   Attorneys for Defendant
   Telephone:  (202) 328-7222
   Facsimile:   (202) 328-7030
   Attorneys for Defendant
   CALHOON MEBA ENGINEERING SCHOOL

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.
   Neal I. Korval, Esq.
   Jonathan A. Wexler, Esq.
   805 Third Avenue
   New York, New York  10022
   Telephone: (212) 407-7700
   Facsimile:  (212) 407-7799
   Attorneys for Defendant
   CALHOON MEBA ENGINEERING SCHOOL

## PRELIMINARY STATEMENT

This Supplemental Memorandum is submitted by Defendant pursuant to the Court's Memorandum to Counsel dated February 26, 2004, which reviews certain evidence submitted in connection with the Motion for Summary Judgment brought by Defendant, Calhoun MEBA Engineering School ("CMES" or "Defendant") and asks for comment on the reasonableness of the CMES Equal Employment Opportunity and Anti-Harassment Policy ("EEO Policy"), which provides for harassment complaints to be lodged with the Director of CMES, or with the Human Resources Manager ("HR Manager"). The Court's Memorandum raises two issues -- one legal and one factual. The legal issue is whether the Defendant's EEO policy is reasonable. The factual issue is whether the plaintiff, Edward Bernard ("Mr. Bernard" or "Plaintiff"), testified that he had told his supervisor or anyone else in management about racist remarks made by a co-worker ("Helms") prior to September 2002.

Defendant will show the following below: (a) the EEO Policy is reasonable as a matter of law; (b) Plaintiff has never contended that CMES was on notice of any racial content of Helms' remarks prior to September 2002; and (c) the testimony quoted by the Court is ambiguous, at most, and contradicts other testimony given by Mr. Bernard. The ambiguity is resolved by an affidavit from Plaintiff's supervisor, Robert Shafer, submitted with this Supplemental Memorandum, confirming that Mr. Bernard's first report to Mr. Shafer of racial remarks by Helms was on September 3, 2002.

## ARGUMENT

### A. The Reporting Procedures in the EEO Policy are Reasonable

#### 1. The EEO Policy Is Reasonable as a Matter of Law

The bulk of the case law on the "reasonableness" of complaint procedures involves supervisory harassment, wherein the burdens of the parties are allocated differently than in the instant case. When

supervisory harassment has been established, there is a presumption of liability, subject to the employer's affirmative defense that it exercised reasonable care and that the employee unreasonably failed to take advantage of preventive or corrective opportunities. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). By contrast, in cases of alleged coworker harassment like the instant one, a negligence theory is applied, under which the burden of establishing that the employer knew or should have known of the harassment and failed to take corrective action remains with the plaintiff. *Church v. Maryland*, 180 F.Supp.2d 708, 727-28 (D.Md. 2002); *Jaudon v. Elder Health Inc.*, 125 F.Supp.2d 153, 161 (D.Md. 2000).

This Circuit has held that, under *Faragher* and *Ellerth*, a policy must be "both reasonably designed and reasonably effectual." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). As with other complaint policies that have been held "reasonable" within this Circuit, the CMES EEO Policy "clearly identifies the prohibited conduct, assures employees who make complaints that they will be protected against retaliation, describes in detail the complaint process, identifies several places where a complaint may be filed, and provides for the prompt investigation of the complaint and equally prompt remedial action." *Church*, 180 F.Supp.2d at 737 (D.Md. 2002). A complaint policy has been found unreasonable for having inadequate assurances of confidentiality and overly narrow definitions of prohibited harassment, *Thomas v. B.E.T. Soundstage Restaurant,* 104 F.Supp.2d 558, 565-66 (D.Md. 2000), but the only reason that any court within this Circuit has ever offered for finding a complaint policy unreasonable *on the basis of the level of management to which the complaint is to be directed* is that the policy made inadequate provision for circumventing the harasser, *i.e.* where it required the complaint to be made *to the harasser. Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266-67 (4th Cir. 2001)

