**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MARYLAND**

EDWARD G. BERNARD, JR.   :
           :
  Plaintiff,     :  Civil Action No.:  03 CV 531
           :
v.           :
           :
CALHOON MEBA ENGINEERING SCHOOL :
           :
  Defendant.    :
           :

**TRANSCRIPT PAGES REFERENCED IN PLAINTIFF'S SUPPLEMENTAL**
**MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

Jean D. Meta, Esquire
Bar No.:  15569
Law Office of Jean D. Meta
133 Defense Highway, Suite 111
Annapolis, Maryland 21401
Telephone:  (410) 224-0755
Facsimile:  (410) 224-7079

Attorney for Plaintiff

Dated:  March 5, 2004

# TRANSCRIPT OF PROCEEDINGS

1        In the United States District Court

2          The District of Maryland

3  -----------------------------------x

4  Edward G. Bernard, Jr.        :

5       Plaintiff,        : NO. SMF-03-CV-443

6          v.         :

7                   :

8  Calhoon MEBA Engineering     :

9   School                 :

10       Defendant        :

11  -----------------------------------x

12         **Wednesday, August 27, 2003**

13  DEPOSITION OF:

14           **Dawn Trumps,**

15  a witness, called by counsel pursuant to notice,

16  commencing at 10:00 a.m., which was taken at 1007

17  Eastern Avenue, Baltimore, Maryland.

18

This transcript has been completely indexed for your convenience. It will help you locate the testimony you want FAST. The index is located in the back pages of this volume.

19

20

21



**Overnite**

Court Reporting Service

Serving Washington, D.C. metro area        (301) 593-0671

1    we begin?

2    A. No.

3    Q. Please state your full name and address.

4    A. Dawn Marie Trumps. 2422 Parliament Drive,

5    Abington, Maryland 21009.

6    Q. Who is your current employer?

7    A. MEBA Benefit Plans.

8    Q. Where are they located?

9    A. 1007 Eastern Avenue; Baltimore, Maryland

10    21202.

11    Q. Can you tell me what the relationship is

12    between MEBA Benefit Plans and Calhoun MEBA School

13    of Engineering?

14    A. The engineering school is actually what we

15    consider the MEBA training plan. It is a benefit

16    that falls under the umbrella of MEBA Benefit Plans.

17    They just have a different location, different

18    facility. We are physically located in Baltimore.

19    They are in Easton. They are managed under the

20    umbrella of MEBA Benefit Plans. We administer

21    benefits for the MEBA union.

1    taken some undergraduate classes. I have completed

2    a graduate program at Johns Hopkins University,

3    masters in applied behavioral sciences,

4    organizational development, and human resources

5    development.

6      Q. Do you have to take any type of updated

7    training?

8      A. No.

9      Q. Any type of certificate or degree attached

0    to human resources management?

.1      A. I don't hold any type of certificate.

.2      Q. Do you have occasions to travel to the

.3    Calhoun MEBA School in Easton?

.4      A. Yes.

.5      Q. How often?

.6      A. Once a month or more often as needed.

.7      Q. What's the reason for travelling to the

.8    school?

.9      A. I provide HR support to their staff of

20    approximately 60 employees.

21      Q. Are you responsible for overseeing the

Page 10

1    Q. You said that you go to the school about

2    once a month?

3    A. Currently.

4    Q. How often other times?  It changes?

5    A. In 2002 I was going probably once a week.

6    Q. Why was that?

7    A. I was new to the organization.  The

8    introduction of our employee handbook, and policies

9    were new.  It just took a little more support from

10   me, as well as they had a new director.  It was a

11   lot of change going on at one time.  I was available

12   more frequently for that.

13   Q. Can you describe to me the hierarchy at

14   the school, beginning with the director and working

15   down?

16   A. There is a school director who reports to

17   the administrator of MEBA Benefit Plans and the

18   board of trustees.  Underneath her is an assistant

19   director of academics, a facilities manager.  Then

20   underneath that layer would be like a housekeeping

21   supervisor, kitchen services supervisor, and a

Page 36

1    place for filing complaints at the school?

2        A. The procedure is that the employee should

3    report it to myself or the director. I'm sorry.

4    You are saying regular complaints, not

5    specifically --

6        MR. WEXLER: Clarify what kind of

7    complaints.

