IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EDWARD G. BERNARD, JR.,       :
     Plaintiff               :
                                 :
         v.                   :   Civil No. AMD 03-0531
                                 :
CALHOON MEBA             :
ENGINEERING SCHOOL,     :
     Defendant           :
                         ..o0o..

MEMORANDUM OPINION

Plaintiff, Edward G. Bernard, Jr., who is African-American, instituted this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, alleging claims for hostile work environment based on race and for retaliation. Defendant, Calhoon MEBA Engineering School ("Calhoon"), is an educational facility located in Talbot County, Maryland, that provides continuing education and license-upgrade training for marine officers. Specifically, Bernard alleges that during his employment at Calhoon, during the period from November 2000 through August 2003, a co-worker, William Helms ("Helms"), subjected him to a hostile work environment by repeatedly making racially offensive remarks and comments to him. Bernard further alleges that Calhoon condoned Helms's behavior and ultimately retaliated against Bernard for complaining about it. Discovery has concluded and now pending is Calhoon's motion for summary judgment. The issues have been fully briefed and no hearing is necessary. For the reasons set forth below, I shall grant the motion for summary judgment.

I.

Pursuant to Fed. R. Civ. P. 56 (c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material for purposes of summary judgment, if, when applied to the substantive law, it affects the outcome of the litigation. *Id*. at 248. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248-49. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Anderson,* 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court,

however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

II.

Viewing the record in the light most favorable to Bernard, the material facts are as follows.

Calhoon hired Bernard to work in its Maintenance Department on November 13, 2000.[1] According to a May 2002 job description prepared by his supervisor, Bernard's position consisted of mechanical work on the Calhoon fleet of trucks and grounds equipment; daily maintenance and cleaning of boats; helping with safe boating classes; signing of boat fleet plans; trimming and fertilizing campus trees, flowers and bushes; and bike repair. Def.'s Mot. for Summ. J., Ex. 5 (Memorandum from Bob Shafer to Joyce Matthews, May 1, 2002).

A.

Bernard contends that he was subjected to an actionable hostile work environment by Calhoon employees and supervisors. Compl. ¶ 25. The following incidents are the subject of Bernard's racial harassment claims that resulted from Helms's behavior.

Just after he was hired, sometime in November 2000, Helms told Bernard, "You know what Ed, you're all right for a black boy." Def.'s Mot. for Summ. J., Ex. 1 at 61 (Bernard

---

[1]Employees in the Maintenance Department are responsible for landscaping, snow removal, and  maintenance and repair of boats and vehicles.

Dep., Aug. 21, 2003) (hereinafter "Bernard Dep."). On another unspecified occasion, Helms said to Bernard, "Bend over, I need me a black boy today." *Id.* at 137. Helms also once approached Bernard and asked him, "How do you get a black man out if a tree? You cut the Rope." *Id.* at 61. Finally, on August 30, 2002, Helms stated (apparently in reference to management), "Ed, I'm going to tell you right now, I think they're all trying to make us their niggers." *Id.* at 67- 68. Helms repeated this last comment to Bernard one other time approximately a month before Bernard resigned in August 2003. *Id.* at 72.

On September 3, 2002, Bernard told his supervisor, Bob Shafer, that he was "tired" of Helm's racial remarks. Shafer reported the alleged harassment to Dawn Trumps, the Human Resources Manager, via voice mail.[2] Trumps (who was not present on site every day) arranged to be at the school the next day to address Bernard's complaint. Bernard told Trumps only about the August 30 comment ("I think they're all trying to make us their niggers."). Bernard acknowledged to Trumps that Shafer had required Helms to apologize and that, at Shafer's insistence, they shook hands, but Bernard said that was an unsatisfactory response. Trumps assured Bernard that Helms's August 30 remark was inappropriate, that Calhoon did not tolerate racial remarks, and she assured Bernard that Helms could not get him fired. She said that she would speak to Helms and take further action if there were future

---

[2]Under Calhoon's anti-harassment policy, Bernard was directed to report any harassment to the Human Resources Manager, Trumps, or the Director of the School, Joyce Matthews. *See infra* pp. 10-11; 15-17. Nevertheless, as described in text, although the school's policy did not impose a duty that he do so, Shafer took prompt remedial action, which included notification to Trumps and Matthews.

incidents. That same day, Trumps met with Helms, who said he would stop making racial comments.  Trumps warned him that further incidents would lead to discipline. The incident was documented in Helms's permanent file.