2

(fact that policy allowed complainant to bypass supervisor supported finding that it was "in no way defective or dysfunctional"); *Thomas*, 104 F.Supp.2d at 565 (failure to "provide lateral reporting alternatives for those offended by their immediate supervisors" among potential reasons to conclude that policy was defective or dysfunctional); *see also Faragher*, 524 U.S. at 808, 118 S.Ct. 2275, 141 L.Ed.2d 662. Thus, the potential avenues for filing a complaint are at issue only when the alleged harasser is among those parties to whom a complaint is to be directed. Here, however, the CMES EEO Policy makes explicit provision for circumventing harassers in the reporting chain: "if this individual [the complainant] believes that any person listed below is the one responsible for the conduct, the report should not be made to that person." (Defendant's Statement of Uncontested Facts, hereinafter "Facts," Exhibit 7, ¶ 4).

The Fourth Circuit has held that a company's distribution of an anti-harassment policy and the availability of *higher management* to receive complaints is sufficient to satisfy the first prong of the *Faragher/Ellerth* affirmative defense. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266-67 (4th Cir. 2001); *see also Shaw v. Autozone, Inc.*, 180 F.3d 806, 811-12 (7th Cir. 1999). The reasonableness of a complaint policy is thus established as a matter of law when that policy allows alleged victims of harassment to bypass the harasser. While the Policy of CMES might ideally offer more than two avenues for filing a complaint, the applicable legal standard is clearly one of reasonableness, not perfection. *Brown*, 184 F.3d at 397. Indeed, the EEO Policy provides that suspected violations be reported to the HR Manager, and Mr. Shafer did exactly that when Mr. Bernard lodged his complaint. It is therefore clear that, in practice, complaints may also effectively be brought to the attention of low-level supervisors. (Trumps Deposition pp. 35-36, hereinafter "Trumps p. ___.")

3

### 2. The Burden on Mr. Bernard to Report Harassment to Ms. Matthews or Ms. Trumps Was Not Onerous

The "burden" of lodging a complaint with one of two specified officials at CMES is not onerous. The two individuals in question, the HR Manager, Dawn Trumps, and the Director, Joyce Matthews, are a consistent presence at the School, and CMES is a sufficiently small institution (with an hourly non-academic support staff of approximately 35 individuals (Trumps p. 13)), that there are no bureaucratic barriers to approaching either one of them. Ms. Trumps visits the school on a regular basis, and her visits are announced via the School's internal television monitors, located throughout its buildings. (Facts, ¶ 10.) As the School's Director, Ms. Matthews is based onsite.

There is substantial evidence in the undisputed record that Mr. Bernard was not intimidated by and had no reservations about contacting either Ms. Trumps or Ms. Matthews. When Ms. Trumps arrived at the School on September 4, 2002, following Mr. Shafer's voicemail of the previous day regarding Mr. Bernard's complaint, Mr. Bernard immediately sought her out, before she had even spoken with Mr. Shafer. (Facts, ¶ 23.) In addition to telling her that he was not satisfied with Mr. Shafer's response to his complaint (Facts, ¶ 23), Plaintiff informed Ms. Trumps that he had already spoken with an attorney about the possibility of filing a complaint with the Maryland Human Rights Commission. (Facts, ¶ 24.) Neither is a statement that an employee intimidated by Ms. Trumps' perceived authority would likely make. Nor is there any evidence that Mr. Bernard felt any pressure to be less than forthcoming with either Ms. Matthews or Ms. Trumps during their subsequent meetings. (Facts ¶¶ 27-32; 46-49.) Mr. Bernard's level of familiarity with Ms. Trumps and Ms. Matthews is further evidenced by the fact that he referred to them respectively simply as "Dawn" (7 times — Bernard Deposition pp. 74, 77, 153, 161, 214, 285, hereafter cited as "Bernard p.___") and "Joyce" (10 times — Bernard pp. 83 [3 times], 92, 93 [2 times], 104, 119, 267, 285) throughout his deposition, while

4

almost never referring to them as "Ms. Trumps" or "Ms. Matthews," although the questioner consistently did so.[1] Finally, it is worth observing that Mr. Bernard has neither alleged nor argued that the reporting provisions of the Policy were unreasonable, onerous or intimidating.