8        BY MS. META:

9    Q. Any personnel complaints.

10       A. To go to your supervisor first, myself

11   second, and the director third. It states

12   specifically in the complaint policy that if your

13   complaint is about your supervisor, skip step one

14   and come directly to the HR person.

15   Q. Any employee with any type of personnel

16   complaint is directed to go to their supervisor

17   first?

18       A. That's right.

19   Q. Are supervisors given any instruction at

20   the school in how to handle personnel complaints.

21       A. We are conducting some sessions with them.

1  I don't know what predates me.

2      Q. You said you are conducting sessions.

3  Have you just started doing these or --

4      A. We are doing them as issues come up.  I do

5  have formalized training, presentations ready to go

6  on each category, whether it be harassment, FMLA,

7  ADA, whatever.

8      Q. I'm confused as to whether or not these

9  are things you started doing or things you prepared

10  and they are ready to go?

11      A. As issues have arisen, I will deal

12  directly with that supervisor and say, this is what

13  you should do, or this is what we need to do.  There

14  has not been any formalized training.  We have it

15  prepared.  It has not been delivered to the group of

16  supervisors as a whole specifically on how to handle

17  complaints.

18      Q. When do you anticipate presenting that

19  training?

20      A. We have some training scheduled next week,

21  but not on that topic.  Probably in the fall.

Page 38

1  Summer is very tough because they have a lot of

2  things going on here for me that it can't get out

3  there all the time.

4      Q. Will this training be administered to all

5  the supervisors?

6      A. Yes.  We have done supervisory training.

7  Not specifically on the topic you are asking about.

8      Q. If I understand correctly, you said

9  informally as issues arise you do have training of

10  supervisors.  What's the nature of that type of

11  training or instruction?

12      A. I don't understand your question.  Can you

13  restate it.

14      Q. You are saying that you have a formal

15  structure in place that you anticipate presenting in

16  the fall.  But that you also have an informal

17  structure that you have used.  And whenever issues

18  arise.  I'm asking you what that structure is, what

19  type of instruction, discussion do you have with the

20  supervisor regarding them filing a personnel

21  complaint?

OVERNIGHT COURT REPORTIN

1    A. It depends on the nature of the subject

2    matter. What I find to be very frequent is FLMA.

3    Lot of questions about that. So I deal with that o

4    a case by case basis.

5       Specifically, with whatever manager needs

6    to deal with that issue. Most of those matters come

7    through me. That is such a nebulous topic that

8    really one person needs to be making decisions about

9    that.

10      That is kind of hard to -- we can give

11    guidance and training, but that is a difficult topic

12    matter to say; here, you determine whether or not

13    that is FLMA approved.

14    Q. Have you encountered situations where you

15    have to do informal training of race complaints or

16    individuals that present them complaining of racial

17    discrimination?

18    A. No.

19    Q. How does a complaint come to your

20    attention?

21    A. It can come to my attention through the

1    employee, through the supervisor or through the

2    director.

3        Q. Personnel complaints that are made by

4    employees, I'm talking about once a complaint

5    reaches your desk, what steps do you take to

6    investigate?

7        A. Again, we have to be more specific.  If

8    you're talking about complaints of a racial

9    discrimination nature.

10        Q. Yes.

11        A. I would, and have, speak with the

12    director, speak with the manager, speak with the

13    parties involved, or anybody else that the person

14    making the complaint says is a witness.  After an

15    investigation, speak with the director again about

16    what remedial action needs to take place, and carry

17    that out.  And document it.

18        Q. In early September of 2002 you were

19    notified of a complaint of discrimination filed by

20    Mr. Bernard; is that correct?

21        A. That's correct.

1  October 4th.  We believed him, that he was not going

2  to act.  Would we have liked to have gotten it in

3  writing; yes.  Did we get it; no.

4      Q. Now we are on meeting number 2.  We have

5  two more left.  What is the next meeting?

6      A. There is a lot of time span that goes by

7  that I know you're going to want some information.

8  The next time we met with Ed Bernard formally was in

9  the middle of June.

10      Q. What was the November meeting?

11      A. I had a meeting with Will Helms

12  November 7th.

13      Q. Let's go to that meeting on November 7th.

14      A. Joyce and I called Will Helms to follow up

15  on some of the allegations made by Darryl Glenn

16  This was the first opportunity, she had been

17  travelling for a number of weeks.

18      Q. Joyce had been travelling?

19      A. Yes.  This was the first time, she and I

20  were both on campus.  I did not want to have that

21  discussion with Will without her presence.