Two days later, on September 6, 2002, School Director Joyce Matthews ("Matthews") met with the rest of the Maintenance Department and instructed them not to participate in rumors, abusive language, name calling, racial or sexual harassment, or any type of discrimination. Upon his request, Bernard was excused from attending the meeting. Matthews met with Bernard individually and assured him that racially offensive language was not tolerated and that any such behavior should be reported to herself or Trumps.

On October 4, 2002, Trumps met with Bernard and others to find out if there had been any new occurrences of offensive conduct and to address Bernard's complaint that someone told him that the maintenance staff felt he was "prejudiced against white boys because he was isolating himself." Def.'s Mot. for. Summ. J., Ex. 2 at 49-50 (Trumps Deposition, Aug. 27, 2003) (hereinafter "Trumps Dep.").[3] On October 10, 2002, Trumps and Matthews had another meeting with Helms and Bernard relating to an incident during which Helms allegedly told another African-American employee that he "could not count to 18." *Id*. at 53-56.  Bernard reported the incident after hearing about it second hand. Trumps also

---

[3]Apparently, Bernard contends that the school management's "constant drilling" and "questioning" of him to uncover whether Bernard continued to experience racial harassment contributed to the hostile work environment. Bernard Dep. at 138. I reject this contention out-of-hand, however. As matter of law, the school cannot be faulted for its reasonable attempts to ensure that the remedial steps it undertook were minimally effective.

addressed some threatening statements that Bernard had made to her regarding Helms.

No further comments were made to Bernard until the repetition of the August 30 remark in July 2003. Bernard Dep. at 102-104. This last remark was not reported to anyone at Calhoon.

B.

Bernard also alleges a claim for unlawful retaliation. The alleged retaliatory actions consisted of "constant and unrelenting criticism from his supervisors, including verbal and written warnings about his attendance, unjustified deductions from his weekly pay, demotion from the position of maintenance mechanic to grounds crew and threats of termination from employment." Compl. ¶ 22. The following facts relate to Bernard's claim of retaliation.

*Alleged Demotion*

In November 2002, Bernard, without experiencing a change in his job title or salary, was assigned to the Maintenance Department grounds crew to fill a vacancy caused by a co-worker's illness. His new assignment required him to cut grass, trim bushes, and winterize and service tractors. Bernard considered his assignment to these tasks to be a demotion from his previous work as a mechanic. Bernard Dep. at 198. At the same time, because the boats were taken out of the water in October, Bernard's regular boat work was reduced. Bernard also took issue with Calhoon's failure to give him a satisfactory pay raise along with his new responsibilities and the interference with his mechanic work. *Id*. at 26.

*Warnings Regarding Attendance and a Temporary Reduction in Pay*

Under the Calhoon Attendance and Leave Policy in effect in 2002, employees were required to exhaust all vacation and paid time off before unpaid absences were allowed. Once accrued leave was exhausted, all unpaid absences, lateness and early leave were documented and Calhoon would impose progressive discipline. Unscheduled absences were to be reported to the Office Manager within one hour of the start of the employee's shift. In 2002, Bernard received two separate written warnings for unpaid absences, one of which was ultimately rescinded and the other of which Bernard signed.  Bernard received a third warning from his acting manager, Mark D'Arcy, for failing to tell D'Arcy that he would be absent on November 15, 2002.  Bernard did not sign the warning and he claimed that D'Arcy knew he would not be in.