### B. Plaintiff Does Not Contend that CMES Was on Notice of Any Racial Content of Helms' Remarks Prior to September, 2002

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl. Op.") acknowledges that Mr. Bernard's *first* complaint to his supervisor about Helms' racial remarks was made in September 2002, although he had earlier complained about other aspects of Helms' conduct toward him. (Pl. Op. pp. 3-4.) Indeed, the Complaint itself alleges only that *"[s]ince at least August 2002,* Mr. Bernard has been subjected to a hostile work environment based on his race, Black, because of the derogatory comments of Mr. Helms." (Complaint ¶ 11, emph. added.) The Complaint expressly states that *"[o]n or about September 3, 2002*, Mr. Bernard, in accordance with the grievance procedures outlined in [Defendant's] Employee Handbook, spoke with his immediate supervisor regarding Mr. Helms' offensive remarks, and filed a complaint with Ms. Dawn Trumps, [Defendant's] Human Resources Manager." (Complaint ¶ 16, emph. added.) Nowhere in the Complaint is there any

---

[1] Even if Mr. Bernard had found Ms. Matthews and Ms. Trumps to be intimidating figures, neither a fear of retaliation nor a suspicion that complaints will be ignored is sufficient to justify a failure to adhere to an employer's complaint procedures; "[T]he law against . . . harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267-68 (4th Cir. 2001)(citing *Shaw v. Autozone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)). Additionally, the EEO Policy addresses the possibility that employees may hesitate to bring complaints, by assuring them that CMES does not "expect employees to be experts on issues like discrimination and harassment" so "[e]mployees are required to report all conduct they believe may violate this policy, whether directly observed or reported to them, directly to the Human Resources Manager." (Facts, Exhibit 7, ¶4).

5

suggestion that Plaintiff, prior to September 2002, had complained that Mr. Helms' remarks had a racial content.

### C. Mr. Bernard, In Fact, Did Not Complain About Any Racial Content of Helms' Remarks Prior to September 3, 2002

Defendant respectfully refers the Court to the accompanying Affidavit of Robert Shafer, which states unambiguously (at ¶ 3) that the September 3rd complaint was the first that Mr. Bernard made to him about racial comments of Helms. This affidavit is submitted because it appears that the Court has interpreted Mr. Bernard's response (at p. 72 of his deposition) as evidence that Mr. Bernard complained before September 3, 2002 about some racial content of Helms' remarks. In fact, Mr. Bernard's testimony on this point is, at most, ambiguous, and contradicts other testimony that he gave.

On several occasions during his deposition Mr. Bernard had the opportunity to indicate that he complained about racial remarks prior to September 2, 2002, but he did not do so. For example, when recounting the racial comments about which he said he complained to Mr. Shafer, Mr. Bernard testified that Helms said, "Ed, I'm going to tell you right now, I think that they're all trying to make us their niggers . . ." (Bernard pp. 61-62), and added "and that's what sparked it off." (Bernard p. 62), clearly referring to his September 3 complaint to Mr. Shafer.[2] Shortly after this testimony there came the following exchange (Bernard p. 64):

> Q. Let me break it down into two periods, if this helps you. There came a time when you registered a complaint about Will Helms'

---

[2] This is consistent with the testimony of Ms. Trumps, to whom Mr. Bernard spoke the next day—and with the file memorandum she prepared at the time. Ms. Trumps both recalled and recorded that Mr. Bernard complained only about this comment, rather than the half-dozen or so about which Mr. Bernard testified at deposition. (Trumps p. 41 and Exhibit 13) Mr. Bernard carefully reviewed the file memorandum at his deposition, and was invited to indicate statements with which he disagreed, and did so. He did not take issue, however, with Ms. Trumps' statement that September 3 was the first time he complained about racial comments. (Bernard pp.86-91.)

6

>   comments, and that was September of 2002, and we're going to get into that in just a minute or two.
>
>   A.   Right.