In December 2002, Calhoon deducted a week's pay from Bernard's paycheck. Bernard had been paid for holiday pay that he was not entitled to under the Calhoon attendance policy. However, Bernard appealed to Matthews, stating that he did not understand the policy, and the deduction was promptly reversed and the pay was restored.

In February 2003, Calhoon instituted a new attendance policy that used a point system under which employees received a warning after accumulating four points.  Bernard received two warnings under this policy-- one of which he signed and the other of which he acknowledged was justified. Bernard Dep. at 296.

*Job Performance Appraisals and Conflicts with Supervisors*

John McNally was hired as the new Facilities Manager in February 2003. Bernard had

numerous conflicts with McNally regarding his job performance. On deposition, Bernard stated that he regarded McNally as a racist because: (1) McNally questioned Bernard as to why he had not disposed of a cardboard box as McNally had requested; and (2) McNally forced Bernard to take a safe boating course– a test taken by everyone in the Maintenance Department. Bernard Dep. at 224-225; 238-239.

On April 9, 2003, during a meeting with Bernard and Shafer, McNally told Bernard that he was aware of Bernard's September 2002 complaint and asked if Bernard experienced any discriminatory behavior since that time. Bernard responded that he thought McNally's request that he keep a log of his boat activities, meet with McNally every week, and prepare weekly boat reports was potentially retaliatory but that he was reserving judgment. Bernard also told McNally that there were additional incidents of racial harassment, but he refused to discuss the incidents further or meet with Director Matthews.[4]  McNally assured him that his requests were merely the result of his own inexperience with boats and that Bernard was not the only mechanic who had been questioned. Def.'s Mot. for Summ. J., Ex. 30 (Confidential Personnel Record of April 9 meeting). He told Bernard that he would be asking periodically if there had been any new incidents and would try to make Bernard's work

---

[4]Although McNally reported that Bernard told him that he had experienced discriminatory behavior after his September 3 complaint, Bernard was clear in his deposition testimony that the only racial comment that was made to him after September 3 was the last comment made a month before Bernard resigned his employment at Calhoon. *See* Bernard Dep. at 62.  It appears from the record that the continued harassing conduct to which Bernard refers was the inquiries regarding new occurrences of racial harassment. Bernard Dep. at 136. *But see supra* n.3.

environment easy and comfortable. *Id*. A follow-up meeting took place on April 14, 2003, during which Matthews and McNally told Bernard that the school would not tolerate inappropriate racial behavior. Bernard again refused to discuss any incidents.

Thereafter, on June 10, 2003, McNally asked Bernard to check the fuel level on the Ketch, one of the Calhoon boats. Bernard replied that he did not know how it could be checked because the tube leading to the tank was twisted. McNally proceeded to use a dowel rod to measure the fuel level and the asked him, "What was so hard about that, why couldn't you have done this?" Bernard walked away while McNally was still speaking with him.

The following day, Shafer issued a warning to Bernard for not cleaning up a lifeboat. McNally wrote a memo to Bernard in support of Shafer's warning and stated that a number of incidents led him to conclude that Bernard's performance was substandard. That same day, Bernard gave McNally a handwritten note, characterizing the fuel tank incident as racially motivated and retaliatory. Bernard demanded to meet with Matthews. The following day, Bernard sent a letter to the MEBA Trustees saying that he had filed suit against Calhoon on February 27, 2003 (i.e., this case, which was filed on February 26, 2003), and he asserted that several more suits were going to be filed by other employees because of McNally.

On June 17, 2003, Trumps and Matthews met with Bernard to discuss his letter. Bernard recounted the incident with the boat fuel tank. Trumps and Matthews then met with McNally, who stated that he regarded Bernard's act of walking away during their

conversation as insubordinate. He also told them that Bernard had lost his work log and made errors in inspection reports.