While subsequent responses indicate some confusion on Mr. Bernard's part as to whether the "complaint" in question was his complaint to Mr. Shafer or his subsequent EEOC charge, there is no suggestion that Mr. Bernard was saying that he had complained *before* September 3. (Bernard p. 65.) Mr. Bernard plainly agreed that he first complained to Mr. Shafer about the racial comments in September 2002, and he quickly corrected himself when he started to testify about earlier complaints about racial jokes and comments—these complaints were made to the employees on the grounds crew, not to Mr. Shafer. (*Id.*)[3]

The testimony that the Court cites in support of the idea that Mr. Bernard testified that there were prior complaints about the racial nature of Mr. Helms' comments to Mr. Shafer is preceded by this testimony: "I complained all of the time. I told Bob I didn't appreciate how Will was talking about me behind my back telling me I wouldn't be able to tell everybody [sic] I wouldn't be able to get lifeboat running after had been sitting there for a while." (Bernard p. 72.) The question that followed this is ambiguous: it asks about the first time Plaintiff "complained to Bob Shafer about Will Helms *either* acting as a racist *or* making racial remarks." While it is undisputed that Mr. Bernard regarded everything Will Helms did as "acting as a racist," and, therefore, answered accordingly, he did not

---

[3] Yet another example of Mr. Bernard's agreement that the September 3 complaint was his first regarding explicit racial remarks: on p. 111 of the deposition, Mr. Bernard was asked, "The first time you tried [to complain about racial remarks] with the School they extracted an apology from Mr. Helms for you and a promise it wouldn't happen in the future, correct?" Mr. Bernard's response ("If you want to put it like that. I don't really call it an apology") takes issue with the sincerity of the apology, but not with the fact that Mr. Bernard's first complaint produced the apology and promise.

7

testify that he mentioned Helms' racial motivation or racial conduct in any prior complaints to Shafer,[4] although he shared his views with some members of the grounds crew.  Finally, far from insisting that he had been telling Mr. Shafer about racial comments all along, Mr. Bernard, after saying that he "told [Mr. Shafer] everything" on September 3, 2002, refused to be pinned down to an exact date: "It may have been around September 3rd.  It *might* have been before that," (Bernard p. 73, emph. added), but Mr. Bernard certainly did not say or imply that it was years before that.

Thus, the record does not support a conclusion that Mr. Bernard complained to Mr. Shafer about racial harassment prior to September 2002.  On the contrary, the record is consistent that the earlier complaints were general and that Mr. Bernard did not recount any explicitly racial jokes and comments to Mr. Shafer before September 2002.  (See Shafer Aff. ¶ 4.)  At most, Plaintiff's testimony is ambiguous and internally self-contradictory, and the question is definitively clarified by Mr. Shafer's affidavit.

## **CONCLUSION**

Defendant CMES has demonstrated that the EEO Policy is reasonable, and Plaintiff has never contended that CMES was on notice of any racial content of Helms' remarks prior to September 2002.  The testimony referred to in the Court's Memorandum is at most ambiguous, and contradicts other testimony given by Mr. Bernard.  Furthermore, CMES management immediately took prompt remedial action when it learned of the racial content of Helms' comments.  For these reasons, and for those stated in Defendant's previously filed Memoranda of Points and Authorities, Defendant's Motion for Summary Judgment should be granted.

---

[4] That Helms' criticisms of him rankled is clear from other testimony.  Earlier he testified that "[h]e always criticized behind my back and it would come back to me." (Bernard p. 31.)

Dated: Washington, D.C.  
       March 5, 2004

Respectfully submitted,

BEINS, AXELROD, KRAFT, GLEASON & GIBSON, P.C.

By: _____  
   Barbara Kraft, Esq.  
   1717 Massachusetts Avenue, N.W., Suite 704  
   Washington, D.C. 20036-2001  
   Telephone: (202) 328-7222  
   Fax: (202) 328-7030  
   Attorneys for Defendant  
   CALHOON MEBA ENGINEERING SCHOOL

VEDDER, PRICE, KAUFMAN & KAMMHOLZ, P.C.

By: _____  
   Neal I. Korval, Esq.  
   Jonathan A. Wexler, Esq.  
   805 Third Avenue  
   New York, New York 10022  
   Telephone: (212) 407-7700  
   Facsimile: (212) 407-7799  
   Attorneys for Defendant  
   CALHOON MEBA ENGINEERING SCHOOL

9