On June 24, 2003, McNally issued a warning for unsatisfactory work and insubordination related to the Ketch incident. Def.'s Mot. for. Summ. J. at 20, Ex. 35 (Employee Warning Notice). Bernard contends that this warning was racially motivated and retaliatory because it was not issued until two weeks after the incident. Bernard Dep. at 278. On June 26, Trumps and Matthews discussed the warning and concluded that Bernard had been insubordinate on June 10. In July, McNally wrote additional memoranda explaining problems with the maintenance and mechanical condition of the Calhoon boats, but he did not subject Bernard to any disciplinary action. Bernard views these criticisms as racially motivated and retaliatory. Bernard Dep. at 294-295.

*　　*　　*　　*　　*

One month later, on August 15, 2003, Bernard resigned from Calhoon to take a higher paying position.

## C.

Among other contentions, Calhoon asserts that, as a matter of law, it exercised reasonable care to prevent and remedy any harassment of which it had or is charged with knowledge. In this connection, the Calhoon employee handbook includes a section entitled "Equal Employment Opportunity and Anti-Harassment Policy" which provides that any employee who believes he or she has been subjected to violative conduct should report that

conduct to the Human Resources Manager or the School Director. Def.'s Mot. for Summ.

J., Ex. 7 (Calhoon Equal Employment and Anti-Harassment Policy). The policy states that

violations can lead to various penalties ranging from a notation in the individual's file to

discharge from employment depending on the circumstances. *Id*. The Human Resources

Manager, Trumps,[5] meets with all newly hired employees to conduct a handbook orientation.

In February 2002, Trumps conducted a training session on harassment in the workplace for

school employees. During his tenure, Bernard attended classes related to Calhoon's

employee handbook. Additionally, at some point, McNally, the Facilities Manager,

distributed a document that listed the use of cultural or racial slurs, disrespectful comments,

putdowns, and harassing language/actions as unacceptable conduct.

III.

A.

To survive summary judgement on a claim of a racially hostile work environment,

Bernard must project evidence sufficient if believed to permit a reasonable fact finder to

conclude by a preponderance of the evidence the following elements:

> (1) that the conduct in question was unwelcome; (2) that the harassment was
> based on race; (3) that the harassment was sufficiently pervasive or severe to
> create an abusive working environment; and (4) that some basis exists for
> imputing liability to the employer.

---

[5]Trumps is employed by Marine Engineers Beneficial Association ("MEBA") Benefit
Plans, which provides training at Calhoon for MEBA union members. Calhoon is managed by
the MEBA Benefits Plans, which are governed by a board of trustees consisting of elected union
officials and shipping company owners or representatives.

*Causey v. Balog,* 162 F.3d 795, 801 (4th Cir. 1998). An employer may defeat a plaintiff's case at the summary judgment stage by adducing substantial evidence that undermines the proof of any one or more of the above elements as a matter of law. Alternatively, in a case such as this one, in which the plaintiff does not contend that a tangible employment action resulted from the harassment and where there is no evidence of harassment by a *supervisor*, the employer may rely on the affirmative defense of "reasonable care." *See Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983). That is, "[a] negligence theory is applied . . . . The employer is only directly liable in such a case if the employer fails 'after, actual or constructive notice, to take prompt and adequate action to stop [the harassment].'" *Church v. Maryland*, 180 F.Supp.2d 708, 727-28 (D.Md.)(citations omitted), *aff'd*, 53 Fed.Appx. 673, 2002 WL 31819679 (4th Cir. December 17, 2002).

I have previously observed that, "[g]iven the coarseness of modern discourse, racist speech, however repugnant to people of good will in a culturally diverse society, might only rarely give rise to a cognizable claim of hostile environment employment discrimination." *Collier v. Ram Partners, Inc.*, 159 F. Supp.2d 889, 890 (D. Md. 2001). In this case, I am persuaded that the record supports the first three elements of Bernard's claim. First, it is undisputed that Helms's racially offensive remarks to Bernard were both unwelcome and based on race, thus satisfying the first two elements of the claim.

Calhoon contends that the third element-- pervasiveness/severity-- is not made out

because the record shows only intermittent or trivial racial comments. However, on this record, and the circumstances it presents, a reasonable juror could reasonably find that Bernard's work environment was plagued by such "discriminatory intimidation, ridicule and insult," *see Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986), as to rise to the level of actionable harassment. Although Calhoon characterizes Helms's comments as mere jokes not rising to a level of establishing a hostile or abusive work environment, it is clear, drawing all reasonable inferences in favor of Bernard, that Helms's comments may reasonably be viewed as abusive and significantly harassing in a modern American workplace.

A reasonable juror could find that Helms's "jokes" were more than a mere "handful of unkind remarks, misunderstandings, and accidents." *See Karim v. Staples, Inc.*, 210 F. Supp.2d 737, 752 (D.Md. 2002), *appeal dismissed*, 60 Fed.Appx. 999, 2003 WL 1958712 (4th Cir. April 28, 2003). In particular, his use of "nigger" on August 30, 2002, is the essence of despicable racial animus. *See Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a 'mere offensive utterance', the word 'nigger' is pure anathema to African-Americans."); *Brumback v. Callas Contractors, Inc.*, 913 F. Supp. 929, 939 (D. Md. 1995) ("[R]epeated use of the ancient epithet 'nigger' [can not be held] trivial as a matter of law."); *Rogers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger.'")

-13-

(internal citations omitted); *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D.Ill. 1984) ("[R]acial epithets 'conjure up the entire history of racial discrimination in this country.'")(citation omitted)).[6] Further, Helms's repeated use of the term "black boy," both in describing Bernard and in making "jokes," is no less offensive and is indicative of the same kind of racial animus that is not tolerated in a harassment-free workplace. *See Ross v. Douglas County, Nebraska*, 234 F.3d 391, 396 (8th Cir. 2000) (recognizing that African-American supervisor's use of the term "black boy" in reference to African-American subordinate is racially offensive and probative of hostile environment based on race). Accordingly, the conclusion is inescapable that a reasonable juror could find that Helms's remarks created an actionable hostile environment and that Bernard himself found the environment to be abusive. *See Meritor Savings Bank*, 477 U.S. at 65.[7]

---

[6]Calhoon's attempts to distinguish *Spriggs*, *Rogers*, and *Bailey* on the grounds that those cases all involved supervisory harassment are to no avail. Supervisory harassment is dispositive on the issue of employer liability, not on whether the harassment was sufficiently pervasive or severe. Additionally, Calhoon argues that the harassment in *Spriggs* was more pervasive and severe and consequently the court did not rest its decision on the use of a racial epithet. However, the court's decision in *Spriggs* did not rely solely on the frequency of the harassment; rather, decision rested on the totality of the circumstances, which included the use of racial epithets. *See Spriggs*, 242 F.3d at 184-85. A reasonable juror could reasonably find the totality of the harassment at issue here is no less opprobrious.

[7]Calhoon seems to assert that because other African-Americans in its workplace found it easier to tolerate Helms's racist behavior, and indeed, may have engaged in similar conduct, Bernard is somehow unduly oversensitive about such matters, and that Helms's conduct should therefore be deemed trivial and non-actionable. *See* Def.'s Mem. at (unnumbered p. 12) (Noting that Helms "socialized" with other African-Americans who worked at Calhoon, and that other African-Americans dismissed Bernard's complaints about Helms by observing that, "We all joke around like that."). What this reliance on the general atmosphere of the Calhoon workplace overlooks, however, is that some African-Americans are genuinely offended by such "jokes." *See Collier v. Ram Partners, Inc.,* 159 F. Supp.2d 889, 900 (D.Md. 2001) (" That a generation of (continued...)

-14-

Thus, to avoid summary judgment, Bernard must project evidence sufficient to generate a genuine dispute of material fact as to the fourth element of his claim: that Calhoon was culpably negligent in allowing the hostile environment to exist. As stated above, an employer is liable for a non-supervisory employee's actionable racial harassment of a co-worker only if the employer has actual or constructive knowledge that the harassment is occurring and negligently failed to take prompt and adequate remedial action to stop it. *Collier,* 159 F. Supp.2d at 898. Summary judgment will be denied "if reasonable minds could differ as to whether the [employer's] remedial action was 'reasonably calculated to end the harassment.'" *Katz,* 709 F.2d at 256. As a matter of law, Bernard has not made such a showing.

---

[7](...continued)
African-Americans exists for whom the use of the 'ancient epithet' . . . is genuinely hurtful and damaging is a fact to be celebrated in law, not dismissed as inexplicable or inherently incredible."). While it is undoubtedly true, as Calhoon argues, that Title VII is not a "civility code," *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998), it is equally true that Title VII guarantees to *individuals*, not only to *groups*, the right to work in a harassment-free environment. *Cf. Connecticut v. Teal,* 457 U.S. 440,453-54 (1982) (observing as to Title VII that, "The principal focus of the statute is the protection of the individual employee, rather than the protection of the minority group as a whole. Indeed, the entire statute and its legislative history are replete with references to protection for the individual employee."); *and cf. id.* at 456 ("[e]very *individual* employee is protected against . . . discriminatory treatment") (citation omitted; emphasis in original); *Diaz v. American Telephone & Telegraph,*752 F.2d 1356, 1360 (9th Cir.1985) ("It is, of course, true that Title VII was designed to deter and remedy discrimination on the basis of group characteristics and to remove barriers that favor certain groups over others . . . . But, at the same time, Title VII's focus on the rights of individual members of protected classes is 'unambiguous.'")(citations and footnote omitted). *See Ross v. Douglas County, Nebraska*, 234 F.3d 391, 396 (8th Cir. 2000) (recognizing that *African-American supervisor*'s use of the term "black boy" in reference to African-American subordinate is racially offensive and probative of hostile environment based on race). Employers and the lawyers who represent them in employment discrimination litigation would be wise to keep this long-settled principle in mind.

At the outset, I am constrained to address a stark deficiency in Calhoon's anti-harassment policy. An employer is charged with acting reasonably to prevent and correct harassment in the work place and any anti-harassment policy must be both reasonably designed and reasonably effectual. *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). In my view, there exists a genuine dispute of material fact as to whether the Calhoon policy meets the "reasonable design" requirement. Under the policy, any individual who believes himself or herself to have been subjected to violative harassing conduct is directed to report the offensive conduct to one of only *two* people at the school: the Human Resources Manager or the Director of the School. Def.'s Mot. for Summ. J., Ex. 7 (Equal Employment Opportunity and Anti-Harassment Policy). Notably, it is insufficient under the Calhoon policy for an employee, including a lower-wage, hourly employee, to go directly to his or her supervisor if harassed by a co-worker. Instead, an employee is directed to go to either the Human Resource Manager, who is neither located on site at the school, nor a Calhoon employee, or to the Director of the School. Indeed, Calhoon notes that Shafer, Bernard's immediate supervisor, was not the proper person with whom a complaint should have been lodged. Def.'s Mot. Summ. J. at 29.

In defense of the design of its policy, Calhoon argues that under *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266-67 (4th Cir. 2001), a complaint policy is reasonable as a matter of law as long as the policy allows alleged victims to bypass a harassing supervisor. Def.'s Suppl. Mem. at 3. However, in *Barrett* the anti-harassment policy allowed

employees to contact *any* supervisor or member of the management team. *Barrett*, 240 F.3d at 265. Thus, while on the facts of *Barrett* it was important to allow the victim to circumvent the supervisor who was the source of the harassment, that feature alone is not necessarily enough to create a reasonable policy.

Thus, notwithstanding Calhoon's vigorous defense of its policy, I am not prepared to find it reasonable as a matter of law. A policy that provides severely limited avenues for employee complaints, particularly for low-wage employees who may never come in contact with the upper echelon of a company's management (or who may be intimidated from, or simply too shy or withdrawing to initiate, such contact), reasonably could be viewed by a juror as unreasonable. *See Carson v. Giant Food, Inc.*, 187 F. Supp.2d 462, 479-80 (D. Md. 2002) (finding that where an employee reported racial harassment to supervisors and managers under an anti-harassment policy that directed employees to report harassment to the Fair Employment Office, the employer was on notice of harassment). Such a juror might legitimately wonder why an employer distrusts its supervisors such that it is not willing to impose a duty upon them further to report and/or respond to complaints of discriminatory conduct by co-workers.

Nonetheless, summary judgement is warranted on this record because Calhoon promptly responded to Bernard's complaints of racial harassment without regard to the *procedures provided for* in its deficient policy. Shafer, although not the proper person to receive complaints of racial harassment under the Calhoon policy, contacted Trumps and

Matthews on the same day that Bernard complained about Helms's racist remarks.[8] In addition, immediately upon learning of Helms's harassing behavior, Shafer summoned Helms, who at Shafer's insistence "apologized" to Bernard. The following day, Trumps met with Bernard and Helms.

In addition to the evident promptness of Calhoon's response, as a matter of law, Calhoon's  response to the report of harassment was adequate to remedy the harm done. After Helms promised that the racist remarks would cease, Trumps documented the incident in his permanent file and told him that further incidents would lead to discipline. Two days later, Matthews met with the entire Maintenance Department to remind them of the anti-harassment policy. Bernard argues that this response was inadequate although he acknowledges that he did not think Helms should have been fired for his comments. Pl.'s Opp'n to Mot. for Summ. J. at 8; Bernard Dep. at 136-137. Notwithstanding Bernard's argument, it is clear that by directly reprimanding Helms and reminding the entire Maintenance Department about the anti-harassment policy, Calhoon adequately responded to the harassment. *See Swentek v. USAir, Inc.*, 830 F.2d 552, 558 (4th Cir. 1987) (holding that a written warning coupled with threat of suspension was adequate response to sexual

---

[8]Bernard's deposition testimony suggests that he complained about Helms's behavior prior to September 3, 2002. Specifically, he stated, "I complained all the time. I told [Shafer] I didn't appreciate how [Helms] was talking behind my back . . ." Bernard Dep. at 72.  Further, in response to a question as to when he first complained to Shafer about Helm's racist remarks, Bernard stated, "I been [sic] telling [Shafer] that every [sic] since I started working there I didn't appreciate how Will was cracking a whole bunch of jokes and stuff like that.  I told him plenty of times." *Id.* at 72. However, nowhere in the record  does Bernard establish that he complained of racial harassment to any school official or supervisor prior to September 3, 2002. Accordingly, as a matter of law, Calhoon was not on notice of any actionable harassment prior to that date.

harassment); *Spicer v. Commonwealth of Virginia, Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995)(en banc)(holding that training sessions coupled with admonishment to employees making inappropriate sexual remarks was adequate response to sexual harassment).

Furthermore, Trumps and Matthews repeatedly asked Bernard whether he had experienced any new harassment and were not informed of any specific occurrences. Although Bernard found these efforts annoying, Trumps and Matthews acted appropriately in pursuing such follow-up inquiries. As the Fourth Circuit has stated:

> When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in cessation of the complained conduct, liability must cease as well. Employers cannot be saddled with the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct or the remedial measures taken in response to such conduct.

*Spicer,* 66 F.3d at 711. The record reveals that after the incident in September 2002, Helms made no further racially harassing remarks to Bernard until July 2003, one month before he resigned his employment at Calhoon.  Bernard admits that he did not report the last comment to anyone at Calhoon and therefore, the school cannot be held liable for failing to address it. *See id*.

Ultimately, Bernard fails to project sufficient evidence in support of his claim for a racially hostile work environment. Although he has marshaled sufficient evidence to permit a reasonable juror to find that the harassment was unwelcome, was based on his race, and

was sufficiently severe and pervasive such that the conditions of his employment were altered and an abusive atmosphere was created, he has failed to generate a dispute of material fact as to whether there is some basis for imposing liability on his former employer, Calhoon. Notwithstanding Calhoon's deficient anti-harassment policy, Calhoon promptly and adequately responded to Bernard's complaints of racial harassment and no further incidents of racial harassment were reported. Accordingly, summary judgment shall be granted as to the harassment claim.

### B.

Similarly, Bernard's retaliation claim fails as a matter of law because Bernard has not projected sufficient evidence to satisfy the requirements of a prima facie case. Significantly, Bernard's opposition to the pending motion for summary judgment makes no mention of his retaliation claim or Calhoon's arguments against it. Nonetheless, I have considered the claim, viewing the facts in the light most favorable to the nonmovant.

To establish a prima facie case of retaliation under Title VII, a plaintiff must prove that "(1) she engaged in a protective activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Guten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing *Bell v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). Once the plaintiff establishes the prima facie case, the defendant has the burden of producing evidence of a legitimate nondiscriminatory reason for the adverse action. *Munday v. Waste Mgt. of N. America, Inc.*,

126 F.3d 239, 242 (4th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the defendant does so, then the plaintiff bears the burden of proving retaliation by demonstrating that the employer's reason is pretextual and the real reason for the adverse employment action was retaliation. *Id.* (citing *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994)); *Obi v. Anne Arundel County*, 142 F. Supp.2d 655 (D. Md. 2001), *aff'd*, 28 Fed.Appx. 383, 2002 WL 246327 (4th Cir. February 21, 2002); *and see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (explaining pretext standard).

Bernard has failed to show that Calhoon took any cognizable adverse employment action against him. In his complaint, Bernard states that Calhoon retaliated against him by (1) deducting monies from his pay; (2) demoting him; (3) threatening to terminate his employment and (4) other acts. Compl. ¶ 28. However, the record reveals that none of these incidents affected the "terms, conditions or benefits" of Bernard's employment. *See Van Guten*, 242 F.3d at 865.

First, Bernard's pay was deducted after it was determined that he was mistakenly paid for time off. Regardless of whether the deduction was warranted, the pay was restored within a week. Second, Bernard was not demoted when he was temporarily assigned to the ground crew. His salary was not reduced, he experienced no change in his job title and the duties were within the scope of his official job description. Third, there is no evidence in the record to suggest that anyone at Calhoon ever threatened to fire Bernard. It is true that he was given

a series of warnings regarding his attendance, insubordination and poor performance. However, none of these verbal acts amount to an adverse employment decision because none altered the terms, conditions or benefits of employment. *See id.* (citing *Munday*, 126 F.3d at 242).

Moreover, even if it were possible to conclude that Bernard experienced one or more adverse employment actions, Calhoon has articulated unrebutted legitimate nonretaliatory reasons for its decisions. Bernard was placed on the grounds crew because of an unforeseen vacancy in the department; the warnings resulted from either Bernard's unexcused absence or his failure to satisfactorily perform his job in specific instances. Accordingly, Calhoon is entitled to summary judgment as to the retaliation claim.

IV.

For the reasons stated above, the motion for summary judgment shall be granted. An order follows.


Filed:  March 29, 2004                                /s/
                                         ANDRE M. DAVIS
                                         UNITED STATES DISTRICT JUDGE